# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GB-SP HOLDINGS, LLC, on behalf of itself and derivatively on behalf of BRIDGESTREET WORLDWIDE, INC., and DONAL KINSELLA,

Plaintiffs,

v.

WAYNE R. WALKER, DAVID ORLOFSKY, KEITH R. ALBRIGHT, SEAN WORKER, LEE CURTIS, EUGENE I. DAVIS, ANTHONY J. LACIVITA, MATT DOHENY, BRAD SCHER, VERSA CAPITAL MANAGEMENT, LLC, DOMUS BWW FUNDING, LLC, and BRIDGESTREET WORLDWIDE, INC.,

Defendants,

and

BRIDGESTREET WORLDWIDE, INC.,

Nominal Defendant.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

C.A. No. 9413-VCF

## MEMORANDUM OPINION

Date Submitted: January 24, 2024
Date Decided: November 15, 2024

Paul D. Brown, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Robert O'Hare, Jr. Michael Zarocostas, Andrew C. Levitt, O'HARE PARNAGIAN LLP, New York, New York; *Attorneys for Plaintiffs GB-SP Holdings, LLC and Donal Kinsella*.

Rebeca L. Butcher, Jennifer L. Cree, LANDIS RATH & COBB LLP, Wilmington, Delaware; Neil A. Steiner, DECHERT LLP, New York, New York; *Attorneys for Defendants Versa Capital Management, LLC and Domus BWW Funding, LLC*.

Sean J. Bellew, BELLEW, LLC, Wilmington, Delaware; *Attorney for Wayne R. Walker, David Orlofsky, Keith R. Albright, Sean Worker, Lee Curtis, Eugene I. Davis, Anthony J. LaCivita, Matthew Doheny, Bradley E. Scher, and BridgeStreet Worldwide, Inc.*

**FIORAVANTI, Vice Chancellor**

In the early 2010s, BridgeStreet WorldWide, Inc. ("BSW" or the "Company") was deep in debt to its lender syndicate. The Company initiated an ultimately unsuccessful sale process, but one of the bidders for the Company had another idea: to purchase the Company's senior secured debt from its existing creditors, with the ultimate goal of acquiring the entire Company. After BSW defaulted on its debt obligations, it entered into a forbearance agreement with its new creditor. During negotiations of the forbearance agreement, the Company's board refused to honor the contractual rights of its largest stockholder under a shareholders agreement to have its designee elected to the Company's board of directors. The Company and the board also refused to provide requested information to the stockholder, again in violation of the shareholders agreement.

As part of the forbearance agreement, the creditor agreed to indemnify the directors for claims asserted by the Company's largest stockholder. Senior management, which included two directors, secured continued employment and bonuses from the creditor. In addition, the four ostensibly "independent" directors agreed not to stand for re-election—effectively resigning as part of the transaction.

A few weeks later, five new directors were elected to join the board. Four of the new directors required the approval of the creditor; the fifth new director was the designee of the Company's largest stockholder that had been demanding that he be seated on the board. The next month, the Company violated the financial covenants

in the forbearance agreement. Following months of negotiations and in consultation with its advisers, the board approved a consensual foreclosure with the creditor. In the foreclosure, the Company transferred all of the equity of its operating subsidiaries to the creditor in exchange for cancellation of approximately $38 million of the remaining $46 million owed to the creditor.

In this action, the Company's largest stockholder and its director designee assert a variety of claims. They allege, as headline claims, that the Company and certain directors breached the shareholders agreement and that the Company's directors breached their fiduciary duties in approving the forbearance agreement and the consensual foreclosure. The plaintiffs further allege that the creditor aided and abetted the directors' breach of fiduciary duty. The creditor has asserted a counterclaim against the stockholder plaintiff, alleging that the stockholder breached a pledge agreement by filing and maintaining this action.

In this post-trial opinion, the court concludes that the Company and certain directors breached the shareholders agreement, and the stockholder plaintiff is entitled to nominal damages for proving those breaches. The court also concludes that the directors who approved the forbearance agreement breached their fiduciary duty of loyalty, and that the creditor aided and abetted that breach. As a remedy for the breach of fiduciary duty, the directors who approved the forbearance agreement must disgorge and return to the Company all amounts paid to them or their counsel

as indemnification from the creditor and management bonuses approved in connection with the transaction. And, as a remedy for the creditor's aiding and abetting that breach, its debt is equitably subordinated as to any amounts collected or received by or on behalf of the Company from the directors as a result of that disgorgement.

Finally, the court concludes that the consensual foreclosure was not the product of a fiduciary breach, and that the stockholder plaintiff did not breach the pledge agreement by filing this action.

## I. BACKGROUND

These are the facts as the court finds them after trial.[1]

This case involves two groups of director defendants. Between December 24, 2012 and October 11, 2013, BSW's board of directors comprised Lee Curtis, Eugene I. Davis, Matthew Doheny, Anthony J. LaCivita, Bradley E. Scher, and Sean Worker (the "Pre-Forbearance Board" or the "Pre-Forbearance Directors").[2] After October

---

[1] Other factual findings are contained in the analysis of the claims. The record consists of 253 joint trial exhibits, trial testimony from five fact witnesses and one expert, deposition testimony from seven fact witnesses, and 68 stipulations of fact in the pretrial order. Trial exhibits are cited as "JX"; stipulated facts in the pre-trial order are cited as "PTO"; and references to the docket are cited as "Dkt.," with each followed by the relevant section, page, paragraph, exhibit, or docket number. Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text.

[2] PTO ¶¶ 8–13.

11, 2013, the BSW board comprised Curtis, Worker, Keith R. Albright,[3] Donal Kinsella, David Orlofsky, and Wayne R. Walker (the "Post-Forbearance Board" or the "Post-Forbearance Directors," and together with the Pre-Forbearance Directors, the "Director Defendants").[4] Worker, BSW's CEO, and Curtis, BSW's President, served on the BSW board at all relevant times.[5]

## A. The Company's Business

BSW was a Delaware corporation that serviced apartments and corporate housing in thousands of locations around the world through its various operating

---

[3] On June 22, 2023, counsel for the Director Defendants filed a suggestion of death advising the court that Albright had died during the pendency of this litigation. Dkt. 266. Court of Chancery Rule 25(a)(1) provides that, if a party dies during the pendency of litigation, a motion for substitution must be filed within 90 days after a suggestion of death is filed on record. If a motion for substitution is not filed within 90 days, "the action by or against the decedent must be dismissed." Ct. Ch. R. 25(a)(1). After counsel filed a suggestion of death, no motion for substitution was filed. Accordingly, the claims against Albright are dismissed with prejudice. *Wilson v. Joma, Inc.*, 1989 WL 68304, at *1 (Del. May 19, 1989); *Smith v. Pritzker*, 1981 WL 88243, at *1 (Del. Ch. Oct. 20, 1981).

[4] PTO ¶¶ 8–9, 14–16, 47. Paul Seitz was also elected to the board on October 11, 2013, but resigned shortly thereafter for reasons not explained in the record. *Id.* ¶¶ 47–48. Seitz is not a defendant in this action.

[5] *Id.* ¶¶ 8–9.

4

subsidiaries.[6]  BSW did not own any real estate.[7]  Rather, BSW held an inventory mix of short, medium, and long-term leased units.[8]

In 2007, BSW, then known as Amkadian Holdings, Inc., entered into a $30 million credit agreement with a lender syndicate led by Credit Suisse, Cayman Islands Branch ("Credit Suisse").[9]  Credit Suisse and the lenders obtained a first-priority lien on substantially all of BSW's assets, including the capital stock of BSW's subsidiaries, with the exclusion of certain foreign subsidiaries.[10]  In connection with the credit agreement, Credit Suisse and certain BSW stockholders entered into a pledge agreement (the "Pledge Agreement"), pledging the stockholders' shares as collateral for the loan.[11]  The Pledge Agreement appointed Credit Suisse as attorney-in-fact for the pledgors and gave Credit Suisse the right

---

[6] *Id.* ¶ 3.  BSW filed its certificate of dissolution on March 4, 2014.  The court may take judicial notice of filings with the Delaware Secretary of State.  *See Swift v. Hous. Wire & Cable Co.*, 2021 WL 5763903, at *2 n.14 (Del. Ch. Dec. 3, 2021); D.R.E. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *id.* at 201(c)–(d) ("The court . . . may take judicial notice on its own . . . at any stage of the proceeding.").

[7] Tr. 441:1 (Halpern).

[8] JX 11 at 7; Tr. 441:2–10 (Halpern).

[9] JX 4.

[10] *Id.* §§ 4.1(j), 6.8, 6.12(b).

[11] JX 6 § 2.1; *but see* JX 38 at 6 ("CS does not have a pledge of 100% of the equity interests of the Borrower as a result of the issuance of equity pursuant to the Shareholders Agreement to certain officers and directors which were not pledged in favor of the lenders.").

upon an event of default under the credit agreement "to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral" and "to settle, compromise, compound, adjust or defend any claims, actions, suits or proceedings relating to all or any of the Collateral."[12]

## B. BSW's Debt Restructuring

In January 2011, BSW restructured its $30 million credit facility and entered into an amended and restated credit agreement with Credit Suisse (the "Credit Agreement").[13] In connection with the restructuring, GB-SP Holdings, LLC ("GB-SP") acquired 1,470 shares of BSW's Class A common stock, which represented more than 60% of BSW's outstanding common stock.[14] At that time, GB-SP executed a joinder agreement (the "Joinder Agreement") and became a party to the Pledge Agreement, which caused GB-SP to pledge its shares of BSW common

---

[12] JX 6 §§ 6.1(a)(i)(C)–(D). The appointment is coupled with an interest and is irrevocable. *Id.* § 6.2. Collateral is defined as "the property of the Pledgors described in Section 2.1 in which Security Interests are granted to the Agent for the benefit of the Secured Parties." *Id.* § 1.3.

[13] JX 8; PTO ¶ 5.

[14] JX 1 at 1; PTO ¶ 6.

stock as collateral.[15]  GB-SP also executed an irrevocable proxy (the "Proxy"), which appointed the Company's board of directors

> as [GB-SP's] proxy to vote all the Shares . . . now owned or hereafter acquired, and to exercise all powers which [GB-SP] would be entitled to exercise if personally present, on all matters upon which [GB-SP] may be entitled to vote or act at any annual or special meeting of shareholders of the Company . . . and to sign any written consent of shareholders on [GB-SP's] behalf to vote or otherwise act on [GB-SP's] behalf with respect to all of the Shares in lieu of any annual or special meeting of shareholders.[16]

BSW and its then-stockholders, including GB-SP, entered into a shareholders agreement (the "Shareholders Agreement") as part of the restructuring.[17]  The Shareholders Agreement dictated stockholder information rights, stockholder voting rights, and board composition.  Section 2.2 required the Company to "furnish to each Shareholder . . . such information relating to the financial condition, business, prospects or corporate affairs of the Company as that such Shareholder . . . may from

---

[15] PTO ¶ 5; JX 9.  Under the Joinder Agreement, GB-SP agreed that it "pledges, assigns, transfers and grants to [Credit Suisse] . . . a continuing security interest in and Lien on all of its right, title and interest in, to and under the Collateral[.]"  JX 9 at 1.  GB-SP also agreed that it would "assume[] all obligations and liabilities of a Pledgor under the Pledge [] Agreement."  *Id.*

[16] JX 7.  The Proxy was given "in consideration of the restructuring of the Company and the agreement of the Senior Lenders . . . to renew their outstanding credit facilities."  *Id.* Further, GB-SP expressly agreed that the Proxy "shall be irrevocable and is coupled with an interest and shall remain in place until payment in full of all obligations" BSW had under any senior credit agreement.  *Id.*

[17] JX 1.  No party has raised a challenge to the validity of any provision of the Shareholders Agreement.

time to time reasonably request."[18] Section 3.3(a) established a board consisting "of not more than seven (7) members."[19] The seven directors consisted of one director designated by GB-SP (the "GB-SP Director"), the CEO and President (the "Management Directors"), and four independent directors designated collectively by the GB-SP director and the Management Directors, subject to approval by the senior lenders under the Credit Agreement.[20] Each BSW stockholder was required to "vote all of its Voting Stock and take all other necessary or desirable actions within its control (whether in the capacity of stockholder, director, member of the executive committee or officer of the Company or otherwise)" to implement that structure.[21] Section 3.3(c) delineated certain qualifications that individuals must meet to serve as directors.[22]

The Shareholders Agreement was amended on September 20, 2011.[23] Curtis, Doheny, LaCivita, Scher, and Worker each executed the amendment as a

---

[18] *Id.* § 2.2.

[19] *Id.* § 3.3(a)(i).

[20] *Id.* §§ 3.3(a)(ii)(A)–(C).

[21] *Id.* § 3.3(a). Section 3.6(d) granted the GB-SP Director and the Management Directors the right to select and appoint one independent director to serve as chairman of the board, subject to the lenders' approval. *Id.* § 3.6(d).

[22] *Id.* § 3.3(c).

[23] JX 10.

"shareholder and director."[24] The amendment revised the director qualifications in Section 3.3(c), but otherwise maintained the terms and provisions of the original agreement.[25]

### C. BSW's Financial Distress and Quest for Strategic Alternatives

Shortly after the January 2011 restructuring, BSW began looking for a strategic purchaser.[26] BSW retained Houlihan Lokey ("Houlihan") in November 2011 to market the Company to potential buyers.[27] Before embarking on a broad sale process, Houlihan approached Oakwood Worldwide ("Oakwood"), BSW's most logical strategic acquirer.[28] In January 2012, Oakwood submitted a non-binding letter of intent ("LOI") to purchase BSW for $25 million in cash.[29] The Pre-Forbearance Board rejected the offer as insufficient to pre-empt a broader marketing process and instructed Houlihan to seek other buyers.[30] Houlihan contacted 75 financial sponsors and 17 strategic buyers.[31] Thirty-one financial sponsors signed non-disclosure agreements (an "NDA") and received a confidential

---

[24] *Id.* at 3–8. Curtis executed the amendment on behalf of GB-SP pursuant to the Proxy. *Id.* at 3.

[25] *Id.* at 1–2.

[26] Tr. 784:2–18 (Worker).

[27] PTO ¶ 19; JX 72 at 2.

[28] JX 72 at 2.

[29] *Id.*

[30] *Id.*

[31] *Id.*

information memorandum ("CIM").  Two private equity firms—Versa Capital Management LLC ("Versa") and H.I.G. Capital ("HIG")—each submitted a non-binding LOI.[32]  Of the 17 strategic buyers, six signed an NDA and received a CIM.[33]  Oakwood was the only potential strategic buyer to submit a non-binding LOI.[34]

HIG made the highest offer, bidding $42 million in cash and $5 million in a note payable with a six-year maturity.[35]  Following due diligence, HIG rescinded its offer, noting that its financial diligence had revealed a less attractive value proposition than initially believed.[36]  The Pre-Forbearance Board then directed Houlihan to re-engage with both Oakwood and Versa.[37]  Oakwood, which had just acquired Marriott ExecuStay, was not interested in pursuing another acquisition at that time.[38]  Versa, on the other hand, resubmitted a non-binding LOI for $35 million, after which the parties entered into an exclusivity agreement in July 2012.[39]  After a thorough diligence process, Versa submitted a revised offer in October 2012 to

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* at 3.

[36] *Id.* at 7.

[37] *Id.*

[38] *Id.*

[39] *Id.*

acquire BSW and its operating subsidiaries for $30 million free of debt.[40]  In December 2012, Versa revised its offer to $30.5 million, and the parties entered into another non-binding LOI.[41]  Thereafter, the parties were unable to agree on a purchase price or deal structure, and Versa walked away from an outright purchase of the Company.[42]  On December 31, 2012, BSW failed to make its interest and principal payments under the Credit Agreement.[43]

### D. Kinsella Acquires GB-SP

In July 2012, a company owned by Kinsella, IEOT Holdings LLC ("IEOT"), acquired GB-SP in satisfaction of a €1,262,356 judgment against GB-SP's former owner, Sorrento Asset Management ("Sorrento").[44]  Kinsella had invested $1.8 million in Sorrento.[45]  After Sorrento mishandled Kinsella's investment, Kinsella filed suit against Sorrento's promotors—Darina Heavy, Ken Hely, John Ryan, and Bryan Turley—in Dublin High Court and prevailed in that litigation.[46]  To satisfy

---

[40] *Id.*; JX 19 at 1.

[41] JX 22.

[42] PTO ¶ 21; JX 72 at 7.

[43] JX 28 at 3; JX 66 §§ 2.1(a)–(b).

[44] Tr. 12:20–13:20, 15:15–21 (Kinsella); JX 30 at 3–19.

[45] Tr. 12:22–13:3 (Kinsella).

[46] *Id.* at 13:7–8 (Kinsella); JX 30.

the judgment, Sorrento's promoters transferred their ownership interests in GB-SP to IEOT.[47]

In a December 24, 2012 letter to BSW, IEOT advised that IEOT "now owns all of the issued and outstanding common stock in BSW previously owned by GB-SP" and "hereby appoints [Donal Kinsella] to serve as the [GB-SP] Director" under Section 3.3 of the Shareholders Agreement.[48] IEOT's letter included a letter of resignation by GB-SP's current director designee, Bryan Turley.[49] IEOT's letter also demanded information pursuant to Section 2 of the Shareholders Agreement.[50]

On December 28, 2012, Worker exchanged emails with Kerry Berchem, an attorney at the Company's outside counsel, Akin Gump Strauss Hauer & Feld, LLP ("Akin Gump") regarding IEOT's demand. The exchange stated the following:

WORKER: What are the next steps with this group?

BERCHEM: I am reading this weekend. Not sure we can do anything.

WORKER: Really? They are demanding information and calling this their right? How can they transfer stock that is pledged to Goodbody?

BERCHEM: Arguably could transfer it w the lien. I really haven't had time to focus on this. But can take a look at our s/h agreement and the llc agmt this weekend. That said the letter doesn't explain how they got the stock and I think we could push back asking for evidence of the

---

[47] Tr. 13:13–20 (Kinsella); JX 30. Kinsella testified that the only asset the promoters had was their equity interests in GB-SP. Tr. 74:12–75:1 (Kinsella).

[48] JX 23 at 4.

[49] *Id.* at 9.

[50] *Id.*

transfer.  We could write a letter that there is no evidence of the transfer and until such cannot effectuate the appointment of Donal Kinsella.  Do you know this person?

BERCHEM:  We could also take the position that since GBSP holdings did not comply w the ROFR in the s/h agmt the transfer is null and void.  A little aggressive but colorable position.

WORKER:  I like it, GREAT color[.][51]

Worker also replied, "Makes sense to attack this.  I do not know Mr. Kinsella[.]"[52]

IEOT soon dispelled the notion that GB-SP had transferred its BSW stock in violation of the right of first refusal in the Shareholders Agreement.  In a January 4, 2013 letter to BSW, IEOT explained that it had acquired GB-SP itself, and that GB-SP still owned the BSW shares.[53]  With that clarification, GB-SP renewed its demand to have Kinsella seated on the BSW board and for BSW documents.[54]

On January 14, 2013, Akin Gump requested documentation from Kinsella's counsel of IEOT's ownership of GB-SP and Kinsella's qualification as a director under Section 3.3(c) of the Shareholders Agreement.[55]  On February 5, 2013,

---

[51] JX 218.

[52] JX 217.

[53] JX 25 at 1.

[54] *Id.* at 2.  BSW claimed that there was confusion as to whether GB-SP had the right to appoint a director to the board.  BSW also claimed that there were questions regarding Kinsella's suitability to serve.  Tr. 384:4–7, 384:15–24, 388:4–389:20 (Worker).

[55] JX 26 at 2.

GB-SP's counsel responded to BSW with the requested documentation.[56] GB-SP's counsel also reiterated its demand to seat Kinsella as the GB-SP Director and to supply information pursuant to the Shareholders Agreement and requested a meeting between Kinsella and a BSW officer or director.[57]

BSW was reluctant to seat Kinsella as the GB-SP Director. BSW was concerned that if it recognized the transaction between GB-SP and IEOT, BSW would not be able to use its net operating losses ("NOLs") to offset its income under the Internal Revenue Code, and BSW would be required to begin paying income taxes.[58] BSW's general counsel, J.R. Dembiec, noted that a "[p]reliminary analysis by [BSW's] accountants indicates that this transaction, if approved, between GB-SP and IEOT may negatively impact, if not eliminate, our ability to use existing NOLs

---

[56] JX 30.

[57] *Id.* at 2.

[58] JX 219 at 1; JX 215 at 1. On February 28, 2013, Worker emailed Davis, Doheny, LaCivita, and Scher with a board agenda that included IOET's "request and related issues (nols, director request)" and a "[h]eavy letter/response" to follow separately. JX 34 at 2. Worker lacked credibility when he testified at trial that he had "no idea what that was a response to." Tr. 722:16–17 (Worker). *See also* JX 232 at 2 ("Just a reminder that by recognizing the transfer we will nearly wipe out all of the NOL's [sic] that are currently on our books due to IRS change of control rules. You may recall the conversations we had with Watkins a few months back related to this. I don't know what Versa's strategy is going forward, but if there is an event that produces income to Bridgestreet Worldwide (i.e. forgiveness of debt) it could put this entity into an income tax paying position.").

in connection with the Versa sale."[59]  Berchem from Akin Gump replied, "Don't think approval is within our discretion, unless I missed something."[60]

On March 26, 2013, John Holland from Akin Gump sent an email to Davis, Dembiec, and Worker, stating:

> As you know, we've received several correspondences from Donal Kinsella and his attorneys regarding [IEOT's] acquisition of [GB-SP's] equity (the latest of which are attached).  IEOT's counsel, at our request, also has provided us with documentation of the transfer, including a purchase agreement, resignation letters and judgments pursuant to which the transfer was effected.  At this time, the equity transfer appears to be legitimate.
>
> Under the [Shareholders] Agreement, GB-SP [] is entitled to nominate one director and also is entitled to certain information rights.  [] Kinsella has requested that GB-SP [] be permitted to exercise its right to nominate [] Kinsella for election to the Board and to receive the Company's financials.  Please let us know when you'd like to discuss next steps.[61]

In other words, Akin Gump informed BSW that there was no good faith basis to continue to deny GB-SP's information requests or its designation of Kinsella as the GB-SP Director.

On April 11, 2013, Dembiec asked Akin Gump to clarify the status of GB-SP's board seat and the implications of GB-SP's demand to seat Kinsella on the renewal of the Company's director and officer ("D&O") insurance policy:

---

[59] JX 220 at 1.

[60] *Id.*

[61] JX 170 at 1.

[W]e are discussing a renewal of the current D&O policy which is set to expire April 30. One question that has come up is the status of the Board seat for GB[-SP]. My understanding is that GB[-SP] had their Board seat but when Turley resigned they lost their presence on the Board. I am not sure how we want to handle that question and would like your input. Also, I'm not sure how to address the proposed and pending IEOT transfer and their request for a Board seat.[62]

Holland pointed Dembiec to Section 3.3(a) of the Shareholders Agreement, remarking that GB-SP "has the right to nominate someone for election to the Board of Directors," and "the official size of the Board still is seven directors, even though [GB-SP] currently doesn't have a director on the Board."[63]

### E. BSW Continues to Default on its Obligations Under the Credit Agreement, and Versa Acquires BSW's Debt Through Domus

The Pre-Forbearance Board met on February 4, 2013, with representatives from Akin Gump and Houlihan to discuss the status of Houlihan's sale process.[64] The minutes of the meeting do not reflect any discussion about seating Kinsella as the GB-SP Director.[65] Around this time, BSW's lenders sought permission to engage Versa directly about selling BSW's outstanding debt.[66] On February 6, 2013,

---

[62] JX 171 at 3.

[63] *Id.* at 2.

[64] PTO ¶ 27.

[65] JX 29.

[66] JX 31 at 2–3; Tr. 447:18–24 (Halpern). Paul Halpern, Versa's chief investment officer and Rule 30(b)(6) witness, testified that it was important that BSW's lenders receive permission to speak directly to Versa because "it's really bad for a deal to mess up the process. This deal was dead stuck, and this was the appropriate next step. But to have --

16

Davis, BSW's then-board chairman, confirmed that BSW's lenders could negotiate a potential acquisition of BSW's outstanding debt directly with Versa.[67] Versa and BSW's lenders scheduled an introductory call for the next day.[68] Versa also engaged in parallel discussions with BSW to acquire the Company.[69]

Shortly after BSW again failed to make its interest and principal payments under the Credit Agreement, the Pre-Forbearance Board met on April 2 and April 9, 2013.[70] The April 2 minutes reference the status of a potential sale of BSW and Akin Gump's communications with Plaintiffs' counsel,[71] and the April 9 minutes reference requests from the Company's lenders for additional collateral.[72]

Versa chose to forgo an outright purchase of the Company and, instead, adopted a loan-to-own strategy.[73] On April 11, 2013, Versa, through its newly

---

to take it unilaterally could ruffle a lot of feathers and possibly implicate commitments the different parties had to each other." Tr. 449:17–22 (Halpern).

[67] JX 31 at 2; Tr. 448:16–449:5 (Halpern).

[68] JX 31 at 1.

[69] JX 35; Tr. 452:1–453:1 (Halpern).

[70] PTO ¶¶ 30–31; JX 39; JX 40.

[71] JX 39.

[72] JX 40.

[73] A loan-to-own transaction is a change in control transaction by which an acquirer becomes the target's senior secured lender and then obtains ownership of the target's equity or assets through a liquidation process. *See* David A. Skeel Jr., *The Past, Present and Future of Debtor-in-Possession Financing*, 25 Cardozo L. Rev. 1905, 1921 (2004) (describing loan-to-own transactions as comparable to change-in-control transactions as they are often intended to ensure that the acquirer can "purchase the [debtor's] assets free

formed subsidiary Domus BWW Funding LLC ("Domus"),[74] executed the documents necessary to acquire all of the secured debt of BSW and its subsidiaries from Credit Suisse under the Credit Agreement.[75] Through Domus, Versa paid roughly $23 million for the debt and the rights associated with it.[76]

An internal Versa presentation dated April 13, 2013, provided an update on its BSW acquisition strategy.[77] Among other things, the update outlined different means by which Versa could gain control of BSW's assets, including through a consensual transaction, a strict foreclosure, a public foreclosure, or an asset sale pursuant to Section 363 of the U.S. Bankruptcy Code (the "Bankruptcy Code").[78] The presentation explained that a consensual transaction would require board and stockholder approval, but indicated that the current independent BSW board

---

and clear of any existing or future claims, and [] eliminate the claims of [] unsecured creditors"). Versa specializes in distressed control investments. Tr. 424:14–17 (Halpern) ("So the investment strategy has been, and remains today, for these funds, control investments in distress and special situations in middle-market companies in North America.").

[74] PTO ¶ 18; Tr. 454:6–14 (Halpern) (explaining that Domus was "an entity owned by one or more of the funds advised by Versa" and "set up to execute these trades and acquire [BSW's] debt").

[75] Tr. 454:1–5 (Halpern); *see also* JX 211; JX 212; JX 213. These transactions closed on May 1, 2013. Tr. 460:14–17 (Halpern); PTO ¶ 32.

[76] Tr. 457:18–458:12 (Halpern).

[77] JX 41.

[78] *Id.* at 5.

members would not approve a consensual transaction.[79]  Because BSW's board held the Proxy to vote all of GB-SP's shares, a stockholder vote would also involve board approval.[80]  As an alternative, Versa noted that BSW's CEO and President—Walker and Curtis—could vote to replace or fire the independent directors and then approve the transaction, but acknowledged that replacing or firing the independent directors could give rise to claims for breach of fiduciary duty or fraudulent conveyance.[81]  Another alternative was to modify the transaction to facilitate approval from the current BSW board through (1) enhanced D&O coverage or direct indemnification of directors; (2) assumption of all liabilities; and (3) removal of the requirement that BSW remain in existence for two years.[82]  The presentation also explained that BSW could go bankrupt before Versa obtained its assets, but an imminent bankruptcy filing was unlikely since most of the necessary bankruptcy preparation work had not been completed.[83]

F.    **The Pre-Forbearance Board Negotiates a Forbearance Agreement**

At a board meeting held on May 2, 2013, Credit Suisse informed the Pre-Forbearance Board that the lenders under the Credit Agreement had sold their

---

[79] *Id.* at 6.

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *Id.*

respective interests in BSW's first and second lien loans to Domus.[84]  At this same board meeting, Worker proposed retention bonuses for himself and members of senior management.[85]  As justifications for the bonus package, Worker cited the uncertainty facing BSW and the need to ensure the continued employment of certain BSW executives by underwriting the financial and employment risks of being an executive at a distressed company.[86]  The Pre-Forbearance Board then unanimously approved an executive compensation memorandum of understanding ("MOU").[87] The MOU provided that, in various circumstances, the executives would be paid the following retention bonuses:

---

[84] JX 43 at 2.

[85] *Id.* at 3.

[86] *Id.*

[87] *Id.*  The MOU stated the following in its background section:

> The Company is at a critical juncture.  It will either be sold in the near future to a private equity fund investor or, failing the completion of such transaction, may become subject to a foreclosure action or bankruptcy proceeding undertaken by the Lenders or others, or subject to other remedies available to the Lenders under law and as prescribed by the Amended and Restated Credit Agreement to which the Company and the Lenders are a party.  Such proceedings and/or remedies would allow the Lenders to take control of the Company's assets and operations.  In light of this situation, and in view of other reasonably predictable outcomes, there is significant risk and uncertainty with respect to financial outcomes for the Executives and the shareholders generally.

*Id.* at 8.

| Executive | Sale of the Company (Outside of Bankruptcy)[88] | Sale or Reorganization of the Company (Pursuant to a Bankruptcy Filing or Foreclosure Proceeding)[89] | No Sale, Bankruptcy, or Foreclosure[90] |
|---|---|---|---|
| Sean Worker | $142,199 | $150,500 | $142,199 |
| Lee Curtis | $107,417 | $120,500 | $107,417 |
| Dale Gingrich | $56,777 | $85,000 | $56,777 |
| JR Dembiec | $56,777 | $85,000 | $56,777 |
| Jeffrey Dunn | $36,830 | $59,999 | $36,830 |
| To be allocated[91] | $40,000 | $50,000 | $40,000 |
| Total Bonus | $440,000 | $550,999 | $440,000 |

In addition to the retention bonuses, the MOU provided for severance payments to the BSW executives.[92] The MOU retained the severance provisions in Curtis's and Worker's existing employment agreements with the Company. The

---

[88] *Id.* at 9.

[89] *Id.* at 10.

[90] *Id.* at 11.

[91] Each scenario had additional requirements and terms. For example, in the case of a sale outside of bankruptcy, the MOU provided that the retention bonus "shall be paid, by the Company or the acquiring entity, to the Executives upon closing of the Sale Transaction regardless of whether the Executives (other than Worker and Curtis) continue to be employed by the acquiring entity." *Id.* at 9.

[92] *Id.* at 11.

other BSW executives would receive six months of salary and all accrued paid time off as severance if their employment was terminated without cause.[93]  Additionally, if BSW's lenders foreclosed on the Company, BSW's lenders would continue to employ Curtis and Worker under the terms of their existing employment agreements.[94]

In June 2013, Versa and BSW began exchanging drafts of a forbearance agreement.[95]  On July 23, 2013, Akin Gump sent the Pre-Forbearance Directors and BSW executives a list of issues regarding a potential forbearance agreement.[96]  Among the issues were (1) indemnification for claims arising from, or relating to, the forbearance agreement; (2) a release of claims against BSW's directors and officers by Versa; and (3) payment of advisers' fees.[97]  In exchange for the release of claims, Versa requested that Davis, Doheny, LaCivita, and Scher deliver irrevocable resignations to be held in escrow.[98]

Meanwhile, GB-SP continued to press for its informational and corporate governance rights in numerous letters to the Pre-Forbearance Directors and Akin

---

[93] *Id.*

[94] *Id.*

[95] *See* JX 172.

[96] JX 49 at 3–4.

[97] *Id.* at 3.

[98] JX 50 at 3.  Davis, Doheny, LaCivita, and Scher refused to resign but instead signed agreements not to stand for re-election or to accept any such nomination.  *Id.* at 2.

Gump, even threatening legal action.[99]  BSW's counsel sought to string Plaintiffs

along until after they could finalize a forbearance agreement with Versa.  Indeed,

one Akin Gump attorney asked internally, "Is there any additional information that

we can provide to [Plaintiffs' counsel] to keep them warm while we're sorting out

the forbearance agreement?"[100]

The Pre-Forbearance Directors' continuing refusal to seat Kinsella as the

GB-SP Director created a potential liability that BSW's insurers were not willing to

cover.  The insurers carved out this coverage through a "major stockholder

exclusion."[101]  BSW's D&O policy excluded claims brought by holders of 10% or

---

[99] *See* JX 44 (May 2, 2013 email indicating that GB-SP had not received information under the Shareholders Agreement and Kinsella had not been seated as the GB-SP Director in the "four months since [the] original notice [was sent] to BSW" and demanding that an initial meeting be scheduled); JX 45 (June 10, 2013 letter restating that GB-SP had designated Kinsella to serve as the GB-SP Director); JX 47 at 3–5 (June 14, 2013 letter demanding certain financial statements, organizational documents, minutes of BSW board and stockholders meetings, and information concerning capital structure); JX 48 at 2 (July 10, 2013 letter reconfirming that Kinsella had been designated as the GB-SP Director, demanding notice of BSW board meetings, and requesting additional documents); JX 57 at 4 (August 20, 2013 letter complaining that Plaintiffs were being ignored by BSW and threatening legal action); JX 58 at 1 (August 30, 2013 letter requesting to inspect certain books and records of BSW pursuant to 8 *Del. C.* § 220(d)).

[100] JX 240 at 2.

[101] A "major stockholder exclusion" is a provision in a D&O insurance policy which removes claims from coverage when they are brought by or on behalf of a major stockholder of the company, typically a stockholder that owns more than 5–10% of the company's outstanding equity. *See, e.g.*, *EMSI Acq., Inc. v. RSUI Indem. Co.*, 787 F. App'x 97, 99 (3d Cir. 2019) (excluding claims from coverage when they are brought by a stockholder with more than 5% of the company's equity); *McGowan v. Liberty Ins. Underwriters, Inc.*, 2020 WL 8186268, at *1 (S.D. Fl. Oct. 26, 2020) (same); *Abrams v. Allied World Assurance Co. (U.S.) Inc.*, 657 F. Supp. 3d 1280, 1288–98 (N.D. Cal. 2023)

more of the Company's stock.[102]  On August 1, 2013, BSW's insurance broker informed Akin Gump and BSW:

> We have requested AIG to remove the Major Shareholder exclusion on the policy which they denied.  We asked them if they could give us an option, even if that would change some of the terms and conditions *i.e.* premium etc.  AIG declined this request as well.  AIG is concerned with the fact that GB-SP Holdings does not have active representation on the board and fear that due to the fact that their investment is at risk that they may sue.  This is exposure that they did not want to pick up as such they put the exclusion on the policy last year.[103]

In an email to the insurance broker the next day, Akin Gump inquired:  "If we added another director to the board from [GB-SP] now, would that help to get the major shareholder exclusion deleted?"[104]

Two weeks later, on August 16, 2013, Akin Gump informed Dembiec and the Pre-Forbearance Directors that, despite its efforts, BSW's insurance carrier may not agree to remove the major stockholder exclusion from the D&O policy.[105]  To remedy this gap in coverage, Akin Gump recommended that Versa provide broad indemnification coverage for any claims brought by GB-SP.[106]

---

(interpreting a "Major Security Holder Claims Exclusion" which excluded claims brought by a stockholder who owns more than 10% of the company's equity).

[102] JX 174 at 1.

[103] JX 173 at 2.  Two separate insurers also declined to provide supplemental coverage.  *Id.*

[104] *Id.* at 1.  Akin Gump's inquiry indicates that Akin Gump believed Kinsella could be seated at any time.

[105] JX 174.

[106] *Id.*

Around the time the parties were negotiating the proposed forbearance agreement, Versa contacted Walker about serving as a director on the BSW board.[107] Walker is the president and founder of Walker Nell Partners, Inc. ("Walker Nell"), a business consulting firm focused on corporate restructuring and fiduciary services.[108] Walker did not have a previous relationship with Versa or BSW.[109]

Versa also contacted Albright and Orlofsky about serving as directors on the BSW board.[110] Albright was the president of the Pinnacle Group, a consulting firm that specializes in franchising.[111] Albright does not appear to have had any other business dealings with Versa or BSW. Orlofsky, on the other hand, had a prior relationship with Versa. Between 2001 and 2005, Orlofsky served as interim chief financial officer and chief operating officer of Malden Mills, a company whose operations a Versa affiliate acquired out of bankruptcy.[112] In addition, Orlofsky

---

[107] JX 55; JX 163 at 35:15–18 (Walker Dep.); Tr. 615:11–19 (Walker).

[108] JX 163 at 8:17–19 (Walker Dep.); *id.* at 8:22–9:2 (Walker Dep.); Tr. 613:23–614:3 (Walker).

[109] JX 163 at 27:3–10 (Walker Dep.); *id.* at 49:1–4 (Walker Dep.); Tr. 615:20–616:19 (Walker). Following the foreclosure, Versa asked Walker to serve as an independent director on the board of SeaStar Holdings, Inc., which the parties refer to as "Seaborne Airlines." JX 163 at 30:7–12 (Walker Dep.); Tr. 699:16–700:21 (Walker); JX 175 at 25. Seaborne Airlines was acquired by a Versa affiliate following its bankruptcy. Tr. 702:17–20 (Walker). Between August 2017 and January 2018, Walker Nell earned approximately $65,000 in fees in connection with Seaborne Airlines's bankruptcy. JX 175 at 13.

[110] *See* Tr. 585:20–24 (Orlofsky); *id.* at 514:9–16 (Halpern).

[111] JX 62 at 121.

[112] JX 166 at 18:6–19:24, 20:16–21:23 (Orlofsky Dep.); Tr. 555:3–9, 581:9–13 (Orlofsky); *id.* at 514:2–6 (Halpern); JX 62 at 57.

25

served as chairman and sole board member of American Laser Skincare LLC ("ALS") in 2011.[113] As its sole member, Orlofsky caused ALS to file for bankruptcy, and in February 2012, a Versa affiliate acquired ALS through those proceedings.[114] Orlofsky's firm, Zolfo Cooper, served as a pre-petition adviser to ALS, earning approximately $300,000 to $400,000 in fees working on ALS's ultimate bankruptcy.[115]

### G. The Forbearance Agreement

Akin Gump updated the Pre-Forbearance Board on the status of the proposed forbearance agreement with Domus at a September 17, 2013 board meeting.[116] Under the terms of the forbearance agreement, Domus would not exercise its right to foreclose under the Credit Agreement for a five-month period, so long as BSW did not otherwise breach the Credit Agreement or fail to satisfy the additional financial covenants imposed by the forbearance agreement.[117] Dale Gingrich, BSW's Senior Vice President of Finance, and Worker told the Pre-Forbearance Board that they believed BSW should be able to satisfy the additional financial

---

[113] JX 166 at 22:20–23:23 (Orlofsky Dep.); Tr. 581:14–18, 582:10–583:9 (Orlofsky); *id.* at 513:9–14 (Halpern).

[114] Tr. 583:10–16 (Orlofsky); JX 166 at 26:8–18, 27:14–18 (Orlofsky Dep.).

[115] JX 166 at 8:16–20, 25:13–26:8, 31:20–32:4 (Orlofsky Dep.); Tr. 584:17–585:7 (Orlofsky).

[116] JX 61 at 2.

[117] *Id.*

covenants based on currently available information.[118]  The proposed forbearance agreement also provided for Domus to extend additional first lien loans to BSW to cover items such as past due interest payments owed under the Credit Agreement and BSW's working capital needs.[119]  For its part, BSW agreed to grant first priority interests in additional collateral in favor of Domus and undertake stringent financial covenants.[120]

On September 19, 2013, Versa's counsel at Dechert LLP ("Dechert") delivered to BSW's counsel an updated draft of the proposed forbearance agreement, along with a draft indemnity agreement.[121]  The indemnity agreement required Versa to indemnify BSW's directors and officers for claims arising out of the forbearance agreement, as well as for claims brought by GB-SP, IEOT, or Kinsella.[122]  Dechert also transmitted resumes for Albright, Orlofsky, Seitz, and Walker, who Versa proposed to fill the four independent director positions on the BSW board.[123]

---

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] PTO ¶ 43; *see also* JX 62.

[122] *See* JX 62 at 49–56.  The provision did not expressly reference GB-SP but covered claims by "any Person(s) that own or control (whether beneficially, directly or indirectly) 10% or more of the outstanding stock of the Company" and by "any security holder of the Company, whether directly or derivatively, unless such security holder's claim is instigated and continued independent of, and without the solicitation or assistance of, any Major Shareholder[.]"  *Id.* at 50.  GB-SP was BSW's majority stockholder.  PTO ¶ 6.

[123] PTO ¶ 43; *see also* JX 62.

27

On September 30, 2013, BSW and Domus entered into a forbearance agreement (the "Forbearance Agreement"), under which Domus advanced approximately $12.5 million to BSW and agreed to forbear on exercising its right to foreclose under the Credit Agreement for five months.[124] As consideration for the loan, Domus received additional security interests in BSW's foreign subsidiaries.[125] BSW utilized the $12.5 million to pay the accrued interest on its debt owed to Versa and Domus, past due rent payments, its D&O policy, and fees for its legal counsel and financial advisers.[126]

The terms of the executed Forbearance Agreement were materially similar to those of the drafts that were exchanged earlier that month.[127] The Forbearance Agreement required BSW to maintain the following EBITDA and gross margin financial ratios for the duration of the five-month forbearance period:

---

[124] PTO ¶ 44; JX 66 § 2.2.

[125] JX 66 § 4.1(e).

[126] *Id.* at 35.

[127] *Compare* JX 62 at 2–48, *with* JX 66.

| Month Ending | Minimum Interest Coverage Ratio[128] | Minimum Gross Margin Percentage[129] |
|---|---|---|
| September 30, 2013 | 1.10:1.00 | 18% |
| October 31, 2013 | 1.20:1.00 | 20.5% |
| November 30, 2013 | 1.20:1.00 | 18.9% |
| December 31, 2013 | 1.15:1.00 | 16.9% |
| January 31, 2014 | 1.15:1.00 | 13.8% |

If BSW's financial ratios fell below the above amounts, then BSW would be in default under the Forbearance Agreement, and Versa could exercise its right to foreclose on its collateral under the Credit Agreement.[130] The Forbearance Agreement also provided that BSW, Domus, the Pre-Forbearance Directors, and certain BSW officers would enter into a mutual release agreement on the date that the new independent directors were elected to the Company's board.[131]

---

[128] JX 66 § 5.3(a). The minimum interest coverage ratio represented the minimum threshold for the Company's ratio of Consolidated EBITDA to Consolidated Interest Expense. *Id.*

[129] *Id.* § 5.3(e).

[130] *Id.* §§ 3.1, 3.2(a), 3.3.

[131] *Id.* § 9(b); *id.* at 39–47. The executed release agreement is not in the record. The Company agreed to hold its annual meeting of stockholders within 30 days of the funding of the $12 million loan. *Id.* §9(a). Davis, Doheny, LaCivita, and Scher agreed to not seek re-election at the annual meeting of stockholders. *See* JX 50 at 2; JX 63 at 2–5; JX 226 at 1; JX 234 at 1.

That same day, Domus, the Pre-Forbearance Directors, and certain BSW officers entered into the indemnity agreement (the "Indemnity Agreement").[132] The material terms of the executed Indemnity Agreement were the same as those in Dechert's September 19, 2013 draft.[133] The Indemnity Agreement provided for Domus to defend and indemnify the Pre-Forbearance Directors against any claim or proceedings brought by GB-SP, IEOT, or Kinsella related to BSW or its subsidiaries, and included any judgments or settlements.[134] Domus also successfully limited its obligation to the costs of "one counsel" for the Pre-Forbearance Directors, unless otherwise prohibited by the applicable rules of professional responsibility.[135]

BSW, Domus, Curtis, and Worker also entered into a memorandum of understanding on September 30, 2013 (the "September 2013 MOU").[136] The September 2013 MOU obligated Domus, in the event of a consensual foreclosure, to: (1) assume the employment agreements of Curtis and Worker; (2) pay retention bonuses for Curtis and Worker; and (3) pay retention bonuses for other BSW

---

[132] JX 70 at 22–36.

[133] *Compare* JX 62 at 49–56, *with* JX 70 at 22–36.

[134] JX 70 at 23.

[135] *Id.*

[136] PTO ¶ 45.

executives.[137]  The September 2013 MOU incorporated the terms of the retention bonuses from the MOU approved by the Pre-Forbearance Directors.[138]

## H.    The Post-Forbearance Events and Consensual Foreclosure

BSW held an annual meeting of stockholders on October 11, 2013.[139] Kinsella was elected as the GB-SP Director; Curtis and Worker were elected as the Management Directors; and Albright, Orlofsky, Seitz, and Walker were elected as independent directors.[140]  Seitz resigned from the BSW board shortly thereafter for reasons not reflected in the record.[141]  Walker was named as board chairman.[142]  On October 28, 2013, the Post-Forbearance Board held its first meeting with representatives from Akin Gump and Houlihan.[143]  At the meeting, the Post-Forbearance Board discussed with its advisers the various options available in light

---

[137] *See* JX 67; *id.* at 7 ("If the Lenders (or any of the Lenders' affiliates) acquire all or substantially all of the equity or assets of the Company or its operating subsidiaries, in a transaction or a series of related transactions, through a reorganization, restructuring, recapitalization, stock sale, asset sale or foreclosure action or other exercise of any remedies available to the Lenders under the Credit Agreement or related loan documents, the Lenders agree to continue to employ Sean C. Worker and H. Lee Curtis under the terms of their current employment agreements.  For the avoidance of doubt, if the Lenders (or any of the Lenders' affiliates) acquire the Company or its operating subsidiaries in a Sale Transaction, the Lenders agree to continue to employ Sean C. Worker and H. Lee Curtis under the terms of their current employment agreements.").

[138] *Compare* JX 43 at 8–12, *with* JX 67.

[139] PTO ¶ 47; JX 69.

[140] PTO ¶ 47.

[141] *Id.* ¶ 48.

[142] *Id.* ¶ 49.

[143] *Id.* ¶ 50; JX 71.

31

of the forbearance period under the Forbearance Agreement.[144] Houlihan provided an overview of its prior sale process and opined that effectuating a sale of the Company "would be very difficult, especially in light of the fact that the Company's EBIDTA [sic] had declined since [Houlihan's] original marketing and sales efforts."[145]

At the next board meeting on November 18, 2013, BSW management informed the Post-Forbearance Board that BSW had breached the minimum interest coverage ratio and the minimum gross margin percentage in the Forbearance Agreement during the month of October.[146] In an executive session, Kinsella requested additional information to substantiate these breaches and asked if Domus might be willing to invest another $10 million in BSW or to waive the breaches.[147] BSW's counsel reminded the directors that the Forbearance Agreement would expire by its terms in approximately three months, so even if Domus granted a waiver, the entire amount of the senior secured debt would still be due and owing at that time.[148] The Post-Forbearance Board then discussed potential alternatives available to BSW, such as third-party financing, a sale of the Company or its assets, re-financing the

---

[144] JX 71 at 2.

[145] *Id*. at 2–3.

[146] JX 80 at 2.

[147] *Id.*

[148] *Id.*

Company's debt, an out-of-court restructuring, and a bankruptcy filing under either chapter 7 or chapter 11 of the Bankruptcy Code.[149] The Post-Forbearance Board resolved that BSW would notify Domus of the breaches, as required by the Credit Agreement, and request a waiver to give the board additional time to examine potential paths forward.[150]

On November 20, 2013, BSW informed Domus of BSW's default.[151] Domus responded the next day, declaring that the default terminated the Forbearance Agreement and reserving Domus's rights under the Credit Agreement.[152] That same day, BSW began to discuss the idea of using an assignment for the benefit of creditors or "ABC" proceeding.[153] Walker instructed the Company to include an ABC proceeding as a potential restructuring option but emphasized that the Company's "primary concern . . . is to make sure that the [Post-Forbearance] Board

---

[149] *Id.* at 3.

[150] *Id.*

[151] JX 83.

[152] JX 144.

[153] JX 84. In an ABC, the entity, or assignor, assigns its assets to an assignee, which is charged with liquidating the assets and distributing the proceeds to the assignor's creditors. *In re Wack Jills, Inc.,* 322 A.3d 1132, 1145 (Del. Ch. 2024). In Delaware, ABCs are governed by 10 *Del. C.* §§ 7381–7387.

is advised of and complies with Delaware fiduciary law in the performance of its duties."[154] Six days later, Domus delivered a foreclosure proposal to BSW.[155]

On December 4, 2013, the Post-Forbearance Board met and, over Kinsella's opposition, passed a budget for 2014.[156] Kinsella wanted a budget that incorporated aggressive cost cutting, and he demanded more information before approving the proposed budget.[157] The other board members did not share Kinsella's concerns, and each voted to approve the budget.[158] In an executive session, Walker reminded the Post-Forbearance Directors that BSW had defaulted on the terms of the Forbearance Agreement and had requested a waiver of that default.[159] The Post-Forbearance Board discussed its various options. Houlihan advised that refinancing BSW's debt or selling BSW's equity or assets was highly unlikely in light of the Company's current business operations, the investment market's overall

---

[154] JX 84 at 1. During this period, Kinsella was regularly requesting additional information from the Company. *See, e.g.*, JX 87; JX 89.

[155] JX 86.

[156] JX 91 at 2.

[157] *Id.* at 1–2.

[158] *Id.* at 2.

[159] *Id.* Members of the Post-Forbearance Board inquired whether any additional covenants under the Forbearance Agreement or Credit Agreement had been breached, and management responded that, based upon information available as the date of the meeting, BSW had also breached the "cash covenant" in the Forbearance Agreement. *Id.* Management noted, however, that the month was not yet closed from a financial standpoint and, as such, it was too early to tell whether additional covenants had been breached. *Id.*

condition, and the Company's senior secured debt.[160]  The Post-Forbearance Board discussed the possibility of an additional equity investment from GB-SP or IEOT, or from an entity known as "Goodbody."[161]  Kinsella indicated that he was not willing to make an additional investment at that time.[162]  The Post-Forbearance Board resolved to seek an additional equity investment from Goodbody and to ask Domus to waive BSW's technical default under the Forbearance Agreement.[163]

On December 16, 2013, Plaintiffs' counsel sent a letter to BSW outlining Kinsella's dissatisfaction with the actions of the Post-Forbearance Board, BSW's responses to their requests for information, and BSW's refusal to seat Kinsella as the GB-SP Director from December 2012 to October 2013.[164]  Kinsella urged the board to chart a course other than a consensual foreclosure.[165]

The Post-Forbearance Board met the next day.  At an executive session, Albright, Curtis, Orlofsky, Walker, and Worker discussed the correspondence received from Kinsella's counsel, but took no specific actions.[166]  After Kinsella

---

[160] *Id.* at 3.

[161] *Id.* Goodbody appears to be a reference to Goodbody Stockbrokers Nominees Limited, which was the general partner of an entity that once held debt of GB-SP.  *See* JX 1 at 3.

[162] JX 91 at 3; *see* Tr. 136:9–23 (Kinsella) (confirming that Kinsella was not interested in putting more money into BSW).

[163] JX 91 at 3.

[164] *See* PTO ¶ 55; JX 94.

[165] JX 94 at 2–3.

[166] JX 96 at 1.

joined the meeting, Albright and Walker reported that Domus refused to discuss a default waiver and requested that BSW start working towards a consensual foreclosure in accordance with Domus's November 26 proposal.[167]  The Post-Forbearance Board discussed the Company's options.[168]  A representative from Houlihan opined that a sale of the Company or debt refinancing would be extremely difficult due to the decline in the Company's EBITDA.[169]  Akin Gump explained the differences between a chapter 7 and a chapter 11 bankruptcy.[170]  Kinsella proposed that BSW file for bankruptcy, but the motion failed to pass.[171]  Two days later, Akin Gump forwarded draft foreclosure documents prepared by Versa and Domus's counsel to Walker.[172]  Before year's end, Houlihan delivered a draft chapter 11 bankruptcy analysis to BSW.[173]

---

[167] *Id.* at 2.

[168] *Id.* at 3.

[169] *Id.*

[170] *Id.*

[171] *Id.*  The draft minutes indicated that Kinsella had specified a chapter 7 bankruptcy filing. But at the next meeting, Kinsella insisted that "he had moved to have the company file for 'bankruptcy' generally and not a bankruptcy under Chapter 7." JX 102 at 1.  Kinsella also requested that the minutes reflect that he made the motion because the Company was insolvent. *Id.*  The December 17 minutes were approved with these changes. *Id.*

[172] JX 98.

[173] JX 100 at 1.

At the board's next meeting on January 3, 2014, Walker, Worker, and Houlihan presented a bankruptcy analysis.[174]  They explained that a bankruptcy filing would require debtor in possession ("DIP") financing in amounts ranging from $7 to $9 million and that it would be difficult to obtain DIP financing from any party other than Versa.[175]  They also noted that Versa's approval would be needed to file for chapter 11 and that they believed chapter 11 would cause damaging disruptions to the Company's ongoing operations.[176]  In an executive session, the Post-Forbearance Board further discussed whether the Company should file for chapter 11 bankruptcy or if it should agree to a consensual foreclosure.[177]  The board minutes state the following:

> Mr. Albright stated that, under all the circumstances and weighing the advice of counsel and the Company's financial advisors, he didn't see a viable option other than a consensual foreclosure.  Mr. Orlofsky added that in light of the combined management and Houlihan Lokey analysis, a Chapter 11 filing would be difficult and expensive and if the Company could essentially achieve a similar result while avoiding the time, costs and damage to the business, he believed a consensual foreclosure made the most sense.  Mr. Kinsella disagreed, stating again that he felt the Company was insolvent and that a bankruptcy filing was

---

[174] JX 102 at 1–2.

[175] *Id.* at 2.  Orlofsky testified that DIP financing would only realistically come from Versa because there was no value beyond the amount of the bank debt.  Tr. 570:4–13 (Orlofsky).  Orlofsky has a background in bankruptcy and corporate restructurings.  *Id.* at 552:16–17, 553:8–10 (Orlofsky) (testifying that he had been in the restructuring business "for the last 23 years" and believed to "have expertise in corporate restructurings").  The court found Orlofsky to be a credible witness at trial.

[176] JX 102 at 2.

[177] *Id.*

37

the best course of action. Mr. Walker encouraged Mr. Kinsella to more fully explain his reasoning for supporting a bankruptcy filing, but Mr. Kinsella declined, stating that he didn't feel a need to add anymore to his position on the matter. Mr. Worker and Mr. Curtis had no further comment.[178]

After additional discussion, the Pre-Forbearance Board, with the exception of Kinsella, voted to approve a consensual foreclosure, subject to negotiation and finalization of definitive documentation.[179]

On January 27, 2014, BBK, Ltd. ("BBK"), a business consulting firm that services under-performing and financially challenged companies, delivered to BSW a valuation of BSW's total market value as of December 31, 2013, in anticipation of a consensual foreclosure.[180] BBK determined BSW's fair market value was $29.7 million as a going concern.[181] That same day, Kinsella sent another letter to BSW restating his grievances with the board's management of the Company, his exclusion from the board, the Company's refusal to produce documents, and the board's apparent single-minded focus on a consensual foreclosure.[182] Kinsella reiterated many of these same concerns at a board meeting the next day, lamenting that a

_____

[178] *Id.*

[179] *Id.*

[180] JX 104.

[181] *Id.* at 8.

[182] JX 106 at 1–2.

38

consensual foreclosure would result in the elimination of his equity stake in BSW.[183] In an executive session, the Post-Forbearance Board, including Kinsella, discussed the specifics of a consensual foreclosure and weighed the benefits of an ABC as opposed to a statutory dissolution.[184] After the executive session, "it was the consensus of the [Post-Forbearance] Board that the January interest payment to [Domus] should not be paid under the current circumstances."[185]

On February 25, 2014, the Post-Forbearance Board met to address Kinsella's letters and concerns.[186] In an executive session, the Post-Forbearance Board recounted all of its efforts up until that point, highlighting its deliberative process and the various alternatives to a consensual foreclosure it had considered.[187] Midway through, Kinsella, apparently fed up with the board's recitation, left the meeting.[188] The remaining Post-Forbearance Directors continued to discuss the work they had done to chart BSW's course and specifically noted Kinsella's

---

[183] JX 107 at 2.

[184] *Id.* at 3.

[185] *Id.*

[186] JX 111.

[187] *Id.* at 1–4.

[188] *Id.* at 2; Tr. 159:5–7 (Kinsella) ("Q. And so when you got upset at board meetings, you just walked out; right, sir? A. I probably left. I really did.").

December 4, 2013 statement that neither GB-SP nor IEOT was willing to contribute any additional capital to BSW.[189]

On Friday, February 28, 2014, at 4:08 p.m., Holland from Akin Gump sent an email notice of a telephonic special meeting of the board to be held on Sunday, March 2, 2014, at 4:00 p.m. ET to each of the Post-Forbearance Directors.[190] The email included an agenda for the meeting, prior meeting minutes, an executive summary, draft resolutions, and BBK's valuation report for the Company as of December 31, 2013.[191] Kinsella was in Ireland at the time the notice was sent.[192] Kinsella read the notice on Saturday morning, March 1, and chose not to participate in the March 2 meeting.[193]

At the March 2 meeting, Albright, Curtis, Orlofsky, Walker, and Worker all voted in favor of resolutions authorizing the consummation of a consensual foreclosure in favor of Domus (the "Consensual Foreclosure") and to pursue an ABC.[194] Walker's company, Walker Nell, was chosen to be the assignee.[195] Domus

---

[189] JX 111 at 3–4.

[190] JX 115.

[191] *Id.*

[192] Tr. 60:1–4 (Kinsella).

[193] *Id.* at 61:7–22 (Kinsella).

[194] PTO ¶ 65; JX 116. The Post-Forbearance Board also authorized BSW to file a certificate of dissolution with the Delaware Secretary of State. JX 116 at 10–11.

[195] PTO ¶ 66; JX 116 at 9.

advanced $425,000 to BSW under the Credit Agreement to fund the services and expenses of Walker Nell as assignee.[196] The Post-Forbearance Directors also discussed finalizing Domus's assumption of Curtis's and Worker's employment agreements with BSW that were memorialized in the September 2013 MOU.[197]

The Consensual Foreclosure closed on March 3, 2014.[198] At the time of the Consensual Foreclosure, BSW owed $46,996,687.56 to Domus under the Credit Agreement.[199] As part of the Consensual Foreclosure, BSW transferred its equity interests in its operating subsidiaries to Domus in satisfaction of $30 million of the outstanding loan obligations.[200] Domus also canceled $9,496,687.56 of the remaining obligations of $16,966,687.56.[201] That left $7.5 million, plus interest, outstanding.[202]

---

[196] PTO ¶ 68.

[197] JX 116 at 3. Curtis and Worker executed the amendment and assumption agreements on March 3, 2014. JX 124; JX 125.

[198] PTO ¶ 69; *see also* JX 118; 119; JX 120; JX 121; JX 122; JX 123; JX 124; JX 125.

[199] JX 118 at 2.

[200] *Id*. at 3, 28.

[201] *Id*. at 28.

[202] *Id*.; Tr. 473:4–10 (Halpern).

## I.       Procedural History

### 1.       This Action and the ABC Actions

On March 4, 2014, Plaintiffs commenced this action.[203] That same day, BSW and BridgeStreet Corporate Housing Worldwide, Inc. ("BSW Corporate Housing") filed separate ABC actions in this court. Both entities selected Walker Nell as the assignee for their respective assets.[204] These ABC actions have been, for the most part, dormant. Both remain pending at the time of this opinion.

After Plaintiffs filed their complaint, this action was largely inactive for two years, prompting the court to request status reports three times.[205] On June 20, 2016, the parties filed a stipulation of settlement.[206] The settlement provided for Domus to pay $327,500 to GB-SP and Kinsella in exchange for a release.[207] On November 4, 2016, the court rejected the settlement, noting that the Company would receive effectively nothing for release of the derivative claims.[208]

---

[203] Dkt. 1 ("Compl.").

[204] *In re BridgeStreet Corp. Housing Worldwide, Inc.*, C.A. No. 9411-VCF (Del. Ch.), Dkt. 1; *In re BridgeStreet Worldwide, Inc.*, C.A. No. 9412-VCF (Del. Ch.), Dkt. 1.

[205] Dkts. 25, 31, 34.

[206] Dkt. 47.

[207] *Id.* at 11–13, 16–20.

[208] Dkt. 54 at 17:2–18:13.

On February 9, 2017, Defendants filed motions to dismiss the complaint under Court of Chancery Rules 12(b)(6), 23, and 23.1.[209] On April 7, 2017, Defendants filed motions to enforce the stipulation of settlement that the court previously rejected.[210] Defendants sought enforcement of the settlement as to Plaintiffs' direct claims, arguing that the court's prior ruling does not "alter[] the enforceability of the release of direct claims executed by the individual Plaintiffs[.]"[211] Defendants also argued that the existing settlement should be enforced as to the derivative claims upon payment of $50,000 to the Company.[212]

On May 31, 2018, the court denied the Defendants' motion to enforce the existing settlement and granted in part and denied in part the Defendants' motion to dismiss.[213] On June 21, 2018, Versa and Domus (the "Versa Defendants") filed their answer to the complaint, along with a counterclaim against GB-SP asserting a breach of the Pledge Agreement.[214] BSW and the Director Defendants (the "BSW Defendants") filed their answer on September 17, 2018.[215] Thereafter, the case moved at a snail's pace. In August 2019, the court entered a scheduling order

---

[209] Dkts. 55, 57.

[210] Dkts. 60–63.

[211] Dkt. 61 at 15.

[212] *Id.*

[213] Dkts. 88, 92.

[214] Dkt. 89. The Versa Defendants filed an amended answer on July 8, 2021. Dkt. 119.

[215] Dkt. 93.

providing for an October 2020 trial.[216]  Trial was then rescheduled for May 2021.[217]

Another period of inactivity required the court to hold a status conference in March

2021 and to reschedule trial a second time.[218]  The parties participated in an

unsuccessful mediation in September 2021.[219]

After fairly contentious discovery motions,[220] the court held a four-day trial

from January 10–13, 2022, using Zoom technology.[221]  Following briefing and

post-trial argument,[222] the parties provided supplemental authority for the court's

review on September 22, 2023, and January 24, 2024.[223]

---

[216] Dkt. 98.

[217] Dkts. 105, 108.

[218] Dkts. 109, 111–12.

[219] Dkts. 126, 128.

[220] Dkt. 130 (Plaintiffs' September 24, 2021 Motion to Compel Discovery); Dkt. 144 (Plaintiffs' November 18, 2021 Motion to Compel Compliance with Subpoena); Dkt. 151 (Plaintiffs' November 23, 2021 Motion to Compel Discovery and for Sanctions and Other Relief); Dkts. 195–97 (Versa Defendants' December 23, 2021 Motions in Limine); Dkt. 199 (Plaintiffs' December 28, 2021 Motion in Limine for Spoliation Sanctions); *see* Dkts. 148, 150, 182–83, 217–20 (addressing discovery disputes).

[221] Dkt. 229.

[222] Dkts. 237, 243–44, 256, 259, 262, 264.  On May 5, 2022, during post-trial briefing, the Versa Defendants advised the court that they had filed bankruptcy petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania.  Dkt. 246.  Accordingly, this action was subject to the automatic stay in 11 U.S.C. § 362.  On September 21, 2022, the bankruptcy court approved a stipulation that provided relief from the stay to allow this action to proceed.  Dkt. 249.

[223] Dkts. 267–69, 272.

## 2. The New York Action

This is not the only proceeding related to Domus's acquisition of BSW's assets. On July 3, 2018, a commercial landlord filed an action in New York state court against BSW, Versa, Domus, and the officers and directors of those entities regarding a commercial lease agreement.[224] The lease gave BSW's subsidiary, BridgeStreet Corporate Housing LLC ("BCH LLC"), the right to sublease apartments for temporary corporate housing.[225] The action sought, among other things, enforcement of a guaranty contained in the lease.[226]

The New York trial court granted the landlord's motion for summary judgment, finding that Versa and Domus were merely continuing the operations of BCH LLC, and thus remained liable for the lease.[227] The New York Supreme Court,

---

[224] *47 E. 34th St. (NY), L.P. v. BridgeStreet Worldwide, Inc.*, C.A. No. 653057/2018 (N.Y. Sup. Ct. July 3, 2018).

[225] Dkt. 267 Ex. A at 2.

[226] *Id.* at 2–3.

[227] *Id.* at 1. Plaintiffs argued in their post-trial reply brief that the New York trial court's decision in *47 East 34th Street (NY), L.P. v. BridgeStreet Worldwide, Inc.*, 2022 WL 1225381 (N.Y. Sup. Ct. Apr. 26, 2022), collaterally estopped Defendants to argue that entire fairness does not apply to the Pre- and Post-Forbearance Directors' actions. Pls.' Post-Trial Reply Br. 1–6. The New York trial court's decision has since been reversed. *See 47 E. 34th St. (NY) L.P. v. BridgeStreet Worldwide, Inc.*, 197 N.Y.S.3d 3, 13 (N.Y. App. Div. 2023). Regardless, the issues before the New York trial court that Plaintiffs rely upon were not identical to those in this case and were not necessary to the judgment in the New York action. *See D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.*, 564 N.E.2d 634, 636 (N.Y. 1990) (noting that collateral estoppel bars a party from relitigating an issue decided against it only when the identical issue was necessarily decided in the prior action). In any event, the trial court's decision was reversed, and neither party asks the court to apply collateral

45

Appellate Division, First Department later reversed that decision, finding that there was no evidence of any conveyance for less than fair value.[228]  The landlord's subsequent applications for reargument or for leave to further appeal the First Department's decision were denied.[229]

## II. ANALYSIS

To succeed at trial, Plaintiffs must prove each element of each of their claims against each defendant by a preponderance of the evidence. *S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *15 (Del. Ch. Mar. 15, 2017), *aff'd*, 177 A.3d 610 (Del. 2017) (TABLE).  Preponderance of the evidence "has been defined to mean the side on which 'the greater weight of the evidence' is found." *Taylor v. State*, 748 A.2d 914, 914 (Del. 2000) (TABLE) (quoting *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967)); *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) ("Proof by a preponderance of the evidence means proof that something is more likely than not.  It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."  (internal quotation marks omitted)).

---

estoppel based upon the First Department's September 2023 decision reversing the New York trial court.

[228] Dkt. 267 Ex. A at 13.

[229] Dkt. 272 Ex. 1.

## A. Count V (Breach of Shareholders Agreement)

To prevail on a breach of contract claim, a plaintiff must meet its burden of proof on, "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

GB-SP argues that BSW, Curtis, Davis, Doheny, LaCivita, Scher, and Worker (the "Count V Defendants") breached the Shareholders Agreement by depriving GB-SP of its rights to (1) receive information concerning BSW; (2) inspect BSW's finances and accounts; (3) designate Kinsella as the GB-SP Director; (4) select and appoint the independent directors and board chairman alongside the Management Directors; and (5) have the GB-SP Director attend BSW board meetings held no less than every other month.[230]

### 1. The Count V Defendants are Parties to the Shareholders Agreement.

Five of the seven Count V Defendants—Davis, Doheny, LaCivita, Scher, and Worker—argue that they cannot be liable for any breach of the Shareholders Agreement because they are not parties to the agreement.[231] The original

---

[230] Pls.' Post-Trial Opening Br. 47; *see, e.g.*, JX 1 §§ 2.1(a)–(b), 2.2, 3.3(a)(ii)(A), 3.3(a)(ii)(C), 3.5, 3.6(d).

[231] BSW Defs.' Post-Trial Answering Br. 22.

Shareholders Agreement, executed in January 2011, is signed by BSW, GB-SP, Curtis, Stephen Hanton, Jon Wohlfert, and BridgeStreet Worldwide Management Company Phantom Share Program Trust.[232] Sections 6.3 and 6.4 of the Shareholders Agreement state that BSW will sell shares of Class B common stock to Worker, as CEO, and each of the directors appointed pursuant to Section 3.3(a)(ii)(C).[233] Each purchaser of equity securities pursuant to Sections 6.3 and 6.4 is required to execute a joinder agreement binding them to the conditions and provisions of the Shareholders Agreement.[234]

There are no executed joinder agreements in the trial record for Davis, Doheny, LaCivita, Scher, or Worker. Nevertheless, it is apparent that Davis, Doheny, LaCivita, and Scher were each appointed pursuant to Section 3.3(a)(ii)(C), and under Section 6.6, they were required to execute joinder agreements.[235] Additionally, Davis, Doheny, LaCivita, Scher, and Worker each executed the September 2011 amendment to the Shareholders Agreement, signing "as shareholder

---

[232] JX 1 at 23–24.

[233] *Id*. §§ 6.3, 6.4.

[234] *Id.* § 6.6; *id*. at 26.

[235] Pursuant to Section 3.3 of the Shareholders Agreement, the two Management Directors, the GB-SP Director, and four independent directors comprised the BSW board. Curtis and Worker were the Management Directors. Therefore, Davis, Doheny, LaCivita, and Scher were the four independent directors.

and director."[236]   Both the Shareholders Agreement and the amendment defined "shareholders" as "all other holders of shares of capital stock of the Company from time to time,"[237] and the amendment provided that it and the Shareholders Agreement are "one and the same instrument."[238]   By signing the amendment as shareholders, each of Davis, Doheny, LaCivita, Scher, and Worker became parties to and bound by the Shareholders Agreement.  Thus, Plaintiffs proved that the Count V Defendants are all parties to the Shareholders Agreement.

### 2.   The Count V Defendants' Attempts to Evade Liability are Without Merit.

The Count V Defendants assert an array of defenses and arguments to evade liability for breach of the Shareholders Agreement.  Each is without merit.  First, the Count V Defendants cite *Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958 (Del. Ch. Sept. 29, 2016), for the proposition that directors or officers "are not liable on corporate contracts as long as they do not purport to bind themselves individually."[239]   *Huff Energy* does not help the Count V Defendants.  Unlike the directors in *Huff Energy*, who bound themselves to the shareholders agreement

---

[236] JX 10 at 3–8.  In addition, the stipulation of settlement identified Curtis, Davis, Doheny, LaCivita, Scher, and Worker as BSW stockholders and was signed on their behalf by their counsel.  Dkt. 47 ¶ 3.

[237] JX 1 at 1; JX 10 at 1.

[238] JX 10 § 2.

[239] BSW Defs.' Post-Trial Answering Br. 23 (quoting *Huff Energy*, 2016 WL 5462958, at *7).

solely in their representative capacity, Davis, Doheny, LaCivita, Scher, and Worker bound themselves individually as "shareholders" to the Shareholders Agreement, as amended. *Cf. Huff Energy*, 2016 WL 5462958, at *7 ("While it is true that [the directors] signed the Shareholders Agreement, it is clear on the face of the document that they did so in a representative, not individual, capacity. . . . The [directors] were not personally obligated to perform under the contract and cannot be held liable for breach of the contract.").

The Count V Defendants next argue that claims pertaining to the Shareholders Agreement may only be asserted as part of GB-SP's fiduciary duty claims.[240] This, too, ignores that Curtis, Davis, Doheny, LaCivita, Scher, and Worker are parties to the Shareholders Agreement as directors *and* as stockholders. *Cf. Lacey v. Mota-Velasco*, 2021 WL 508982, at *1 (Del. Ch. Feb. 11, 2021) (concluding that claims asserted against directors, solely in that capacity, for breach of the company's certificate of incorporation sounded in fiduciary liability, not contractual liability). Unlike in *Lacey*, GB-SP asserted its breach of contract claim against the Count V Defendants as stockholders and contractual parties to the Shareholders Agreement. Therefore, *Lacey* is inapposite, and GB-SP's claim for breach of the Shareholders

---

[240] *Id.* at 24.

Agreement against the parties to that agreement is a direct claim for breach of contract.[241]

The Count V Defendants next contend that they cannot be held liable for breach of the Shareholders Agreement because they relied on the Company's counsel and are protected under 8 *Del. C.* § 141(e).[242] Under Delaware law, directors are permitted to rely on the advice and counsel of professionals and experts:

> A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.

8 *Del. C.* § 141(e).

The Count V Defendants' invocation of Section 141(e) fails for at least three independent reasons. First, a defense based on Section 141(e) is an affirmative defense. *See Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *3 n.7 (Del. Ch. Dec. 19, 2002) (observing that "the protections of § 141(e) would constitute an

---

[241] The Count V Defendants' argument also ignores that they acknowledged specific performance and damages would be available against them in the event of a breach of the Shareholders Agreement. JX 1 § 7.10.

[242] BSW Defs.' Post-Trial Answering Br. 25–27.

affirmative defense"), *aff'd*, 825 A.2d 239 (Del. 2003) (TABLE); *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 56 (Del. Ch. 2013) (referring to a defense of reliance on advisers under Section 141(e) as an "affirmative defense"); *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 48 (Del. Ch. 2014) (same). Affirmative defenses are required to be asserted in an answer or in an amended answer. *See* Ct. Ch. R. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."); *Knutkowski v. Cross*, 2011 WL 6820335, at *2 (Del. Ch. Dec. 22, 2011) (observing that Court of Chancery Rules 8(c), 12(b), and 15(a) "suggest that a defendant is required to plead affirmative defenses in her answer, but that, if the defendant fails to do so, the Court has discretion to allow the defendant to amend her answer"); *Anderson v. Hill*, 2020 WL 2128738, at *5 n.35 (Del. Ch. May 5, 2020) ("Court of Chancery Rule 8(c) requires a defendant to raise an affirmative defense . . . in a responsive pleading."). As a general rule, the failure to raise an affirmative defense in an answer constitutes waiver. *See Anderson*, 2020 WL 2128738, at *5 n.35 ("[An affirmative defense] was not plead in Defendants' answer, nor is there a motion before the Court to amend Defendants' answer, so that defense is waived unless an amendment is subsequently sought and allowed."). Here, the Count V Defendants did not assert a Section 141(e) defense in their answer and did not at any point seek to amend their answer. Thus, the defense is waived.

52

Second, the Count V Defendants cite no authority for the proposition that they can rely on Section 141(e) as a complete defense to claims asserted against them for breach of the Shareholders Agreement in their capacities as stockholders.[243] Third, the Count V Defendants cite no specific evidence of any attorney advising them that they could refuse to seat Kinsella as the GB-SP Director or deprive GB-SP of its information rights under the Shareholders Agreement.[244] At best, Akin Gump created a gauntlet to slow GB-SP from enforcing its rights after it had been acquired by IEOT. But by March 26, 2013, there could be no mistake that IEOT's acquisition of GB-SP had not violated the Shareholders Agreement, and IEOT-controlled GB-SP had an enforceable right under the Shareholders Agreement to designate Kinsella as the GB-SP Director and to obtain information as a stockholder.[245]

### 3. The Alleged Breaches

With the Count V Defendants' preliminary defenses resolved, the court evaluates each provision of the Shareholders Agreement that GB-SP claims was breached.

---

[243] *See id.* at 25–27.

[244] Worker said it was not in his "purview" to make decisions concerning GB-SP's rights and claimed not to know if the Pre-Forbearance Directors discussed Akin Gump's conclusions. Tr. 718:4–13, 721:10–17, 728:5–22 (Worker). Worker's testimony did not come close to establishing a legitimate defense based on Section § 141(e).

[245] *See* JX 170 at 1.

### a. Sections 2.1(b) and (c)

Section 2.1(b) of the Shareholders Agreement required BSW to furnish to each stockholder, as soon as practicable after the end of each fiscal year and in any event within 120 days thereafter, BSW's audited consolidated balance sheet, income statement, and cash flow statement.[246] Section 2.1(c) required BSW to furnish to each shareholder, as soon as practicable after the end of the first, second, and third quarterly accounting periods and in any event within 45 days thereafter, a consolidated balance sheet, income statement, and cashflow statement.[247]

GB-SP, in all relevant periods to this dispute, was a stockholder of BSW.[248] BSW's fiscal year ended on December 31, 2012. Under the Shareholders Agreement, BSW had 120 days from that date to provide GB-SP with BSW's audited consolidated balance sheet, income statement, and cash flow statement. The first quarter ended on March 31, 2013, triggering BSW's obligation to provide GB-SP with a consolidated balance sheet, income statement, and cash flow statement within 45 days. On June 14, 2013, more than two months after the yearly information was due and around a month after the quarterly information was due, GB-SP had yet to receive the required financial information and sent a letter to BSW

---

[246] JX 1 § 2.1(b). Section 2.1(b) did not impose an obligation on stockholders, just the Company.

[247] *Id.* § 2.1(c).

[248] PTO ¶¶ 6, 25; Tr. 13:13–20 (Kinsella).

requesting it.[249] GB-SP again renewed its request on July 10, 2013, asking for largely the same information[250] and noting that since its last letter, "most of the demanded documents and other materials have not been provided."[251]

Despite these repeated requests and GB-SP's contractual rights to receive the requested information, the Count V Defendants did not fulfill these requests. GB-SP's July 10 letter noted that most of the demanded documents had not yet been delivered. The Count V Defendants do not attempt to argue that these requests were ever fulfilled. GB-SP should not have even needed to request this information, as BSW was required to deliver it under the Shareholders Agreement. When BSW failed to deliver the required information, BSW breached Sections 2.1(b) and (c) of the Shareholders Agreement.

### b. Section 2.2

Section 2.2 of the Shareholders Agreement required BSW to provide a stockholder with information relating to the financial condition, business, prospects,

---

[249] JX 47.

[250] The requests made on June 14, 2013, differ from those made on July 10, 2013, in two respects. The first request sought an audited consolidated balance sheet, income statement, and cash flow statement for fiscal years ended December 31, 2012, and December 31, 2013. JX 47 at 3. The second request sought the same information, but for fiscal years ended December 31, 2011, and December 31, 2012. JX 48 at 4. The second request also sought "all documents relating to the investment in BSW by Versa [] or any of its affiliates." *Id.* at 5.

[251] JX 48 at 2.

or corporate affairs of BSW that a stockholder reasonably requested.[252]  GB-SP's June 14 and July 10 letters also requested BSW's organizational documents, records from board and stockholder meetings, information about the Company's capital structure, and other reasonable categories of information under Section 2.2.[253]  As with the financial statements, GB-SP did not receive this information despite repeated requests over several months.  The Company does not dispute the reasonableness of GB-SP's requests or contend that the Company had a right to withhold such information.  BSW simply failed to comply with GB-SP's requests and kept GB-SP in the dark, thereby violating GB-SP's inspection rights as a stockholder under Section 2.2 of the Shareholders Agreement.  When BSW failed to deliver the required information, BSW also breached Section 2.2 of the Shareholders Agreement.

### c.    Section 3.3(a)(ii)(A)

Section 3.3 of the Shareholders Agreement detailed the procedures for electing or designating members to BSW's board of directors.  Section 3.3(a) states:

> For so long as any obligations under the Senior Credit Agreement remain outstanding or the Senior Lenders hold any Shares or the Warrants, each Shareholder will vote all of its Voting Stock and take all other necessary or desirable actions within its control (whether in the capacity of stockholder, director, member of the executive

---

[252] JX 1 § 2.2.  Section 2.2 did not impose an obligation on stockholders, just the Company.
[253] JX 47 at 3–5; JX 48 at 4–6.

committee or officer of the Company or otherwise) in order to accomplish the following:

> (i) Cause the Board to consist of not more than seven (7) members; and
>
> (ii) If necessary for the election of such individuals to the Board, vote all of its Voting Stock in favor of the following persons:
>
> > (A) One (1) representative designated by [GB-SP] who shall not be an executive of the Company . . . (the "[GB-SP] Director")[.][254]

Preventing a stockholder from exercising its bargained-for contractual protections in a stockholders agreement constitutes a violation of the implied obligation to perform the stockholders agreement in good faith. *See Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1998 WL 71836, at \*8 (Del. Ch. Feb. 4, 1998), *as revised* (Mar. 5, 1998). Section 3.3(a)(ii)(A) required the Pre-Forbearance Directors, as stockholders, to take all actions necessary or desirable to vote their stock in favor of electing Kinsella as the GB-SP Director.

On December 24, 2012, IEOT sent a letter notifying BSW that IEOT "now owns all of the issued and outstanding common stock in BSW previously owned by GB-SP."[255] The letter also notified BSW that IEOT was appointing Kinsella as the

---

[254] JX 1 § 3.3(a).

[255] PTO ¶ 22; JX 23 at 4.

57

GB-SP Director.[256] At this point, the Pre-Forbearance Board should have begun taking the actions necessary to elect Kinsella as the GB-SP Director. Instead, on December 28, 2012, Berchem from Akin Gump and Worker began scheming to devise any basis to prevent Kinsella from being seated on the board. First, they questioned the propriety of Kinsella's ownership of GB-SP.[257] This concern grew out of GB-SP's December 24, 2012 letter, which could be read to suggest that GB-SP had directly transferred its BSW stock to IEOT. A transfer of GB-SP's BSW stock might have violated transfer restrictions imposed by GB-SP's operating agreement and the notice provisions of the Shareholders Agreement.[258] On January 4, 2013, however, IEOT clarified that it had acquired ownership of GB-SP itself, and GB-SP was still the owner of the BSW shares.[259] Having explained why BSW's concerns regarding GB-SP's letter were unfounded, GB-SP renewed its demand to have Kinsella seated as the GB-SP Director and to receive the requested documents.[260]

---

[256] *Id.*

[257] *See* JX 217; JX 218.

[258] JX 24 at 2.

[259] JX 25 at 1.

[260] *Id.* at 2.

For the next ten months, BSW and the Pre-Forbearance Directors stonewalled GB-SP and prevented Kinsella from being seated until October 11, 2013.[261] GB-SP proved that each of the Count V Defendants failed to take "all . . . necessary or desirable actions within its control" to seat Kinsella on the BSW board.[262] The ten-month delay in seating Kinsella was antithetical to the Count V Defendants' obligations in the Shareholders Agreement and constituted a breach of Section 3.3(a)(ii)(A).[263] Because the Count V Defendants breached Section 3.3(a)(ii)(A), GB-SP was deprived of its governance rights in Sections 3.3(a)(ii)(C) and 3.6(d).

### 4. The Remedy for Breach of the Shareholders Agreement

GB-SP seeks various forms of relief for breach of the Shareholders Agreement. First, it seeks rescission of all board action taken after the Count V

---

[261] *See* JX 29, JX 36, JX 39, JX 40, JX 43, JX 46, JX 52, JX 61 (February 4, March 10, April 2, April 9, May 2, June 12, August 2, and September 17, 2013 board meetings held without a GB-SP designee); JX 45, JX 47, JX 48, JX 57 (June 10, June 14, July 10, August 20, 2013 letters to BSW and Akin Gump pressing for GB-SP's informational and corporate governance rights under the Shareholders Agreement).

[262] JX 1 § 3.3(a).

[263] The Count V Defendants make two other arguments that do not merit serious consideration. First, they argue that the delay did not harm Kinsella because "[o]nce Kinsella was seated on the Board, he had ample opportunity to voice his thoughts on the best solution to BSW's debt crisis." BSW Defs.' Post-Trial Answering Br. 33. But by October 2013, the Company had already entered into the Forbearance Agreement, and by failing to elect Kinsella, the Count V Defendants had already breached the Shareholders Agreement. Second, the Count V Defendants point to the director exculpation provision in Section 7(a) of BSW's amended and restated certificate of incorporation. *Id.* at 36–37; *see* JX 5 § 7(a). Section 7(a) of BSW's certificate exculpates directors from personal liability for money damages for duty of care claims, not breach of contract claims in their individual capacities as parties to the Shareholders Agreement.

59

Defendants refused to seat Kinsella as a director.[264] Second, in the alternative, GB-SP seeks rescissory damages.[265] Third, GB-SP seeks an order requiring the production of information sought under the Shareholders Agreement.[266] GB-SP separately argues that it is entitled to its attorneys' fees and costs pursuant to Section 7.6 of the Shareholders Agreement.[267]

### a.     Rescission

Rescission is an equitable remedy that "results in abrogation or 'unmaking' of an agreement, and attempts to return the parties to the status quo." *Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982). Rescission is an extraordinary remedy and is granted in "rare scenarios." *Grzybowski v. Tracy*, 2013 WL 4053515, at *7 (Del. Ch. Aug. 9, 2013); *see Craft v. Bariglio*, 1984 WL 8207, at *12 (Del. Ch. Mar. 1, 1984) ("[R]escission will not be granted unless the Court can and does, by its decree, restore the parties substantially to the position which they occupied before making the contract."). GB-SP acknowledges that rescission is impractical at this stage, given that the challenged transactions occurred more than a decade ago.[268] Instead, it seeks the alternative remedy of rescissory damages.

---

[264] Pls.' Post-Trial Opening Br. 54–56.

[265] *Id.* at 55.

[266] *Id.* at 48.

[267] *Id.* at 49; Pls.' Post-Trial Reply Br. 7.

[268] Pls.' Post-Trial Opening Br. 11, 55.

### b. Rescissory Damages

Rescissory damages are the "monetary equivalent of rescission," and may be awarded if the remedy of rescission is impractical but otherwise warranted. *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501 (Del. 1981), *overruled in part on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983). "Rescissory damages are designed to be the economic equivalent of rescission in a circumstance in which rescission is warranted, but not practicable." *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 855 A.2d 1059, 1072 (Del. Ch. 2003), *aff'd*, 840 A.2d 641 (Del. 2003) (TABLE). "[R]escissory damages are the exception, not the rule." *Universal Enter. Gp., L.P. v. Duncan Petroleum Corp.*, 2014 WL 1760023, at *6 (Del. Ch. Apr. 29, 2014), *aff'd*, 99 A.3d 228 (Del. 2014) (TABLE).

An award of rescissory damages "rests in the court's sound discretion." *Telstra Corp. v. Dynegy, Inc.*, 2003 WL 1016984, at *8 n.22 (Del. Ch. Mar 4, 2003). Rescissory damages are inappropriate here for the simple reason that GB-SP has delayed far too long in presenting its claim. "It is a well-established principle of equity that a plaintiff waives the right to rescission by excessive delay in seeking it." *Gotham P'rs L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 174 (Del. 2002) (internal quotation marks omitted); *see In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 815 (Del. Ch. 2011) (stating that a "plaintiff's delay in litigating the case renders it inequitable to use a rescission-based approach"), *aff'd sub nom.*

61

*Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012). Accordingly, "if rescission itself is unwarranted because of the plaintiff's delay, so are rescissory damages." *S. Peru Copper*, 52 A.3d at 815.

GB-SP has unreasonably delayed in seeking rescissory relief. GB-SP could have asserted its claims to enforce its inspection and director designation rights in early 2013 after BSW rejected its initial requests. Instead, GB-SP waited until March 2014 to file this action, five months after Kinsella had already been seated as a director, and after the Post-Forbearance Board had approved the Consensual Foreclosure. Moreover, even after filing the complaint, GB-SP delayed for years in litigating the case. Accordingly, GB-SP is not entitled to rescissory damages for breach of the Shareholders Agreement. *See Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at *29 (Del. Ch. July 20, 2007) (stating that rescinding a transaction five years after its consummation would be an extraordinary remedy), *aff'd*, 945 A.2d 592 (Del. 2008) (TABLE); *S. Peru Copper*, 52 A.3d at 815 (declining to award rescissory damages where plaintiffs delayed in litigating their case); *but see Orchard Enters.*, 88 A.3d at 40–41 (refusing, at the summary judgment stage, to preclude an award of rescissory damages where plaintiff waited two years to file its complaint and discussing cases where rescissory damages were awarded with even greater delays). GB-SP's delay in asserting its contract claims and then

its prolonged delay in bringing its case to trial renders rescissory damages an unjust result at this stage.[269]

### c.       Compensatory Damages

GB-SP has proved that the Count V Defendants breached the Shareholders Agreement and that those breaches deprived GB-SP of its information and governance rights. In a breach of contract case, the non-breaching party is entitled to recover "damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made." *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 265 (Del. 1995). "Contract damages 'are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed. Such damages should not act as a windfall.'" *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (quoting *Huggins v. B. Gary Scott, Inc.*, 1992 WL 179482, at *1 (Del. Super. June 25, 1992)).

---

[269] GB-SP also fails to articulate a coherent rescissory damages theory. "Rescissory damages restore a plaintiff to the position occupied before the defendant's wrongful acts." *Schultz v. Ginsburg*, 965 A.2d 661, 669 (Del. 2009) (internal quotation marks omitted), *overruled on other grounds by Urdan v. WR Cap. P'rs, LLC*, 244 A.3d 668 (Del. 2020). GB-SP attempts to equate the value of GB-SP's equity interest to the value of GB-SP's information and governance rights. *See* JX 157 at 18–19, 20 (Plaintiffs' expert valuing GB-SP's equity interest in BSW as $4.8 million as of December 31, 2012); Pls.' Post-Trial Opening Br. 46 (arguing that GB-SP has rescissory damages of either $4.8 million, or alternatively, $2.5 million, which represents the value of GB-SP's equity interest as of December 13, 2013). But GB-SP does not explain how awarding it the value of its equity stake in BSW would put it in the same position as if GB-SP had received the information that it requested and if BSW had promptly seated Kinsella as the GB-SP Director.

"'Expectation damages are measured by the losses caused and gains prevented by defendant's breach.'" *Id.* at 146–47 (quoting *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998)).

Quantifying the value of governance rights is a difficult endeavor. *See W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 311 A.3d 809, 860, 865 (Del. Ch. 2024) (explaining that "[g]overnance arrangements . . . involve control rights [] so the presumptive remedy will be equitable relief enforcing the right" and "it would be difficult for a court to construct a damages remedy for breach"); *see also* Avner Kalay, *The Market Value of Corporate Votes: Theory and Evidence from Option Prices*, 69 J. Fin. 1235, 1236 (2014) (explaining that "[s]eparating the value of voting rights from that of cash flow rights . . . is not trivial" and analyzing three different methods of estimating the value of voting rights). GB-SP does not attempt to establish the value of its information and governance rights or to present a damages theory. The court declines to do so on its own. That does not mean, however, that GB-SP is entitled to no relief.

"Even if compensatory damages cannot be or have not been demonstrated, the breach of a contractual obligation often warrants an award of nominal damages." *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009); *LaPoint v. AmerisourceBergen Corp.*, 2007 WL 2565709, at *9 (Del. Ch. Sept. 4, 2007) ("[W]here the amount of damages may not be

estimated with reasonable certainty despite a showing of breach on the part of defendant, the Court may still award nominal damages."), *aff'd*, 956 A.2d 642 (Del. 2008) (TABLE). Nominal damages are "'usually assessed in a trivial amount, selected simply for the purpose of declaring an infraction of the Plaintiff's rights and the commission of a wrong.'" *Ivize of Milwaukee*, 2009 WL 1111179, at \*12 (quoting *Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, 2005 WL 3502054, at \*15 (Del. Ch. Dec. 15, 2005)).

The Count V Defendants argue that the breach of contract claim has no associated harm, as Kinsella's vote, numerically, would not have changed the board's ultimate decisions. That cannot be the case. Delaware has a board-centric system. *See OptimisCorp v. Waite*, 137 A.3d 970, 970 (Del. 2016) (TABLE) (noting that Delaware "value[s] the collaboration that comes when the entire board deliberates on corporate action and when all directors are fairly accorded material information"); J. Travis Laster & John Mark Zeberkiewicz, *The Rights & Duties of Blockholder Directors*, 70 Bus. Law. 33, 35 (2015) ("Delaware corporate law embraces a 'board-centric' model of governance. This model expects that all directors will participate in a collective and deliberative decision-making process."). As a foundational case in this jurisdiction has explained:

> Each member of a corporate body has the right to consultation with the others and has the right to be heard upon all questions considered, and it is presumed that if the absent members had been present they might have dissented and their arguments might have convinced the majority

65

of the unwisdom of their proposed action, and thus have produced a different result.

*Lippman v. Kehoe Stenograph Co.*, 95 A. 895, 899 (Del. Ch. 1915) (internal quotation marks omitted). In recognition of this principle, "[w]e proceed on the premise that if proper procedures were followed, then even a director in the minority could, like the 12th juror, sway the rest of his board colleagues to what he believed was the right answer." *Perry v. Sheth*, C.A. No. 2020-0024-JTL, at 51:21–52:1 (Del. Ch. Jan. 16, 2020) (TRANSCRIPT). The Count V Defendants' breach of the Shareholders Agreement prevented GB-SP's designee from being heard in the boardroom. They also purposefully delayed seating Kinsella so as to prevent him from exercising the contractual right to vote on the Forbearance Agreement and to appoint the independent directors who would replace Davis, Doheny, LaCivita, and Scher when they agreed not to seek re-election. GB-SP was harmed and is entitled to a remedy.

Accordingly, having proved breach, but having failed to prove damages, GB-SP is awarded nominal damages of $1.

#### d.    Attorneys' Fees and Expenses

"Delaware generally follows the American Rule, under which litigants are responsible for their own attorneys' fees, regardless of the outcome of the lawsuit." *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 280 (Del. 2022). An exception to the American Rule "is found in contract litigation that involves a fee shifting provision."

*Id.* (internal quotation marks omitted). When a contract contains a fee shifting provision, Delaware courts will enforce that provision. *Id.*

Section 7.6 of the Shareholders Agreement provides that the prevailing party in any dispute "shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to [the Shareholders] Agreement," including reasonable attorneys' fees and expenses.[270] Having prevailed in proving a breach of the Shareholders Agreement, GB-SP is entitled to recover under Section 7.6 its attorneys' fees and expenses incurred in proving the Count V Defendants' breach of the Shareholders Agreement.

## B. Count VI (Tortious Interference with Shareholders Agreement)

In the complaint, GB-SP asserted a claim against the Versa Defendants for tortious interference with the Shareholders Agreement.[271] On May 31, 2018, the court granted the Versa Defendants' motion to dismiss this claim with prejudice.[272] In their post-trial briefing, however, GB-SP seeks to resurrect this claim.[273] GB-SP may not do so. A "dismissal with prejudice is law of the case." *Sciabacucchi v. Malone*, 2021 WL 3662394, at *1 (Del. Ch. Aug. 18, 2021). "The law of the case doctrine . . . is intended to prevent pernicious serial litigation of issues already

---

[270] JX 1 § 7.6.

[271] Compl. ¶¶ 100–02.

[272] Dkt. 92 at 26:1–8.

[273] Pls.' Post-Trial Opening Br. 10–11, 49–51; Pls.' Post-Trial Reply Br. 19–25.

decided in the matter at bar." *Id.* "The efficient disposition of a case requires that each stage of litigation build on the previous stages, and that parties not be free to relitigate every earlier ruling." *Nebel v. Sw. Bancorp., Inc.*, 1999 WL 135259, at *5 (Del. Ch. Mar. 9, 1999). "[T]o avoid dismissal under the law of the case doctrine, the plaintiffs must submit some new information or allegations that would serve to revitalize the claims that were previously raised, adjudicated, and found deficient." *Id.* Thus, "[o]nly where the moving party can show that justice compels departure from the doctrine due to clear error, injustice, or a change in circumstances is such relief granted." *Sciabacucchi*, 2021 WL 3662394, at *1.

Plaintiffs do not attempt to address the law of the case doctrine in their briefing. Accordingly, they have waived any argument against its application. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."). As such, here, the law of the case doctrine operates to bar the re-litigation of Count VI.

### C. Count IV (Violation of BSW's By-Laws)

Count IV alleges that the BSW Defendants breached BSW's by-laws by not providing notice of board meetings to Kinsella or permitting him to attend board meetings from late December 2012 until his election in October 2013. The BSW Defendants argue that the exclusion of Kinsella from board meetings prior to October 11, 2013, did not violate the by-laws because Kinsella was not a director

68

prior to that date.[274] Because Kinsella was not a director, the BSW Defendants maintain that Kinsella had no right to be informed of or participate in board meetings. The court agrees. Under the by-laws, Kinsella had no right to receive notice of or to attend board meetings until he became a director.[275] The Company's refusal to seat Kinsella as a director violated the Shareholders Agreement, not the by-laws.

In addition, Kinsella claims that the BSW Defendants violated the by-laws because the March 2, 2014 special meeting of the board was not called by the President, and Kinsella did not receive timely notice of the meeting. Kinsella argues that the actions taken at the March 2 special meeting were void *ab initio* and not subject to ratification.[276]

As a general matter, "[u]nlike with regular meetings, directors must be given notice of special meetings." *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1045 n.64 (Del. 2014); *see also Lippman*, 95 A. at 898 ("It is, of course, fundamental that a special meeting held without due notice to all the directors is not lawful[.]"). The

---

[274] BSW Defs.' Post-Trial Answering Br. 44.

[275] JX 2 Art. III § 6 ("Regular meetings of the Board of Directors may be held with one (1) day's notice to *each director*[.]" (emphasis added)); *id.* Art III § 7 ("Special meetings of the Board of Directors may be called by the President on two (2) days' notice to *each director*[.]" (emphasis added)).

[276] Pls.' Post-Trial Opening Br. 52–55.

BSW by-laws required two-days' notice for special meetings of the board.[277] Kinsella argues that the BSW Defendants breached the by-laws because notice of the March 2 special meeting was sent eight minutes after the two-day notice deadline. Kinsella cites to this court's decisions in *Schroder v. Scotten, Dillon Company*, 299 A.2d 431 (Del. Ch. 1972), *Moore Business Forms, Inc. v. Cordant Holdings Corporation*, 1998 WL 71836 (Del. Ch. Feb. 4, 1998), and *Rainbow Mountain v. Begeman*, 2017 WL 1097143 (Del. Ch. Mar. 23, 2017), in support of his position.

In *Schroder*, a board of directors failed to provide notice to a director of one special meeting and falsely informed the same director that a second special meeting was rescheduled. 299 A.2d at 435–36. This court held that the actions taken at both meetings were invalid because the director did not receive notice of the meetings, and "special meeting[s] held without due notice to all directors as required by the by-laws [are] not lawful and all acts done at such [] meeting[s] are void." *Id.* at 435. This court also held that the director's absence at the second meeting was procured by trickery because the board chairman represented that the meeting had been rescheduled, and the director relied on that representation in not attending the

---

[277] JX 2 Art. III § 7. The by-laws do not speak in terms of hours or minutes. The BSW Defendants concede that the notice was late but argue that the minor delay does not constitute a breach because Kinsella would not have seen the notice until the next morning even if it had been sent eight minutes earlier. BSW Defs.' Post-Trial Answering Br. 46–48.

70

meeting. *Id.* at 436 ("A quorum obtained by trickery is invalid, and the reasoning which forbids trickery in securing a quorum applies equally well to securing the absence of opposing directors from a meeting by representing that such a meeting will not be held." (citations omitted)).

In *Moore*, a board of directors intentionally did not give notice of a special meeting to a director. 1998 WL 71836, at *4, *7. At a second special meeting a few weeks later that the director attended, the board purported to ratify resolutions that it had adopted at the first special meeting. *Id.* at *7. This court held that actions taken at the first special meeting were void and could not be ratified because the director was intentionally not given notice of the meeting. *Id.* In doing so, this court observed that "Delaware law is well settled that board action taken in the absence of a director, where the absence is obtained by trickery or deceit or where notice of a special meeting was not given to a director, is void." *Id.*

In *Rainbow Mountain*, the court held that two members were removed without cause in violation of the company's by-laws because they were not given notice of their proposed removal or the opportunity to be heard. 2017 WL 1097143, at *9. Because the removal contravened the company's by-laws, the court concluded that equitable defenses could not be asserted, and the defendant was not estopped to

71

argue that the members were improperly terminated even though he participated in their removal. *Id.* at *10.[278]

These cases are distinguishable. *Rainbow Mountain* did not involve a dispute over notice of a special board meeting, so it is inapposite. And, unlike in *Schroder* and *Moore*, there was no trickery employed by the BSW Defendants to procure Kinsella's absence at the special meeting.[279] Kinsella received notice of the special

---

[278] The court in *Rainbow Mountain* cited approvingly the following proposition:

> Delaware law distinguishes between (i) a failure to give notice of a board meeting in the specific manner required by the bylaws and (ii) a contention that the lack of notice was inequitable. In the former scenario, board action taken at the meeting is void. In the latter scenario, board action is voidable in equity, so equitable defenses apply. . . . [T]raditionally when a board took action in contravention of a mandatory bylaw, the board action was treated as void.

2017 WL 1097143, at *9 (quoting *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *19 (Del. Ch. Oct. 11, 2013), *aff'd*, 106 A.3d 1035 (Del. 2014)). The Supreme Court affirmed the holding in *Klaassen* but declined to opine on this rule. *Klaassen*, 106 A.3d at 1046 n.75 ("We need not approve or disapprove that rule, because such a broad pronouncement is not necessary to decide this case."). In a later case, this court questioned whether *Klaassen* accurately expressed the rule, explaining instead that "action taken in violation of a bylaw" should be treated "as voidable, not void (as long as it was action that the corporation otherwise had authority to take under the DGCL and in compliance with its certificate of incorporation." *XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 667 (Del. Ch. 2022), *aff'd in part, rev'd in part*, 304 A.3d 896 (Del. 2023). The Supreme Court did not address this issue on appeal. *XRI Inv. Hldgs.*, 304 A.3d at 918 n.93.

[279] Both parties cite to this court's decision in *Pepsi-Cola Bottling Company v. Woodlawn Canners, Inc.*, 1983 WL 18017 (Del. Ch. Mar. 14, 1983). Unlike in this case, the by-laws at issue in *Pepsi-Cola* expressly provided that notice was not required for special board meetings. *Id*. at *12. As such, *Pepsi-Cola* is distinguishable.

meeting, appreciated its significance, and decided not to attend.[280] At no time prior to the meeting did Kinsella complain that the notice failed to comply with the by-laws.

The purpose of advanced notice for special board meetings is to ensure full participation in corporate democracy and to disincentivize conduct designed to prevent directors from participating in board decision making. *See Lippman*, 95 A. at 898; *OptimisCorp*, 137 A.3d at 970. Kinsella was not prevented from participating in the board's decision-making process. To the contrary, Kinsella was aware of the special meeting and could have attended but made the decision not to.[281] In light of these circumstances, the court concludes that the minor delay in the delivery of notice does not warrant invalidating the actions taken at the special meeting.

Kinsella next argues that the BSW Defendants breached the by-laws because "the [special] meeting was not called by the President or upon written request by

---

[280] Tr. 61:7–22 (Kinsella) (explaining that he "decided not to attend [the special meeting] in protest"). Kinsella also conceded at trial that the delay was probably the result of "human error," and even if the notice had been sent eight minutes earlier, he still would not have seen it until the next morning. *Id.* at 61:17, 163:20–164:20 (Kinsella).

[281] JX 161 at 146:19–20 (Kinsella Dep.) ("It would've have been no problem to attend [the special meeting] by telephone."); Tr. 164:21–165:4 (Kinsella) ("Q. And it would have been easy for you to attend the board meeting because it was telephonic; right, sir? A. I think I could have made the phone call, all right, if I -- yes, I think I could. Q. Right. And you chose not to; right, sir? A. I chose not to, yes.").

two directors."[282]  The by-laws provide that "[s]pecial meetings . . . may be called by the President . . . [and] shall be called by the President . . . upon the written request of a [sic] two (2) of the directors then in office."[283]  The by-laws further provide that "[a]ny notice may be given by the Secretary."[284]  At the time the notice was sent, Holland from Akin Gump was acting as BSW's secretary.[285]  Under the by-laws, "[t]he Secretary . . . shall perform such other duties as may be prescribed by the Board of Directors or President, under whose supervision he shall be."[286]  There is nothing in the record to indicate that Holland was not acting on behalf of the board or the President when he sent the notice of the special meeting—BSW's President, Curtis, was not deposed and did not testify at trial.[287]  As such, the court concludes that the BSW Defendants did not breach the by-laws.

---

[282] Pls.' Post-Trial Opening Br. 53.

[283] JX 2 Art. III § 7.

[284] *Id.*

[285] *See* JX 111 at 4 (February 25, 2014 board meeting minutes signed by Holland as "Acting Secretary"); JX 116 at 5 (March 2, 2014 board meeting minutes signed by Holland as "Acting Secretary").

[286] JX 2 Art. VI § 10.

[287] To the extent there is any dispute over whether Holland's sending of the notice constituted a breach of the by-laws, the court concludes that no breach occurred.  As acting Secretary, Holland was authorized under the by-laws to send notice of the special meeting. *Id.* Art. VI § 10 ("The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors[.]").  Further, the requirement of who sends the notice "must be regarded as precatory and ministerial, not mandatory." *In re Bigmar, Inc.*, 2002 WL 550469, at *19 (Del. Ch. Apr. 5, 2002); *see, e.g.*, *Sarabyn v. Jessco, Inc.*, 1978 WL 2504, at *2 (Del. Ch. Sept. 20, 1978) (declining to

#### D.    Count I (Breach of Fiduciary Duty)

Count I is a derivative claim for breach of fiduciary duty against the Director Defendants.[288] "A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

Directors of Delaware corporations owe two fundamental fiduciary duties to the corporation and its stockholders—the duty of care and the duty of loyalty. *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986). "The fiduciary relationship requires that the directors act prudently, loyally, and in good faith to maximize the value of the corporation over the long-term[.]" *Frederick Hsu Living Tr. v. ODN Hldg. Corp.* (*ODN I*), 2017 WL 1437308, at *18 (Del. Ch. Apr. 14, 2017), *corrected* (Apr. 25, 2017) (citing *Gantler v. Stephens*, 965 A.2d 695, 706 (Del. 2009)); *see also Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020) ("These duties 'do[] not operate intermittently' but are 'the constant compass by which all director actions for the corporation and interactions with its shareholders must be guided.'" (alteration in original) (quoting *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998))).

---

issue a TRO to enjoin a special meeting of stockholders where the notices and proxy materials were sent by the company's president instead of the secretary as provided by the by-laws and characterizing the objection as "hyper-technical").

[288] The court previously concluded that demand was excused as to the fiduciary duty claims. Dkt. 92 at 13:18–15:4.

When a Delaware corporation is facing insolvency, a director's fiduciary responsibilities "do[] not change:  directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners."  *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007); *see also McRitchie v. Zuckerberg*, 315 A.3d 518, 546 (Del. Ch. 2024) ("[E]ven in the vicinity of insolvency, the directors remain[] obligated to strive to increase the value of the corporation for the ultimate benefit of its stockholders.").

When a Delaware corporation becomes insolvent, directors "continue to owe fiduciary duties to the corporation for the benefit of all of its residual claimants, a category which now includes creditors."  *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 546–47 (Del. Ch. 2015).[289]  In circumstances of insolvency, a director's duty to maximize the long-term value of the corporation does not necessarily equate to "acting to ensure the corporation's perpetual existence."  *ODN I*, 2017 WL 1437308, at *19.  Rather, "the efficient liquidation of an insolvent firm

---

[289] As this court recently explained, when a corporation is insolvent, "the value of the corporation is insufficient to pay all of its fixed claimants and leave a residuum.  The residual distribution—in the sense of the last money the corporation has—goes at least partially to pay a class of creditors.  Those not-fully-paid creditors therefore enter the class of residual claimants."  *McRitchie*, 315 A.3d at 547.  Directors, however, "do not owe fiduciary duties to creditors in their capacities as creditors" after the point of insolvency— only as residual claimants.  *Id.*

might well be the method by which the firm's value is enhanced." *Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 791 n.60 (Del. Ch. 2004); *see, e.g.*, *Quadrant Structured Prods.*, 115 A.3d at 546–47 (noting that directors of an insolvent company may make a business judgment that "the best route to maximize the firm's value" is to cease operations and distribute assets to the company's creditors).

GB-SP asserts that the Director Defendants breached their fiduciary duties by approving the Forbearance Agreement and the Consensual Foreclosure and contends that the court should consider both as a single transaction constituting a single fiduciary breach by the Director Defendants collectively. While these two transactions appear, in hindsight, to be causally related, the record does not support GB-SP's proffered approach. Simply put, GB-SP challenges two different decisions made by two different boards separated in time by several months. There is no evidence that Davis, Doheny, LaCivita, and Scher, who did not stand for re-election in October 2013, played any role in approving the Consensual Foreclosure. Nor has GB-SP articulated how Albright, Orlofsky, and Walker, who joined the board in October 2013, could have breached their fiduciary duties as directors in connection with a transaction that predated their tenure on the board. Accordingly, the court considers the merits of the fiduciary claim as against the Pre-Forbearance Directors

77

with respect to the Forbearance Agreement, and as against the Post-Forbearance Directors with respect to the Consensual Foreclosure.[290]

### 1. Approval of the Forbearance Agreement

#### a. Standard of Review

Delaware has three levels of judicial review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness. *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1371 (Del. 1995); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). GB-SP argues that the entire fairness standard of review applies to the approval of the Forbearance Agreement because a majority of the Pre-Forbearance Board was interested in the transaction. The Pre-Forbearance Directors argue that their decision to approve the Forbearance Agreement is subject to the business judgment rule.[291]

The "default standard of review is the business judgment rule, which is a 'presumption that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re Match Gp., Inc. Deriv. Litig.*, 315

---

[290] Evaluating the facts that underly the fiduciary duty claims is not an easy task on this record. Only three of the nine Director Defendants testified in this case, either at trial or by deposition—Orlofsky, Walker, and Worker. Worker was the only Pre-Forbearance Director that testified. None of the Company's advisers testified at trial or were deposed, and the Defendants did not offer any expert testimony. The court must rely heavily on the documentary record, which is also incomplete in many respects.

[291] Neither party argues that enhanced scrutiny is the applicable standard of review.

A.3d 446, 459 (Del. 2024) (alteration in original) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled in part by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).[292] "If the business judgment standard of review applies, a court will not second guess the decisions of disinterested and independent directors. The reviewing court will only interfere if the board's decision lacks any rationally conceivable basis, thereby resulting in waste or a lack of good faith." *Id*.

There are several ways to rebut the business judgment presumption, "including by showing that: (1) a controlling stockholder stands on both sides of a transaction or (2) at least half of the directors who approved the transaction were not disinterested or independent." *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 990 (Del. Ch. 2014) (footnotes omitted), *aff'd sub nom. Corwin v. KKR Fin.*

---

[292] In *Brehm*, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review. *See Brehm*, 746 A.2d at 253 & n.13 (overruling in part on this issue *Aronson*, 473 A.2d at 814; *Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 72–73 (Del. 1997), *as modified on denial of reh'g* (Oct. 22, 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); and *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984)). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. 746 A.2d at 253–54. The seven partially overruled precedents otherwise remain good law. This opinion does not rely on any of them for the standard of appellate review. Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, this decision omits the subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Rule 23.1 canon.

*Hldgs. LLC*, 125 A.3d 304 (Del. 2015).[293]  "If the plaintiff rebuts the business

judgment presumption, the Court applies the entire fairness standard of review[.]"

*Id*. (internal quotation marks omitted).  "Entire fairness, Delaware's most onerous

standard, applies when the board labors under actual conflicts of interest." *Trados*

*II*, 73 A.3d at 44.  Under entire fairness, the court evaluates whether "the corporate

act being challenged is entirely fair to the corporation and its stockholders." *Match*,

315 A.3d at 459.  The court considers whether "the transaction was the product of

both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc. (Technicolor*

*Plenary III*), 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted).

GB-SP does not argue that any of the Pre-Forbearance Directors lacked

independence, but instead argues that they were interested in the transaction.  The

Pre-Forbearance Board had six members when it caused the Company to enter into

the Forbearance Agreement:  Curtis, Davis, Doheny, LaCivita, Scher, and Worker.

Accordingly, GB-SP must demonstrate that at least three of those directors were

interested in the transaction for entire fairness to apply.  *Trados II*, 73 A.3d at 44

("To obtain review under the entire fairness test, the stockholder plaintiff must prove

that there were not enough independent and disinterested individuals among the

_____

[293] The complaint had originally asserted claims against the Versa Defendants as controlling stockholders of BSW, but the court dismissed those claims in 2018 because GB-SP failed to allege facts supporting a reasonable inference that Domus or Versa were controlling stockholders of the Company.  Dkt. 92 at 18:7–19:4.

directors making the challenged decision to comprise a board majority."); *see Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 718 (Del. Ch. 2023) ("[T]he Board had six members. The plaintiff must demonstrate that at least three of those directors were interested or lacked independence to support the application of entire fairness on that basis.").

A director is interested in a transaction if the director "'will receive a personal financial benefit from a transaction that is not equally shared by the stockholders' or if 'a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders.'" *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009) (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)); *see also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993) ("Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally."). "The personal benefit must be so significant that it is improbable that the director could perform her fiduciary duties . . . without being influenced by her overriding personal interest." *Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (alteration in original) (internal quotation marks omitted); *Trados I*, 2009 WL 2225958, at *6 (explaining that personal benefit received by the director

must be "of a sufficiently material importance[] in the context of the director's economic circumstances" (internal quotation marks omitted)).

GB-SP argues that all of the Pre-Forbearance Directors were interested in the Forbearance Agreement because, in connection with their approval of the agreement, each received: (1) D&O insurance coverage; (2) indemnification from Domus for claims arising out of the Forbearance Agreement and for any claims related to the Company asserted by or with the assistance of GB-SP; and (3) a release from Domus of any claims against them in connection with the Forbearance Agreement. GB-SP argues that Curtis and Worker were interested in the Forbearance Agreement for the additional reason that they entered into the September 2013 MOU, which provided them with continued employment, retention of their salaries,[294] and additional six-figure bonuses if a consensual foreclosure was approved.[295]

The court finds the benefits Curtis and Worker obtained in the September 2013 MOU, particularly the guaranty of continued employment in the event of a

---

[294] Worker's base salary was $465,000. JX 164 at 85:25–86:4 (Worker Dep.); Tr. 408:9–12, 783:6–10 (Worker). The level of Curtis's compensation is not a part of the trial record. Curtis was not deposed and did not testify at trial. Given Worker's six-figure salary and Curtis's six-figure retention bonus, the court finds it more likely than not that Curtis's salary was in the six-figure range.

[295] If a bankruptcy or foreclosure transaction was approved, Worker would earn a bonus of $150,500, and Curtis would earn a bonus of $120,500. JX 67 at 4. If a sale outside of bankruptcy occurred, Worker would receive $142,199, and Curtis would receive $107,417. *Id.* at 2. Whereas the bonuses of the other BSW executives were to be paid out regardless of their retention, Curtis's and Worker's bonuses were only to be paid out in the event of a sale outside of bankruptcy if the acquiring company elected to retain them. *Id.*

foreclosure, rendered them interested in the Forbearance Agreement. "Delaware law [] recognizes that management's prospect of future employment can give rise to a disabling conflict in the sale context." *In re Mindbody, Inc.*, 2020 WL 5870084, at *15 (Del. Ch. Oct. 2, 2020) (collecting authorities). "This theory is particularly viable where the future employment offers a marked increase in compensation from the status quo." *Id.*; *cf. In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 498 (Del. Ch. 2010) (concluding, at the preliminary injunction stage, that a director was disinterested despite receiving a retention bonus because the bonus was for less than 1% of the consideration the director would have received from an alternative transaction, and the director's interests were aligned with the company's stockholders).

Whether the remaining four directors were materially interested in the Forbearance Agreement is, however, a closer call. Davis, Doheny, LaCivita, and Scher received D&O insurance, indemnification from Domus for claims arising from the Forbearance Agreement and for claims asserted by GB-SP, and a release of claims by Domus. "Normally, the receipt of indemnification is not deemed to taint related director actions with a presumption of self-interest. That is because indemnification has become commonplace in corporate affairs, and because indemnification does not increase a director's wealth." *In re Sea-Land Corp. S'holders Litig.*, 642 A.2d 792, 804 (Del. Ch. 1993) (citations omitted), *aff'd sub*

*nom. Sea-Land Corp. S'holder Litig. v. Abely*, 633 A.2d 371 (Del. 1993) (TABLE); *see also Chester Cty. Empls.' Ret. Fund v. New Residential Inv. Corp.*, 2017 WL 4461131, at *7 (Del. Ch. Oct. 6, 2017) (concluding, in the demand futility context, that a director's receipt of indemnification and exculpation rights did not render him interested in the transaction); *Edgewater Growth Cap. P'rs LP v. H.I.G. Cap., Inc.*, 68 A.3d 197, 231–32 (Del. Ch. 2013) (finding post-trial that a secured creditor's providing indemnification to directors did not render them beholden to the creditor or prove any violation of the directors' fiduciary duties).

Moreover, although it is well-settled that a plaintiff must establish, director-by-director, the materiality of differential benefits received in connection with a challenged transaction, GB-SP has not attempted to do so here. *See City of Miami Gen. Empls.' v. Comstock*, 2016 WL 4464156, at *18 (Del. Ch. Aug. 24, 2016) ("[W]hen a party challenges a director's action based on a claim of the director's debilitating pecuniary self-interest, that party must allege that the director's interest is material to that director." (internal quotation marks omitted)); *In re Gen. Motors (Hughes) S'holder Litig*, 2005 WL 1089021, at *8 (Del. Ch. May 4, 2005) ("[P]laintiffs' allegations of pecuniary self-interest must allow the Court to infer that the interest was of a sufficiently material importance [to the director]." (internal quotation marks omitted)), *aff'd*, 897 A.2d 162 (Del. 2006). Nevertheless, the troubling circumstances surrounding the receipt of indemnification in this case lead

84

the court to conclude that all of the Pre-Forbearance Directors were materially interested in the Forbearance Agreement.

At the time the Pre-Forbearance Directors were negotiating the Forbearance Agreement, they were aware that GB-SP had an unfettered contractual right to designate a director and that GB-SP had repeatedly demanded Kinsella be seated on the BSW board.[296] As explained above, the Pre-Forbearance Board knew that it did not have a colorable argument to refuse to seat Kinsella by, at the latest, March 2013.[297] Instead, the Pre-Forbearance Directors resolutely refused to seat Kinsella and searched for a strategy "to keep [Kinsella and GB-SP] warm while we're sorting out the forbearance agreement[.]"[298] The resulting real, unmitigated litigation risk arising from the Pre-Forbearance Directors' intentional exclusion of Kinsella was not lost on the Pre-Forbearance Directors—or their D&O insurance providers.

---

[296] *See* JX 170 at 1 (March 26, 2013 email from Akin Gump to Davis, Dembiec, Worker, and other BSW executives indicating that GB-SP "is entitled to nominate one director and also is entitled to certain information rights" under the Shareholders Agreement); JX 44, JX 45, JX 47, JX 48, JX 57, JX 58 (May to August 2013 correspondence from GB-SP and Kinsella requesting documents and demanding that Kinsella be seated as the GB-SP Director); JX 59 at 1 (September 3, 2013 email from Akin Gump to Pre-Forbearance Directors requesting to schedule a call "to discuss the recent correspondences received on behalf of [] Kinsella"); JX 208 (September 16, 2013 letter from Kinsella to Worker regarding director seat on BSW board).

[297] *See* JX 170 at 1.

[298] JX 240 at 2.

Keenly aware that GB-SP might sue them personally, the Pre-Forbearance Directors were, in the months leading up to the Forbearance Agreement, persistently trying to obtain D&O insurance coverage for potential suits by GB-SP. BSW's insurance provider, however, refused to remove the major stockholder exclusion from the Company's policy.[299] BSW's insurance broker asked two other insurers if they would provide coverage for major stockholder claims, and both similarly declined.[300] Due to the high litigation risk, none of the insurers were interested in negotiating a premium to provide coverage for claims asserted by GB-SP.[301]

To fill this gap in coverage, Akin Gump recommended that the Pre-Forbearance Directors ask Versa and Domus to provide broad indemnification coverage for any claims brought by GB-SP.[302] Acknowledging that "this would be a new proposal" and "the indemnification issue has been a big point," Akin Gump

---

[299] JX 51 at 3 ("We have requested AIG to remove the Major Shareholder exclusion on the policy which they denied."); JX 174 ("As you know, the Company's current D&O policy excludes claims brought by 10% holders."). The insurer indicated that it might be willing to eliminate the major stockholder exclusion with respect to the Post-Forbearance Board if the Company sat Kinsella on the board but did not indicate any flexibility with respect to the Pre-Forbearance Board's coverage. *Compare* JX 51 at 3, *with id.* at 4.

[300] JX 51 at 3.

[301] *Id.* ("In our dialogue with Zurich and Excel who are considering providing excess coverage, we asked if they could provide a drop down mechanism or a separate policy to cover this exposure. Both declined this and stated that they would not look to cover the exposure that the primary is excluding. When asked to provide an option inclusive of additional premium, they declined as they feel this is a real exposure that they are not looking to cover.").

[302] JX 174.

asked to get "the full board's input" before sending this request across to Versa.[303]

Notwithstanding this warning, the Pre-Forbearance Board decided to ask for this significant new term, and Domus ultimately agreed to provide this expanded indemnity.[304]

The Pre-Forbearance Directors and Domus entered into the Indemnity Agreement on September 30, 2013, the same day the Pre-Forbearance Directors executed the Forbearance Agreement.[305] The Indemnity Agreement provided the Pre-Forbearance Directors with indemnification against any claims arising out of the Forbearance Agreement *and* against any claims related to the Company or its subsidiaries asserted by or with the assistance of GB-SP.[306] The scope of the indemnity goes beyond what is provided in the ordinary course. It is tailored to specifically address a litigation risk the Pre-Forbearance Directors created for themselves by refusing to seat Kinsella on the board.

These facts persuade the court that Domus's agreement to indemnify the Pre-Forbearance Directors was a material benefit not shared by BSW or its stockholders generally and rendered the Pre-Forbearance Directors interested in the

---

[303] *Id.* Earlier on in the negotiations, the Pre-Forbearance Directors sought indemnification just for claims arising out of the Forbearance Agreement and related transactions. *See* JX 49 at 1.

[304] *See* JX 59; *see also* JX 70.

[305] JX 70 at 22–36.

[306] *Id.* at 22–23.

Forbearance Agreement. Therefore, the decision of the Pre-Forbearance Board to approve the Forbearance Agreement is subject to review under the entire fairness standard. *Trados II*, 73 A.3d at 55 ("A reviewing court deploys the entire fairness test to determine whether the members of a conflicted board of directors complied with their fiduciary duties.").

### b. Entire Fairness Analysis

"To satisfy entire fairness review, the defendants bear the burden of demonstrating that the corporate act being challenged is entirely fair to the corporation and its stockholders." *Match*, 315 A.3d at 459. "[E]ntire fairness is a unitary test, under which a reviewing court will scrutinize both the price and the process elements of the transaction as a whole." *Id.*

In applying entire fairness, the court "must carefully analyze the factual circumstances, apply a disciplined balancing test to its findings, and articulate the bases upon which it decides the ultimate question of entire fairness." *Technicolor Plenary III*, 663 A.2d at 1179. Put differently, the court must make inquiries into both fair price and fair dealing, evaluate whether and the degree to which the board has deviated from an acceptable range of conduct in both categories, and balance those findings to make a unitary decision as to the entire fairness of the transaction. *Weinberger*, 457 A.2d at 711. As the Supreme Court explained in *In re Tesla Motors, Inc. Stockholder Litigation*, 298 A.3d 667 (Del. 2023), "'[a] strong record

of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price.'" *Id.* at 733 (alteration in original) (emphasis omitted) (quoting *Reis*, 28 A.3d at 467); *accord HBK Master Fund, L.P. v. Pivotal Software, Inc.*, 2023 WL 10405169, at *25 (Del. Ch. Aug. 14, 2023), *corrected* (Mar. 12, 2024).

### i. Fair Dealing

"The element of 'fair dealing' focuses upon the conduct of the corporate fiduciaries in effectuating the transaction." *Kahn v. Tremont Corp.*, 694 A.2d 422, 430 (Del. 1997). Fair dealing involves "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger*, 457 A.2d at 711. This is a fact-specific inquiry, and "[t]he absence of certain elements of fair dealing does not *mandate* a decision that the transaction was not entirely fair." *Tesla*, 298 A.3d at 702 n.143 (internal quotation marks omitted).[307]

---

[307] Our Supreme Court in *Tesla* stated a strong preference for trial courts to organize the fair dealing analysis in a way that independently addresses each of the *Weinberger* factors. *See Tesla*, 298 A.3d at 702, n.146. This case does not lend itself to a clean, carefully demarcated analysis of the *Weinberger* factors. The court endeavors to do so here, but given the overlapping nature of the facts as to each element, it may result in redundancy and, hence, a longer opinion.

## 1. Initiation and Timing

"The first *Weinberger* factor examines how the decision under challenge was initiated." *Tornetta v. Musk*, 310 A.3d 430, 527–28 (Del. Ch. 2024) (internal quotation marks omitted). The scope of the first *Weinberger* factor is "not limited to the . . . formal act of making the proposal; it encompasses actions taken . . . in the period leading up to the formal proposal." *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *26 (Del. Ch. Aug. 27, 2015).

On May 2, 2013, the Pre-Forbearance Directors learned that Versa, through Domus, had acquired the Company's debt from its secured lenders.[308] At that time, BSW was already in default, and the debt was nearing maturity on June 30, 2013.[309] When the Forbearance Agreement was executed on September 30, 2013, it identified 15 separate and existing defaults under the Credit Agreement. Among the most serious defaults were: (a) the failure to make interest payments for the quarters ending December 31, 2012, March 31, 2013, and June 30, 2013; (b) the failure to make principal payments at the same three payment dates; (c) the failure to deliver year-end 2012 audited financial statements; (d) the failure to cause certain of BSW's subsidiaries to pay taxes and to remain in good standing where they conducted

---

[308] JX 43 at 2.

[309] JX 8 at 17, 28 (identifying the first and second lien loan maturity date as June 30, 2013). Prior to that time, BSW did not have a forbearance agreement with Credit Suisse or its secured lenders. *See* JX 27 at 1. Rather, at that stage, BSW was hoping to finalize a sale of the entire Company to Versa. *Id.*; JX 28.

90

operations; and (e) the failure to maintain the minimum EBITDA and leverage ratios for each fiscal quarter since April 2011.[310] GB-SP does not dispute the existence of any of the identified defaults. It is also undisputed that these defaults gave Versa the unilateral right under the Credit Agreement to foreclose on the collateral, which consisted of most of the Company's assets.

The Pre-Forbearance Board also had no immediate prospect for a sale of the Company that would satisfy BSW's obligations under the Credit Agreement, let alone result in any payment to equity holders. BSW, with the help of Houlihan, had contacted more than 92 parties—both financial and strategic buyers.[311] HIG rescinded its LOI after conducting due diligence and chose not to pursue an acquisition, and Oakwood declined to reengage after being denied exclusivity a year earlier.[312] The third option was Versa, which chose to acquire the Company's debt at a steep discount with the goal of leveraging its contract rights to acquire the Company. The Forbearance Agreement was one of the limited options available to BSW after Versa decided to forgo a direct acquisition of BSW and acquired the Company's outstanding debt from the Company's secured lenders. The initiation and timing of the Forbearance Agreement in the face of these circumstances does

---

[310] JX 66 § 2.2.

[311] JX 72 at 2.

[312] *Id.* at 7.

not suggest that the transaction was the product of unfair dealing. Other events, however, do.

The approval of the Forbearance Agreement was timed to occur before Kinsella was seated as the GB-SP Director and had any opportunity to weigh in on its terms or the desirability of entering into the transaction. The Pre-Forbearance Directors knew that Kinsella had a right to be seated as a director, but they chose not to elect him out of concern that he or GB-SP might take action to thwart entry into the Forbearance Agreement, such as by filing litigation.[313] In that event, the Pre-Forbearance Directors faced the prospect of having no D&O insurance to defend against or settle the claims due to the major stockholder exclusion in the D&O policy that was, itself, the product of their excluding Kinsella. Moreover, the Pre-Forbearance Directors chose to approve the Forbearance Agreement only *after* obtaining an agreement with Domus to indemnify them against any claims asserted or supported by GB-SP. It is apparent that the Pre-Forbearance Directors held out on approving the transaction until these terms were added.

The general initiation and timing of the Forbearance Agreement were the product of the Company's financial circumstances. But the Pre-Forbearance

---

[313] The Pre-Forbearance Directors appeared to have some concern that GB-SP could prevent the Company from entering into the agreement by filing for bankruptcy itself. *See* JX 41 at 6; JX 158 at 163:24–164:6 (Halpern Dep.). Although that was a theoretical possibility, there is no evidence in the record that there was any serious threat of that occurring.

Directors' intentional timing of the Forbearance Agreement to circumvent Kinsella and GB-SP's rights and to ensure that the Pre-Forbearance Directors obtained valuable personal guarantees was a product of their own making. On balance, this factor weighs against a finding of fair process.

## 2. Negotiation and Structure

"The next *Weinberger* factor examines how the transaction was negotiated and structured." *Tornetta*, 310 A.3d at 529. The Pre-Forbearance Board's negotiations with Versa were led by the Company's counsel at Akin Gump. Akin Gump was ostensibly independent and regularly kept the Pre-Forbearance Board apprised of the negotiations. Nevertheless, Akin Gump actively worked to keep GB-SP in the dark about the Forbearance Agreement until after it was approved.[314]

Akin Gump took the lead in negotiating the terms of indemnification, D&O insurance coverage, and releases with Versa on behalf of the Pre-Forbearance Directors. The prospect of having no D&O insurance coverage in the event of a GB-SP lawsuit figured prominently in the Pre-Forbearance Directors' discussions during the negotiations for, and ultimately the structure of, the Forbearance Agreement. The Company's D&O policy was set to expire in April 2013, and the Company's insurance carrier had raised concerns about entering into a long-term

---

[314] *See* JX 240 at 2.

93

renewal.[315] The insurance carrier was also unwilling to waive the major stockholder exclusion and raised concerns over GB-SP's lack of board representation.[316] The Company's efforts to obtain coverage from excess D&O carriers were also unsuccessful.[317]

Even before realizing the gap in their D&O insurance coverage, the Pre-Forbearance Directors and Akin Gump insisted on Versa indemnifying the directors for liabilities arising from the Forbearance Agreement.[318] Versa initially rejected this request,[319] but ultimately agreed to provide indemnity for claims related to the Forbearance Agreement and for claims initiated or supported by GB-SP.[320] Versa also agreed to fund D&O insurance premiums and to release claims against the Pre-Forbearance Directors.[321] The Indemnity Agreement and the release are separate agreements, but they were integral to the Pre-Forbearance Directors' decision to approve the Forbearance Agreement. The four independent

---

[315] JX 42.

[316] *Id.* It appears that in mid-April 2013, BSW was able to temporarily mollify the insurer by falsely claiming that there was an issue over the "pending transfer of [GB-SP's] interest to IEOT." *Id.* But by that time, as explained above, BSW knew that GB-SP was not transferring its interest to IEOT; rather, IEOT acquired GB-SP.

[317] *See* JX 51 at 3.

[318] *See* JX 49; JX 50; JX 51; JX 59.

[319] *See* JX 49; JX 50.

[320] *See* JX 59; JX 62; JX 229; *see also* JX 70.

[321] *See* JX 50; JX 229.

Pre-Forbearance Directors—Davis, Doheny, LaCivita, and Scher—also agreed not to seek re-election following approval of the Forbearance Agreement, which led to Versa's proposed directors being appointed by Curtis and Worker in October 2013.[322]

Worker also pushed through the September 2013 MOU in connection with the Forbearance Agreement. The September 2013 MOU incorporated the terms of the retention bonuses from the MOU approved by the Pre-Forbearance Directors in May 2013, which provided for Curtis's and Worker's continued employment, retention of salaries, and additional six-figure bonuses if a consensual foreclosure was approved.[323] Worker saw the negotiation of the Forbearance Agreement as an opportunity to prompt Versa's execution of the MOU. During the negotiation of the Forbearance Agreement, on August 14, 2013, Worker emailed Dembiec and requested that he contact Versa and ask "when they will sign off on the Retention

---

[322] Had Kinsella been appointed earlier, as he should have been, Kinsella would have had a say in the appointment of the four new independent directors. Although Kinsella would have been only one of three votes, his voice should have been heard in the process. *Lippman*, 95 A. at 899.

[323] *See* JX 43. Although the MOU was approved by the Pre-Forbearance Directors, BSW's counsel at Akin Gump explained that because Versa would need to execute the MOU, it necessarily had the right to negotiate its terms. *See* JX 224 at 1 (in response to a question asking why the resolutions approving the MOU contemplated further negotiation with the "Company's Lenders," counsel at Akin Gump stated that he was "[n]ot sure we can take the position that Versa needs to execute the MOU, but that Versa doesn't have the right to negotiate its terms. If the bonuses will be paid from the additional loans the company may be receiving from Versa, then we'll have to have that discussion with Versa anyway.").

Incentive agreement as approved by the Board and assumption of employment agreements."[324] In the same email, Worker stated that he wanted the MOU to be "signed in conjunction with the Forbearance Agreement."[325] On September 24, 2013, six days prior to the execution of the Forbearance Agreement, Worker again demonstrated the importance of getting Versa to sign the MOU when he requested that Akin Gump "ensure that [the MOU] is added to all the final docs with simultaneous signature" and provided that he "would prefer [Versa's] signature first as it pertains to this matter."[326]

As for what the Company got as part of the transaction, the primary benefit was time—Domus agreed not to exercise its right to foreclose for five months. But that benefit was not guaranteed and came with harsh conditions. To avoid defaulting during the forbearance period, the Company had to satisfy a slew of stringent financial covenants, and failing even one would permit Domus to immediately foreclose. Not surprisingly, these financial covenants were not particularly favorable to BSW. The Forbearance Agreement provided that BSW would technically default on its obligations if it had a gross margin of less than 20.5% for the period ended October 31, 2013.[327] For the prior two fiscal years ended 2011 and

---

[324] JX 229 at 1.

[325] *Id.*

[326] JX 236 at 1.

[327] JX 66 § 5.3(e).

96

2012, BSW had a gross margin of 19.8% and 19.6% respectively.[328] The last time BSW had a gross margin greater than 20.5% was in the fiscal year ended 2010 and even then, it only cleared that margin by 0.4%.[329] In addition, the required minimum gross margin in the Forbearance Agreement jumped from 18% for the period ending September 30, 2013, to 20.5% for the period ending October 31, 2013.[330]

While unfavorable, these terms were slightly more favorable than those presented by Versa in previous drafts. For example, a July 19, 2013 draft of the Forbearance Agreement required a gross margin of 20.2% for the period ending September 30, 2013, whereas the final version provided for 18.0%.[331] The Company likewise received adjustments in its favor as to the minimum occupancy rate requirements for the period ending September 30, 2013.[332] The Company also received more favorable qualitative terms, extending the period in which they were required to provide compliance reports from five to 20 days after the end of each month.[333] In reality, most of these improvements were short term stopgaps, with the Company's obligations ballooning to unreduced requirements at the end of October

---

[328] JX 105 at 11.

[329] *Id.*

[330] JX 66 § 5.3(e).

[331] *Compare* JX 51 at 22, *with* JX 66 at 15.

[332] *Compare* JX 51 at 22 (95.1% minimum occupancy rate), *with* JX 66 at 15 (94% minimum occupancy rate).

[333] *Compare* JX 51 at 20–23, *with* JX 66 at 13–15.

97

2013—shortly after the pre-planned departure of the four independent directors on the Pre-Forbearance Board.

As for the financial component, the Forbearance Agreement facially conveyed approximately $12.5 million to BSW. Based on the "Use of Proceeds" schedule, approximately $7.6 million of the funds went directly back to Versa and Domus, including for the payment of outstanding interest on BSW's debt and collateral agent fees.[334] Approximately $3.5 million covered BSW's operating expenses, including the payment of overdue rent and tax liabilities.[335] The remainder of the funds covered a tail for the Company's D&O policy, Versa and Domus's transaction expenses, and the Company's adviser fees.[336] Ultimately, the overall economics of BSW's debt remained unchanged.

As part of the Forbearance Agreement, BSW and its subsidiaries pledged all of their equity interests as collateral.[337] This was a critical component of the

---

[334] JX 66 at 35 (allocating $2,848,477.86 for payment of accrued interest on Company's outstanding debt, $250,000 for payment of an upfront fee payable to Domus as collateral agent, and $4,500,000 for payment of a restructuring fee payable to Domus as collateral agent).

[335] *Id.* (allocating $460,000 for payment of partner catch-up fees, $743,853.63 for payment of tax liabilities, and $2,300,000 for payment of past due rent).

[336] *Id.* (allocating $189,118 for payment of D&O tail coverage, $550,293.55 for payment of Versa and Domus's transaction expenses, and $679,242.65 for payment of BSW's legal and financial adviser fees).

[337] *Id.* § 4.1(e) (requiring delivery of "100% of [the] equity interests in any Subsidiary of such Loan Party over which the Collateral Agent does not currently have the benefit of

Forbearance Agreement for Versa and Domus. Long before purchasing the Company's debt from Credit Suisse and the Company's secured lenders, Versa understood that only 65% of the equity of BSW's foreign subsidiaries had been pledged as collateral.[338]  In order to obtain control over all of the Company's operating assets, Versa would need to obtain the remaining 35% equity in these subsidiaries, and it achieved that in the Forbearance Agreement.

Overall, the terms of the Forbearance Agreement were not favorable to the Company.  But given its precarious financial position and minimal leverage against a senior secured creditor that could foreclose at any time, that is not surprising.  That the Company got a bad deal is not, alone, indicative of unfair process, given the broader circumstances.

The benefits that the Pre-Forbearance Directors got as part of the transaction, however, are indicative of unfair process, as is the broader negotiation process.  It is apparent that the Pre-Forbearance Directors were not prioritizing the Company's best interests during the negotiation process.  For example, internal emails in July 2013 identified indemnification and Versa's release of claims against the Pre-

---

such security interest (including, but not limited to, BridgeStreet Singapore PTE LTD, BridgeStreet Australia Pty Limited, BWW Accommodations, Inc., BridgeStreet Accommodations Ltd. and BridgeStreet Corporate Housing Limited)").

[338] *See* JX 38 at 6 (Internal Versa presentation dated March 14, 2013); JX 41 at 5 (Internal Versa presentation dated April 13, 2013); *id.* at 7 ("In order to ensure that Versa can achieve the desired flow-through structure, it should obtain a pledge on the remaining 35% equity interests in the non-U.S. subsidiaries prior to foreclosure.").

99

Forbearance Directors as main open issues, while the Company's financial covenants appeared lower on the list.[339]  Additionally, indemnification proved to be a "big point" in the negotiations, and one which the Pre-Forbearance Directors consistently pushed and even *increased* their ask over the course of negotiations.[340]  Worker was also heavily focused on negotiating and pushing through the September 2013 MOU.  The record does not reflect similarly persistent efforts to improve the Company's terms, and what few improvements the Pre-Forbearance Board got for the Company were limited in scope.

On balance, the court concludes the negotiations and structure of the Forbearance Agreement weigh against a finding of fair process.

### 3.    Approval

The final *Weinberger* factor examines how the transaction was approved. *Tornetta*, 310 A.3d at 532.  The Pre-Forbearance Directors formally met to consider the Forbearance Agreement on September 17, 2013.[341]  Prior to that date, they had received updates from Company management and counsel on the negotiations.  At the meeting, certain board members inquired as to the likelihood that the Company would be able to meet the financial covenants in the Forbearance Agreement.[342]

---

[339] *Compare* JX 49 at 1, *with id.* at 2.

[340] JX 174.

[341] JX 61 at 2.

[342] *Id.*

100

Gingrich and Worker told the Pre-Forbearance Board that, based on currently available information, the Company should be able to satisfy the covenants.[343]

The Pre-Forbearance Board approved the Forbearance Agreement by unanimous written consent on or around September 23, 2013.[344] The transaction was not subjected to a stockholder vote, and none was required.[345] Earlier drafts of the Forbearance Agreement, however, contemplated GB-SP as a signatory to the agreement.[346] When Akin Gump saw this, it informed BSW's management and Worker that "[GB-SP's] signature may be difficult to obtain and the need for this signature needs to be discussed."[347] The final draft did not include GB-SP as a party because doing so would have tipped GB-SP off to the transaction, risking potential litigation.

Weighing the approval together with the other *Weinberger* factors, the court concludes the Pre-Forbearance Directors have not carried their burden to prove that the process for the Forbearance Agreement was fair. The Company was in a bad

---

[343] *Id.*

[344] *See* JX 235. The executed written consent is not in the trial record.

[345] Even if stockholder approval had been required, the board had the authority to vote the Company's stock pursuant to the Shareholders Agreement. *See* JX 1 § 3.1(b).

[346] *See* JX 51 at 33 (July 19, 2013 draft of the Forbearance Agreement including GB-SP as a signatory).

[347] JX 49 at 2. GB-SP was included as a party to the Forbearance Agreement as late as September 3, 2013. *See* JX 59 at 1 (email from Akin Gump stating that "GB-SP [] has been re-inserted as a party to the Forbearance Agreement. We propose that GB-SP [] be removed as a party to the Forbearance Agreement").

101

spot and had minimal leverage going into the negotiations, so a weak negotiating position is to be expected. But the evidence shows that the Pre-Forbearance Directors stiff-armed Kinsella and GB-SP throughout negotiations, pushed through the deal in a manner designed to avoid stockholder detection, and prioritized terms benefiting them personally over those benefiting BSW. Based on the scant record before the court, it concludes the process was unfair.

### ii.        Fair Price

The court's determination on fair process does not end the inquiry. Even if the board engaged in an unfair process in approving the transaction, "it is possible that the pricing terms were so fair as to render the transaction entirely fair." *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 748 (Del. Ch. 2007). "When considering fair price, the court looks at the economic and financial considerations of the transaction to determine if it was substantively fair" and the court's task "is to determine whether the transaction price falls within a range of fairness." *Buddenhagen v. Clifford*, 2024 WL 2106606, at *33 (Del. Ch. May 10, 2024) (internal quotation marks omitted); *see also In re BGC P'rs, Inc. Deriv. Litig.*, 2022 WL 3581641, at *28 (Del. Ch. Aug. 19, 2022) (observing that the economic inquiry in a fair price analysis is "not a remedial calculation"), *aff'd*, 303 A.3d 337 (Del. 2023) (TABLE).

Fair price is a fact intensive, context-specific determination that results in a unique outcome in every case. *Compare Ams. Mining Corp.*, 51 A.3d at 1249–52

(affirming this court's analysis of the fair price for a challenged transaction, which resulted in entry of a $1.347 billion post-trial base damages award), *with Trados II*, 73 A.3d at 76–78 (finding post-trial that the fair value of the company's common stock was zero). Here, the Pre-Forbearance Board bears the burden of proving the Forbearance Agreement was financially fair to the Company at the time it was entered. *Match*, 315 A.3d at 459.

The parties devoted little effort to address the financial fairness of the Forbearance Agreement. Neither side offered expert testimony on the terms of the Forbearance Agreement,[348] sparring instead over the conclusions the court should draw from the terms and circumstances of the transaction. GB-SP centered its argument on the personal benefits the Pre-Forbearance Directors received in exchange for their approval of the Forbearance Agreement and their agreement to not seek re-election in order to allow Curtis and Worker to appoint four new directors.[349] For their part, the Defendants lamented the Company's dire financial condition, downplaying the personal benefits the Pre-Forbearance Directors obtained in connection with the transaction.[350]

---

[348] Plaintiffs only offered an expert for the purposes of valuing BSW. JX 165 at 26:9–14 (Rosen Dep.). The Defendants elected not to offer expert testimony on any subject.

[349] *See* Pls.' Post-Trial Opening Br. 58–59.

[350] *See* Versa Defs.' Post-Trial Answering Br. 21–23.

Witness testimony was similarly unhelpful. Only one of the Pre-Forbearance Directors testified in this case: Worker. Worker's credibility is suspect for several reasons. First, Worker led the effort to keep Kinsella off the board until after the Forbearance Agreement had been approved.[351] Second, Worker's proffered excuse that the Company's counsel advised him that Kinsella did not need to be elected was false. Worker also led the effort to obtain severance and bonus packages for himself and Company management in conjunction with the approval of the Forbearance Agreement.[352] In short, Worker had personal self-interests in the Forbearance Agreement, as well as the Indemnity Agreement and the September 2013 MOU, and his testimony was not credible.

On this sparse post-trial record, the court simply has no basis to assess whether the Pre-Forbearance Directors could have obtained a better deal than the one they negotiated. Could the Pre-Forbearance Directors have obtained better financial terms if they had not been so focused on obtaining releases, insurance, and indemnity from Versa—and in the case of Curtis and Worker—additional compensation? Who knows? Nothing in the record points convincingly one way or another. Indeed, it is not even apparent to the court that allowing Domus to foreclose on the collateral

---

[351] *See, e.g.*, JX 217; JX 218.

[352] *See, e.g.*, JX 43 at 3 (proposing that the Pre-Forbearance Board approve retention bonuses for senior management at the May 2, 2013 board meeting); JX 229, JX 236 (pushing for Versa to sign the MOU in connection with the Forbearance Agreement).

would have been a worse outcome for the Company than the Forbearance Agreement. What is clear, however, is that the Pre-Forbearance Directors have the burden of proving the Forbearance Agreement gave the Company a fair price. That is not a burden the Pre-Forbearance Directors have satisfied. Based upon the evidence presented—and perhaps more so by what was not presented—the Pre-Forbearance Directors did not prove the Company received a fair price in the Forbearance Agreement.

### iii. Unitary Determination

"[T]he entire fairness test is a 'unitary standard.'" *Tesla*, 298 A.3d at 733 (quoting *Tremont,* 694 A.2d at 432). "[T]he test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness." *Weinberger*, 457 A.2d at 711. "Th[e] judgment concerning 'fairness' will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case." *Cinerama, Inc. v. Technicolor, Inc.* (*Technicolor Plenary II*), 663 A.2d 1134, 1140 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995).

The Pre-Forbearance Directors' approval of the Forbearance Agreement was not entirely fair as to process or price. Although the Company was in default under the Credit Agreement, the Pre-Forbearance Directors placed their own interests and Versa's interests ahead of the Company's interests. They desperately wanted to be

105

indemnified for any litigation by GB-SP, and indemnification was a central focus of the negotiation over the Forbearance Agreement even before Akin Gump proposed asking Versa to indemnify the Pre-Forbearance Directors for any claims brought by GB-SP.[353] In certain circumstances, it might not be a breach of fiduciary duty for directors to negotiate for and obtain indemnity from a purchaser. *See Edgewater*, 68 A.3d at 231–32 (concluding post-trial that broad indemnification did not render the board beholden to the indemnitor). The specific facts of this case, however, lead the court to conclude that it was here. The prominence that indemnification played throughout the negotiation of the Forbearance Agreement underscored that the Pre-Forbearance Directors, who, with the exception of Curtis and Worker, were planning a mass departure from the Company after its execution, wanted to be indemnified for any liability that might follow them. In addition to transaction specific liability, the Pre-Forbearance Directors anticipated that GB-SP or Kinsella, or both, would initiate litigation once they became aware the Pre-Forbearance Directors purposefully kept them in the dark and refused to provide GB-SP with

---

[353] *See* JX 49 at 1–2 (Akin Gump email to BSW management listing director indemnification and releases, respectively, as the first two of 10 items being negotiated as of July 24, 2013); JX 50 at 2–3 (listing director releases and indemnification as the first two "major open points" of negotiation over the Forbearance Agreement); *id*. at 1–2 (email from Davis to other Pre-Forbearance Directors and Akin Gump stating that "[i]ndemnity has to be from dollar 1. . . . Indemnity must come from Versa rather than a thinly capitalized Newco. . . . We will not provide resignations, but we will sign agreements not to stand for re-election or to accept any such nomination.").

information until after the Pre-Forbearance Directors approved the Forbearance Agreement. Notwithstanding this risk, the Pre-Forbearance Directors continued to stonewall GB-SP, and instead persistently sought expanded D&O insurance coverage from three different providers to no avail. Unable to obtain coverage for their self-inflicted litigation risk in the market, they used the Company's leverage to get Versa to indemnify them instead. Six of the seven Pre-Forbearance Directors did not testify to try to persuade the court otherwise, and Worker did not address the issue. Meanwhile, the Pre-Forbearance Directors placed terms beneficial to the Company at the bottom of their issues lists and achieved only nominal benefits for the Company during negotiations.

The Pre-Forbearance Directors did not prove the financial terms of the Forbearance Agreement were fair, either. They offered no expert testimony to support the financial fairness of the Forbearance Agreement. Instead, the Pre-Forbearance Directors merely argued the transaction must be fair because BSW was in default, and the Forbearance Agreement gave the Company $12 million and a bit more runway before the ultimate foreclosure. The Pre-Forbearance Directors brush aside the value of the Indemnity Agreement and the bonuses under the September 2013 MOU.[354] They also completely ignore the additional collateral that

---

[354] It is particularly difficult to accept the Pre-Forbearance Directors' dismissal of the value of the Indemnity Agreement when considering that, unlike additional funds paid to the

BSW provided to Versa, including the 35% equity interests in BSW's foreign subsidiaries.

Accordingly, the court finds the Forbearance Agreement and related transactions were not entirely fair to BSW, and the Pre-Forbearance Directors breached their duty of loyalty.

### c.    Damages

Determining the Company's damages resulting from the Pre-Forbearance Directors' breach of fiduciary duty is a difficult task based upon the record.[355]  As explained above, the Pre-Forbearance Directors did not proffer an expert.  Plaintiffs' expert, Gary Rosen, prepared a valuation of GB-SP's equity interests in BSW as of December 31, 2012, but provides no explanation as to how this valuation could be used to quantify damages to BSW.  In fact, Rosen testified that he was not providing a damages analysis at all.[356]  Like the harm to GB-SP caused by the breach of the

---

Company or its management team, this was a real outlay for Domus, from which it could expect no return on investment or round-trip of funds in the event of ultimate foreclosure.

[355] GB-SP incorrectly claims that it is entitled to recover damages for its breach of fiduciary duty claims.  There is no dispute that all of the breach of fiduciary duty claims asserted in this case are derivative.  *See* Dkt. 92 at 3:22–24 ("[P]laintiffs assert derivative claims on behalf of [BSW] for breach of fiduciary duty against the directors. . . ."); *id.* at 4:12–13 ("I refer to Counts I, II, and III [the breach of fiduciary duty claims] together as the derivative claims.").  "Because a derivative suit is . . . brought on behalf of the corporation, the recovery, if any, must go to the corporation." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004).

[356] JX 165 at 25:18–23 (Rosen Dep.) ("Q.  Have you prepared any type of damages report? A:  Not that I recall. . . . Q.  Do you consider your valuation report to be a damages report,

Shareholders Agreement, the harm to BSW caused by the Forbearance Agreement is difficult to quantify. The limited trial record provides the court with no basis to assess the harm the Pre-Forbearance Directors' breach of the duty of loyalty caused to BSW. As a result, the court is unable to determine a transactional damages remedy with any reasonable degree of confidence.

Even if there are no transactional damages resulting from a breach of the duty of loyalty, "a fiduciary [may] not profit personally from his conduct." *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996). When a fiduciary has breached the duty of loyalty, the fiduciary must be deprived of all profit flowing from the breach. *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939) ("If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit. The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the

an expert report on damages? A. It's a valuation report."); *id.* at 26:9–14 ("Q. Putting aside whether it's called a damages report or not, is this an expert report on damages? A. That's a hypothetical question. . . . It's not damages . . . it was done for purposes of valuing the company.").

confidence imposed by the fiduciary relation."); *accord Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989). To that end, this court has broad equitable power in fashioning a remedy "for fiduciary breaches based upon the circumstances of each case." *Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, at *53 n.268 (Del. Ch. May 31, 2000) (citing *Weinberger*, 457 A.3d at 714).

While the harm to the Company is too speculative to quantify, the benefits to the Pre-Forbearance Directors are clear: each received indemnification for all claims brought by GB-SP, and Curtis and Worker received lucrative bonuses under the September 2013 MOU. The Pre-Forbearance Directors cannot retain the benefits they received as a result of their breaches of fiduciary duty. Therefore, the Pre-Forbearance Directors are liable to BSW for all amounts paid to them or their counsel under the Indemnity Agreement. In addition, the bonuses paid to Curtis and Worker under the September 2013 MOU must be disgorged and returned to BSW. *See Valeant*, 921 A.2d at 752–53 (requiring former director and president to disgorge and return $3 million bonus to the company after he failed to show at trial that the challenged transaction was entirely fair).

### 2. Approval of the Consensual Foreclosure

#### a. Standard of Review

GB-SP argues that the Post-Forbearance Directors' approval of the Consensual Foreclosure should also be subject to entire fairness review, contending

that a majority of the Post-Forbearance Board was not disinterested or independent. The Post-Forbearance Directors were Albright, Curtis, Kinsella, Orlofsky, Walker, and Worker. For the entire fairness standard to apply, GB-SP must demonstrate that at least three of the six directors on the Post-Forbearance Board were either interested in the transaction or lacked independence from an interested party. *See Trados II*, 73 A.3d at 44.

### i. Disinterestedness

GB-SP argues that Curtis and Worker were interested in the Consensual Foreclosure because of the financial benefits they received under the September 2013 MOU. As explained above, the September 2013 MOU provided that Domus would assume Curtis's and Worker's employment agreements and pay them retention bonuses in the event of a consensual foreclosure or bankruptcy filing.[357] On the other hand, if BSW was sold outside of bankruptcy, Curtis and Worker might not continue to be employed and, if not retained by the acquiring entity, might not receive bonuses of $107,417 and $142,199, respectively.[358]

The Consensual Foreclosure ensured that Curtis and Worker would retain their management positions and entitlement to retention bonuses. Accordingly, both Curtis and Worker had an interest in seeing the Consensual Foreclosure occur

---

[357] JX 67 at 3–4.

[358] *Id.* at 2.

instead of an open market sale. Lacking evidence in the record that Curtis and Worker had alternate sources of income, the court finds that their salaries and guaranteed bonuses were material to them. *See, e.g.*, *Trados II*, 73 A.3d at 45–46 (concluding post-trial that lucrative payments from a management incentive plan, coupled with post-transaction employment and directorships, were material financial benefits to management directors and concluding the management directors were interested in the challenged transaction); *Oliver v. Boston Univ.*, 2006 WL 1064169, at *27 (Del. Ch. Apr. 14, 2006) (concluding post-trial that board chairman and CEO was interested in transaction where he would receive an asset value realization bonus of 8.5% of net proceeds in the event of any change of control transaction). These financial benefits led to a misalignment of Curtis's and Worker's interests when considering the Consensual Foreclosure. Although the same benefits would accrue to Curtis and Worker if BSW filed for bankruptcy and Domus purchased BSW out of bankruptcy, a disinterested director would have had full flexibility to consider potential paths forward for the Company on the merits without the influence of personal financial gain attached to one of the transaction alternatives. *See Aronson*, 473 A.2d at 816 (explaining that the decisions of a disinterested and independent director are "based on the corporate merits of the subject before the board rather than extraneous considerations or influences"). Because of Curtis's and Worker's

arrangements for bonuses and continued employment under the September 2013 MOU, they cannot be found to be disinterested in the Consensual Foreclosure.

In addition, GB-SP argues that Walker was interested in the Consensual Foreclosure because his company, Walker Nell, received $425,000 to serve as the assignee in the ABC proceedings authorized in connection with the Consensual Foreclosure. Walker first expressed his support in favor of BSW considering an ABC in November 2013, indicating that he was "very familiar with ABCs, having served several times as an assignee including in Delaware."[359] In February 2014, Walker had discussions with Versa about the available funding to administer an ABC, including Walker's fees for serving as assignee.[360] At the March 2, 2014 special board meeting where the Post-Forbearance Board approved the Consensual Foreclosure, the Post-Forbearance Board concurrently authorized BSW and BSW Corporate Housing to commence ABC proceedings and selected Walker Nell to be

---

[359] JX 84 at 1.

[360] Tr. 677:1–13 (Walker) ("Q. Did you negotiate with anyone at Versa concerning how much money would be left behind in a consensual foreclosure to cover your work as the assignee under an ABC proceeding? A. I negotiated to cover the work of an assignment for the benefit of creditors. And that work would include not simply fees for the assignee, but would also include other expenses associated with the administration and wind-down liquidation of the affairs. Q. Right. But your fees would be paid out of that pot of money, if you will; right? A. Yes."). Walker testified that he specifically spoke with Paul Halpern. *Id.* at 677:15–21 (Walker); *see* JX 108.

the assignee,[361] through which $425,000 in fees flowed from Domus to Walker Nell.[362]

Walker's approval of the Consensual Foreclosure enabled Walker Nell to receive substantial fees by facilitating the ABCs. As with Curtis and Worker, the court concludes that these financial benefits were material to Walker and led to a misalignment of Walker's incentives as compared to those of a BSW stockholder.[363] Therefore, the court concludes that Walker was interested in the Consensual Foreclosure.

---

[361] Walker claims to have abstained from voting on the ABCs at the March 2 meeting. Tr. 692:12–693:1 (Walker). Walker's testimony is not credible and not supported by the documentary record. The minutes of the March 2 meeting indicate that (1) Walker was in attendance for the entire meeting; and (2) the Post-Forbearance Directors in attendance approved the resolutions to proceed with the Consensual Foreclosure and the ABCs. There is no indication that any board member in attendance abstained or recused himself from the vote. See JX 116 at 2–3. More important, the pre-trial order stipulates that Walker and the Post-Forbearance Directors in attendance at the March 2 meeting "unanimously authorized resolutions and documents to consummate the consensual 'strict' foreclosure in favor of Domus and an assignment for the benefit of creditors in connection with the assets of BSW." PTO ¶ 65.

[362] JX 116 at 2–3, 9. BSW management originally contemplated $100,000 in expenses in connection with an ABC proceeding, but the total compensation paid to Walker Nell for serving as the assignee was significantly higher. JX 84 at 2.

[363] The record indicates that between October and December 2013, Walker invoiced $43,043.79 for working on BSW matters as a director. JX 97. Based on this figure, the $425,000 fee that Walker received for serving as the assignee in the ABC proceedings was a substantial financial benefit.

114

## ii. Independence

GB-SP argues Orlofsky lacked independence from Versa and Domus. A director lacks independence when he is beholden to or dominated by an interested party. *Aronson*, 473 A.2d at 815. A director's discretion may be sterilized where a director expects to be considered for highly compensated directorships at companies that an interested party launches in the future. *See Delman*, 288 A.3d at 716, 720 (concluding it was reasonably conceivable that directors lacked independence where they "had close ties" to the alleged controller and "expect[ed] to be considered for [future] directorships" (internal quotation marks omitted)); *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 814 (Del. Ch. 2022) (explaining that a director's discretion may be sterilized where the director expects to be considered for future directorships); *cf. In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013) ("Our law is clear that mere allegations that directors are friendly with, travel in the same social circles, or have past business relationships with the proponent of a transaction or the person they are investigating, are not enough to rebut the presumption of independence."), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

Versa and Domus were interested parties in the Consensual Foreclosure. Orlofsky had an existing relationship with Versa prior to joining the BSW board.

Orlofsky previously served as the CFO and COO of Malden Mills.[364] During his tenure at Malden Mills, Orlofsky met Gregory Segall of Versa, who joined the Malden Mills board in conjunction with a bankruptcy process that Orlofsky was facilitating.[365] Thereafter, Orlofsky served as the chairman and sole board member of ALS at Segall's request.[366] As sole board member, Orlofsky authorized ALS to file for bankruptcy, and a Versa affiliate purchased ALS out of bankruptcy in 2012.[367] Orlofsky's consulting firm was paid approximately $400,000 to facilitate ALS's bankruptcy.[368] The following year, Versa tapped Orlofsky again, this time to serve as a director of BSW. This pattern of director nominations and business dealings between Orlofsky and Versa indicates that Orlofsky, unlike a typical independent director, had an expectation that Versa would consider him for future director appointments. Therefore, the court cannot conclude that Orlofsky was independent of Versa for the purposes of the Consensual Foreclosure. *See Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at *7 (Del. Ch. Sept. 28,

---

[364] JX 166 at 18:6–19:1 (Orlofsky Dep.).

[365] *Id.* at 19:1–11, 20:16–21:3 (Orlofsky Dep.); Tr. 555:3–9, 581:9–13 (Orlofsky). Orlofsky left Malden Mills in 2005, and several years later, a Versa affiliate purchased Malden Mills out of a subsequent bankruptcy. JX 166 at 19:18–24 (Orlofsky Dep.).

[366] JX 166 at 23:4–11, 27:11–1 (Orlofsky Dep.); *id.* at 30:21–31:11 (testifying that Segall contacted him about serving on the board of ALS).

[367] JX 166 at 26:8–18, 27:14–18 (Orlofsky Dep.); Tr. 583:5–14 (Orlofsky).

[368] JX 166 at 8:16–20, 25:13–26:11, 31:20–32:9 (Orlofsky Dep.).

2015) (finding there was reasonable doubt as to two directors' independence because of their relationship with the company's controlling stockholder who had nominated them to numerous boards and with whom they reasonably had a strong expectation of future business dealings).[369]

In sum, the court concludes that Curtis, Walker, and Worker were interested in the Consensual Foreclosure, and Orlofsky lacked independence from Versa and Domus. Because a majority of the Post-Forbearance Board was conflicted, the decision to approve the foreclosure is subject to review under the entire fairness standard. *Trados II*, 73 A.3d at 55.[370]

### b. Entire Fairness Analysis

In applying entire fairness, the court examines whether the challenged transaction was a product of fair dealing and fair price. *Match*, 315 A.3d at 459.

---

[369] GB-SP also argues that Walker lacked independence from Versa and Domus. Pls.' Post-Trial Opening Br. 7, 30. Walker, however, did not have a previous relationship with Versa or Domus. JX 163 at 27:3–10 (Walker Dep.); Tr. 615:20–616:11 (Walker). Therefore, the court finds that Walker was independent from Versa and Domus.

[370] At the pleadings stage, the court concluded it was reasonably conceivable that Curtis, Orlofsky, Walker, and Worker breached their duty of loyalty in approving the foreclosure. *See* Dkt. 92 at 13:18–16:17. The court concluded the complaint sufficiently alleged that Curtis, Walker, and Worker were interested in the foreclosure and received a benefit from the foreclosure not shared with the other BSW stockholders. *Id.* at 16:2–7. The court also concluded the complaint sufficiently alleged that Orlofsky, who had a prior business relationship with Versa, lacked independence from Versa. *Id.* at 16:8–17.

117

### i. Fair Dealing

The *Weinberger* factors form the core of the court's fair dealing analysis. *Tornetta*, 310 A.3d at 527. The court considers how the transaction was timed, negotiated and structured, and approved. *Weinberger*, 457 A.2d at 711.

### 1. Initiation and Timing

From a 30,000-foot view, Versa and Domus initiated the foreclosure when Versa, through Domus, first acquired BSW's first and second lien loans from Credit Suisse in April 2013 as part of Versa and Domus's loan-to-own strategy. The foreclosure itself began to crystalize at the Company level with the Pre-Forbearance Board's approval of the ill-fated Forbearance Agreement. As GB-SP's counsel aptly put it at post-trial argument: "at that point, the die was cast."[371] That may be so, and the court does not blind itself to the circumstances leading up to the Consensual Foreclosure. As the court has already found, the Pre-Forbearance Board failed to prove that the Forbearance Agreement was entirely fair, and it is clear from its substance that by the time the Post-Forbearance Directors made it to the table, the deck was stacked. But the focus of the analysis with respect to the Post-Forbearance Directors' discharge of their fiduciary duties is not the quality of the hand they were dealt, but how they played it. Here, the determination of whether the Post-Forbearance Directors breached their fiduciary duties in approving the

---

[371] Dkt. 265 at 21:8–9.

118

Consensual Foreclosure begins with events after the date of the Forbearance Agreement.

On October 11, 2013, Albright, Kinsella, Orlofsky, and Walker were elected to the BSW board, along with Curtis and Worker, who were re-elected as the Management Directors.[372] BSW management informed the board at its November 18, 2013 meeting that the Company had violated two of the covenants in the Forbearance Agreement.[373] One of the violations was the Company's inability to achieve a 20.5% gross margin by October 31, 2013.[374] Two days later, BSW sent a letter to Domus notifying it that BSW had defaulted under the Forbearance Agreement and requesting a waiver of that default.[375] Domus responded the next day, declaring that as a consequence of the default under the Credit Agreement and Forbearance Agreement: "(i) the Forbearance Period has terminated, (ii) the Forbearance is of no further force and effect, and (iii) each of the Existing Defaults is reinstated with the same force and effect as if the Forbearance had not been agreed to."[376] Domus reserved its rights to commence a collection action, to foreclose on

---

[372] PTO ¶ 47. As noted earlier, Seitz was also elected, but for reasons unknown, resigned shortly thereafter.

[373] *See id.* ¶ 50.

[374] JX 82 at 2, 10.

[375] JX 85 at 4; *see also* JX 82 (attaching draft compliance notice).

[376] JX 144 at 1.

the collateral, or to take other enforcement actions.[377]  Internal documents indicated that Domus intended to foreclose within the next four weeks.[378]  Pursuant to this plan, Domus sent BSW an outline of preliminary foreclosure steps on November 26, 2013.[379]

By late November 2013, the Post-Forbearance Board's hands were tied.  This was not a circumstance akin to a board acceding to a sale transaction to satisfy a private equity investor's exit strategy.  *See, e.g.*, *Trados II*, 73 A.3d at 56 (finding unfair dealing where "directors did not make [the] decision [to pursue a merger] after evaluating [the company] from the perspective of the common stockholders, but rather as holders of preferred stock with contractual cash flow rights that diverged materially from those of the common stock and who sought to generate returns consistent with their [venture capital] funds' business model").  Domus had the right to foreclose on all of BSW's assets and was taking immediate steps to do so.  The Post-Forbearance Directors had to select the best choice from a menu of unattractive options and had to do so in a situation when their fiduciary duties required them to consider the interests of residual claimants.  *See McRitchie*, 315 A.3d at 547.  With input of legal and financial advisers, the Post-Forbearance Directors carefully

---

[377] *Id.* at 1–2.

[378] JX 214.

[379] JX 86.

120

evaluated all of the available options, and following rigorous debate over several months, approved a consensual foreclosure on March 2, 2014. What follows is a general chronology of the Post-Forbearance Board's deliberative process.

On December 4, 2013, the Post-Forbearance Board discussed potential alternatives, including seeking an additional forbearance period via waiver of the breaches, selling the Company, refinancing the outstanding senior secured debt, restructuring out-of-court, filing for bankruptcy, or undergoing a strict foreclosure.[380] Houlihan advised that a refinancing of the Company's debt or a sale of the Company were "highly unlikely in light of the Company's current business operations, the investment market's overall condition and majority of the Company's senior secured debt."[381] The Post-Forbearance Board discussed seeking additional equity investments in order to disincentivize Domus from exercising its contractual rights.[382] Kinsella stated that neither GB-SP nor IEOT would be willing to make an equity investment in the Company.[383] The Post-Forbearance Board resolved to reach out to a third party, Goodbody, to solicit interest in making a capital investment.[384] The Post-Forbearance Board also authorized Albright and Walker to

---

[380] JX 91 at 2–3.

[381] *Id.* at 3.

[382] *Id.*

[383] *Id.*

[384] *Id.*

enter into negotiations with Domus, instructing them to reassert the Company's request for a waiver of default, seek clarity on the November 26 letter, and discuss the potential paths forward.[385]

At a December 17, 2013 board meeting, Albright and Walker reported that they had met with Domus representatives and had transmitted the Company's request for a waiver of its default.[386] Domus refused to engage with this proposal absent a significant reduction in outstanding debt or the provision of a significant amount of additional collateral.[387] Instead, Domus again requested that the Company begin taking steps towards a consensual foreclosure in line with its November 26 letter.[388]

The Post-Forbearance Board then discussed the potential alternatives. In response to a previous request by Kinsella, Gingrich and Worker presented an analysis of operating costs that could be reduced to increase profitability and pay down the outstanding debt.[389] They warned that such a strategy would present negative consequences, such as reducing the Company's EBITDA and risking the

---

[385] *Id.*

[386] JX 96 at 2.

[387] *Id.*

[388] *Id.*

[389] *Id.* at 3.

loss of significant international clients.[390]  Houlihan reiterated that a potential sale or refinancing would be very difficult.[391]  While the Post-Forbearance Directors continued to discuss other options, including seeking a sale, refinancing, or additional forbearance period, they specifically resolved to investigate and review two parallel paths:  the filing of a chapter 11 bankruptcy proceeding or entering into a consensual foreclosure with Domus.[392]  The Post-Forbearance Board also authorized the Company's officers to continue negotiating a potential consensual foreclosure with Domus.[393]

Walker presented an analysis of a potential chapter 11 filing at a January 3, 2014 board meeting.[394]  Houlihan reported that a bankruptcy filing would require between $7 to $9 million in DIP financing, which would be difficult to get from anyone other than Versa or Domus, who would have to consent to the bankruptcy filing.[395]  Worker then reported that filing bankruptcy would have negative consequences for the business which would result in a "seriously diminished value" for the enterprise.[396]  Orlofsky remarked, relying on a combined management and

---

[390] *Id.*

[391] *Id.*

[392] *Id.* at 3–4.

[393] *Id.* at 4.

[394] JX 102 at 1–2.

[395] *Id.*

[396] *Id.*

Houlihan analysis, that a consensual foreclosure could achieve a similar result as bankruptcy while avoiding the time, cost, and damage to the business which would be incurred in a bankruptcy.[397] Kinsella expressed, but did not elaborate on, a preference for a bankruptcy filing.[398] After the adviser presentations and lengthy discussion, Albright, Curtis, Orlofsky, Walker, and Worker voted to approve a consensual foreclosure, "subject to the negotiation and finalization of definitive documentation."[399]

On January 27, 2014, BBK delivered a draft analysis that valued the Company at $29.7 million as of December 31, 2013.[400] The Post-Forbearance Directors discussed the status of the Consensual Foreclosure negotiations in a meeting on January 28, 2014.[401] In this meeting, the Post-Forbearance Directors also discussed the relative advantages and disadvantages of pursuing an ABC proceeding as

---

[397] *Id.*

[398] *Id.* ("Mr. Walker encouraged Mr. Kinsella to more fully explain his reasoning for supporting a bankruptcy filing, but Mr. Kinsella declined, stating that he didn't feel a need to add anymore [sic] to his position on the matter.").

[399] *Id.* Kinsella opposed this resolution. *Id.*

[400] JX 104 at 8.

[401] JX 107. Prior to Kinsella joining the meeting, the rest of the Post-Forbearance Board met in executive session to discuss correspondence from Kinsella's counsel the day before. *Id.* at 1.

opposed to a statutory dissolution.[402]  At a February 25, 2014 meeting, the Post-Forbearance Directors, in response to multiple letters from Kinsella, reviewed the available options again.[403]  During those deliberations, the Company's advisers and members of management warned that bankruptcy could be value destructive to the business.[404]  After a thorough discussion, "the [Post-Forbearance] Board affirmed its judgment that due and careful consideration had been given to Mr. Kinsella's demands and to the options available to the Company to maximize the value of the Company and its assets."[405]

In light of the foregoing, it is apparent that the Post-Forbearance Board engaged in a careful evaluation of the Company's options and elected to initiate and pursue the Consensual Foreclosure at the conclusion of a deliberative process.  This factor supports a finding of fair process.

---

[402] *Id.* at 3.  During the meeting, Kinsella announced that he "no longer wanted to participate" and left the meeting but later rejoined and remained for the rest of the meeting. *Id.* at 2–3.

[403] JX 111.  Kinsella refused to remain for the advisers' discussion of the options that had been considered and the reasons why alternative paths had been foregone, and instead left the meeting, this time not rejoining. *Id.* at 2. Nevertheless, the remaining Post-Forbearance Directors still considered the full scope of concerns Kinsella had raised, even after his departure from the meeting. *Id.* at 2–4.

[404] *Id.* at 2–3.

[405] *Id.* at 4.

## 2. Negotiation and Structure

Turning to the second *Weinberger* factor, the negotiation and structure of the Consensual Foreclosure were suboptimal in several ways, but their results were not unexpected and, on balance, do not tip the scales towards unfair process.

The Post-Forbearance Board's greatest fault in the negotiation and structure of the deal arises from the conflicts of one of its negotiators. On December 4, 2013, the Post-Forbearance Board resolved that Walker and Albright would negotiate with Domus on the Company's behalf.[406] Albright's disinterestedness and independence is unchallenged, and his role as a negotiator is a plus for the Post-Forbearance Directors on process. But, as explained above, the roughly half a million dollars paid to Walker Nell for the ABC proceeding renders Walker interested in the broader transaction, and his role as a negotiator, as well as the structural presence of payments rendering him conflicted, weigh against a finding of fair process.

On the whole, however, the final structure of the Consensual Foreclosure was about the best that the Company was going to get. By the time BSW breached its financial covenants in the Forbearance Agreement, the Company had few remaining options, and none were preferable to the Consensual Foreclosure. For instance, a sale to another company that could satisfy BSW's increased post-forbearance debt load and deliver value to stockholders—or even more debt relief for the Company—

---

[406] JX 91 at 3.

was very unlikely in light of both BSW's earlier failed sale process and the $29.7 million BBK valuation.[407] Versa declined to extend forbearance or to provide the Company with additional capital.[408] Kinsella, GB-SP, and IEOT were also unwilling to provide additional investment, and other efforts to solicit equity investment were unsuccessful. That left bankruptcy or foreclosure.

GB-SP argues that the Post-Forbearance Board should have elected to file for bankruptcy, which it asserts might have provided an opportunity for the stockholders to receive a marginal recovery on their investment. But GB-SP provides nothing concrete to indicate that bankruptcy would have allowed for any residual benefits to flow to the Company's stockholders or otherwise provide greater value to BSW than the Consensual Foreclosure. As Kinsella acknowledged, the Company was insolvent.[409] And although Kinsella advocated for bankruptcy, he was unable to articulate why that was the better option, and he did not explain whether chapter 7 or chapter 11 was the right course, either during the Post-Forbearance Board's deliberations or during this case.[410]

---

[407] JX 110 at 4; JX 104.

[408] JX 110 at 4–5.

[409] Tr. 146:16–18 (Kinsella) ("When I say 'insolvent,' I'm aware that, in actual fact, the company is insolvent, and it isn't [able] to pay its debts.").

[410] JX 102 at 2 (January 3, 2014 board meeting where Kinsella indicated that a bankruptcy filing would be "the best course of action" but declined to "fully explain his reasoning for supporting a bankruptcy filing"); Tr. 193:22–194:15 (Kinsella) ("Q. [W]hat would have

By contrast, the Post-Forbearance Board was repeatedly advised that bankruptcy could be more disruptive and costly than a friendly foreclosure. Specifically, the Company's advisers noted that a bankruptcy would require an additional $7 to $9 million in DIP financing, whereas wind-up through an ABC proceeding would require $425,000.[411] The Post-Forbearance Board also appreciated that such DIP financing would be difficult, if not impossible, to receive from anyone other than Domus, given its senior secured position—and Domus wanted to foreclose.[412] Moreover, a strict foreclosure provided BSW with the ability to significantly reduce its indebtedness at a juncture where few other alternatives were available. The Company would receive $38 million in the form of satisfied and cancelled indebtedness, which would exceed the BBK valuation of the Company by more than $8 million.[413]

Altogether, negotiation was impaired because of Walker's conflicts, weighing against a finding of fair process. But those conflicts do not appear to have affected

---

happened if the company did file for bankruptcy?. . . . A. I believe that a liquidator would have succeeded in getting decent value for this company, and realizing the equity value that was in it. . . . Q. Did you have a liquidation analysis done to support that conclusion? A. No. . . . Q. And have you been involved in a Chapter 7 liquidation process before? A. No, sir. . . . In a Chapter 7, I must admit, I am without authority there.").

[411] JX 108.

[412] *See* JX 110 at 5; Tr. 574:22–575:8 (Orlofsky) (testifying that bankruptcy "would have been a last resort" and "was really not a good idea"); *id.* at 398:18–399:14 (Worker) (noting that bankruptcy would cost between $7 to $9 million, making it "financially impossible").

[413] JX 110 at 5.

the ultimate structure of the transaction. While far from an optimal outcome for the Company, the Consensual Foreclosure was the best of bad options. On balance, this factor slightly favors a finding of fair process.

### 3. Approval

Turning to the final *Weinberger* factor, the Post-Forbearance Board approved the foreclosure at a special meeting on March 2, 2014. Kinsella chose not to attend the meeting. All five of the Post-Forbearance Directors in attendance at the meeting authorized resolutions to consummate the Consensual Foreclosure and the ABC proceedings.[414] The Post-Forbearance Board also directed that the Company's stockholders approve the Consensual Foreclosure and ABC under its authority in the Shareholders Agreement.[415] Approval of the Consensual Foreclosure came after three months of negotiations, numerous board meetings, and genuine debate among the Post-Forbearance Directors.

GB-SP argues that the Consensual Foreclosure was inappropriately approved on January 3, 2014, without a valuation of BSW or a substantive chapter 11 analysis.[416] That argument is contrary to the stipulated facts and mischaracterizes

---

[414] JX 116 at 3.

[415] *Id.* at 10.

[416] Pls.' Post-Trial Opening Br. 61; Pls.' Post-Trial Reply Br. 41.

the meeting.[417]  At the January 3, 2014 meeting, the Post-Forbearance Board approved "a consensual foreclosure, subject to negotiation and finalization of definitive documentation regarding same as well as further and final authorization by the Board of all relevant and appropriate transaction documents (and related steps and undertakings)."[418]  The Post-Forbearance Board authorized the Company's executive officers to continue negotiating a consensual foreclosure with Domus, but did not preclude the exploration of other alternatives.[419]  At this same January 3 meeting, prior to the resolution, BSW management provided the Post-Forbearance Board with a "detailed" "quantitative and qualitative analysis of a potential Chapter 11 bankruptcy filing."[420]  Although the Post-Forbearance Board did not receive BBK's valuation analysis until after the January 3 meeting, it had already been informed by its advisers that a sale beyond the value of the Company's debt was very unlikely, an observation which had been proven true by the Company's failed sale process with Houlihan.[421]  And after January 3, the Post-Forbearance Board continued consulting with its advisers and received additional information at its

---

[417] *See* PTO ¶ 65 (stipulating that the Post-Forbearance Directors in attendance at the March 2, 2014 special meeting "unanimously authorized resolutions and documents to consummate the consensual 'strict' foreclosure").

[418] JX 102 at 2.

[419] *Id.*

[420] *Id.* at 1–2.

[421] JX 96 at 3.

January 28 and February 25 meetings.[422]   To the extent the Post-Forbearance Directors lacked all of the materials Kinsella claims they needed on January 3, that cannot be said for subsequent meetings, including the March 2 special meeting when the Consensual Foreclosure was approved.

Outside of this information deficit, GB-SP's remaining challenge to the approval of the Consensual Foreclosure is that the Post-Forbearance Board was conflicted.  The court has considered the conflicts of Curtis, Walker, and Worker, and the evidence and extent to which Orlofsky was not independent of Versa.  Each conflict is concerning, and those issues required the application of the entire fairness standard of review.  But the determination of the applicable standard of review is a procedural question, and in the resulting substantive analysis, these facts are not considered in a vacuum.  *See Trados II*, 73 A.3d at 45 (explaining that the application of entire fairness "does not mean that the [] directors necessarily breached their fiduciary duties, only that entire fairness is the lens through which the court evaluates their actions").  In weighing the evidence, the court finds that the Post-Forbearance Board met several times to discuss BSW's options, listened, considered, and responded to Kinsella's concerns, and received advice from its legal and financial advisers.[423]   The Post-Forbearance Directors carefully evaluated the few remaining

---

[422] JX 107 at 3; JX 111.

[423] Plaintiffs did not allege that the board's advisers were conflicted.

options that remained for the Company and chose to enter into the Consensual Foreclosure.

Overall, all of the *Weinberger* factors counsel a finding that the Post-Forbearance Board's decision to approve the Consensual Foreclosure was the product of fair dealing, despite the conflicts of a majority of the directors. The process was not perfect, but "'perfection is not possible, or expected' as a condition precedent to a judicial determination of entire fairness." *Technicolor Plenary III*, 663 A.2d at 1179 (quoting *Weinberger*, 457 A.2d at 709 n.7); *see also Wayne Cty. Empls.' Ret. Sys. v. Corti*, 2009 WL 2219260, at *13 n.71 (Del. Ch. July 24, 2009) ("While it is possible that the board . . . could arguably have better navigated the sale process, Delaware law does not require perfection."), *aff'd*, 996 A.2d 795 (Del. 2010) (TABLE); *BGC P'rs*, 2022 WL 3581641, at *18 (explaining that perfection "is an unattainable standard that Delaware law does not require" (internal quotation marks omitted)). Despite conflicts, the Post-Forbearance Board navigated the Consensual Foreclosure process in a thorough, well-advised manner and fairly evaluated all the options and concerns raised by Kinsella. The court concludes the Consensual Foreclosure's process was fair to the Company's stockholders.

### ii. Fair Price

In examining fair price, the court considers whether the price falls within a range of reasonableness. *BGC P'rs*, 2022 WL 3581641, at *29. Given BSW's

distressed financial condition and the burden of its debt obligations, the price received in the Consensual Foreclosure was fair to the Company. In the months leading up to the Consensual Foreclosure, BSW had defaulted on its debt obligations and, in the weeks leading up to the Consensual Foreclosure, BSW had stopped making interest and principal payments to Domus. BBK determined that BSW had a negative net book value as of November 30, 2013.[424] At any point, Domus could have foreclosed on the collateral without BSW's consent or could have forced BSW into bankruptcy due to BSW's defaults under the Forbearance Agreement and on-going defaults under the Credit Agreement. Because substantially all of BSW's assets secured this debt obligation, which was now in default, BSW had no realistic prospect of receiving any value in excess of its debt obligations.

The give of the Consensual Foreclosure was 100% of the equity interests in BSW's entities and the get was the satisfaction of approximately $38 million of BSW's outstanding debt to Domus, which was more than $8 million above BBK's valuation of all BSW's assets.[425] In considering these circumstances, the price was fair. *See Cancan Dev., LLC v. Manno*, 2015 WL 3400789, at *26 (Del. Ch. May 27, 2015) (noting that a fiduciary "can satisfy the entire fairness standard in a transaction where an interest holder receives nothing if the fiduciary proves that 'there was no

---

[424] JX 104 at 7; *see id.* at 10–14.

[425] JX 116 at 8; JX 118 at 3, 28.

future for the business and no better alternative for the [interest] holders.'" (alteration in original) (quoting *Blackmore P'rs, L.P. v. Link Energy LLC*, 864 A.2d 80, 86 (Del. Ch. 2004))), *aff'd*, 132 A.3d 750 (Del. 2016) (TABLE). Because BSW's equity interest in its subsidiaries was so deeply underwater, the Consensual Foreclosure provided fair value for those interests. *See Trados II*, 73 A.3d at 78 ("[T]he directors breached no duty to the common stock by agreeing to a Merger in which the common stock received nothing. The common stock had no economic value before the Merger, and the common stockholders received in the Merger the substantial equivalent in value of what they had before."); *Frederick Hsu Living Tr. v. Oak Hill Cap. P'rs III, L.P.* (*ODN II*), 2020 WL 2111476, at *37 (Del. Ch. May 4, 2020) (concluding post-trial that the challenged transaction was substantively fair where the company's "common stock would have ended up worthless with or without the [transaction]" and "[t]he weight of the evidence demonstrate[d] that there was no acquisition or growth opportunity that the Company's former executives and directors could have pursued that would have changed the outcome"); *Jacobs v. Akademos, Inc.*, --- A.3d ----, 2024 WL 4614682, at *35 (Del. Ch. Oct. 30, 2024) ("The common stock . . . had no value before the Merger. The common stockholders received nothing in the Merger, but that was the substantial equivalent of what they had before. The Merger therefore offered a fair price.").

134

Plaintiffs' expert criticizes the BBK report on multiple grounds, none of which the court finds credible. First, Rosen claims that "the BBK report assumes an unusually high cost of equity [] of 35%," which results from BBK's 20% company specific risk premium assumption.[426] In disagreeing with the 20% company specific risk premium, Rosen opines that "[a] more reasonable company specific risk premium for the Company would be in the 3% range," without explanation.[427] "The calculation of a company specific risk is highly subjective and often is justified as a way of taking into account competitive and other factors that endanger the subject company's ability to achieve its projected cash flows." *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 339 (Del. Ch. 2006). Given BSW's financial distress and the fact that it was in continuing default on its loan obligations, Rosen's significant downward adjustment of the company specific risk premium is not credible. In fact, Rosen testified at trial that he did not even consider the financial distress of the Company or the fact that it was already in default when estimating the company specific risk premium or preparing his valuation of the Company.[428]

---

[426] JX 157 at 26–27.

[427] *Id.* at 27.

[428] *See, e.g.*, Tr. 316:17–21 (Rosen) ("Q. In selecting 3 percent, you didn't consider the financial distress that the company was in, that it was in default on its secured -- on its loan agreements; right, sir? A. No, I did not."); *id.* at 317:22–318:2 ("Q. [D]id the company's default due to its failure to make interest payments on its credit agreement as of December 31, 2012, have any impact on your view of the value of the company? A. No.").

Second, Rosen claims that "the BBK Report states that the Market Approach presented in BBK's Exhibit H should be adjusted to add estimated working capital and subtract debt."[429] But that is not what the BBK report says—the BBK report merely points out that "Amkadian Holdings, Inc. acquired BridgeStreet on January 26, 2007 for a purchase price of $32.0 million *plus estimated working capital*, less an amount required at closing to discharge in full the estimated indebtedness."[430] The BBK report, however, does not say that its valuation should be adjusted to add estimated working capital. In short, the court finds that Rosen's criticisms of the BBK report are not persuasive, and Plaintiffs have offered no other evidence to rebut BBK's findings.

The evidence in the record supports a finding of fair price. The combination of BSW's secured debt obligations and its perpetual defaults resulted in the Company's interests in all of its assets, which served as security for Versa's debt, being completely underwater. The Company received nothing beyond satisfaction of the debt secured by the assets foreclosed upon in connection with the Consensual Foreclosure, but this was a fair exchange. The Post-Forbearance Directors have carried their burden and shown that the Consensual Foreclosure offered a fair price to the Company.

---

[429] JX 157 at 27.

[430] JX 104 at 7 (emphasis added).

### iii. Unitary Determination

Having examined fair dealing and fair price individually, the court addresses whether, under a unitary analysis of both prongs, the Post-Forbearance Directors proved that the Consensual Foreclosure was entirely fair.

The Post-Forbearance Directors have carried their burden of proving the fairness of the Consensual Foreclosure by a preponderance of the evidence on both prongs. The Post-Forbearance Board employed a thorough process when negotiating the Consensual Foreclosure. Unlike the negotiations of the Forbearance Agreement, Kinsella was on the board for this process and participated actively throughout, raising challenges to the proposed transaction, pushing for alternative structures, and overall promoting boardroom discussion. The Post-Forbearance Board responded constructively to Kinsella's vocal dissent and actively explored alternatives to a foreclosure, received guidance from legal and financial advisers, and assessed the costs and feasibility of the options available to them. Considering all relevant evidence in the post-trial record, despite the presence of a conflicted negotiator, and a majority conflicted board, the Post-Forbearance Directors succeeded in proving that these conflicts did not interfere with their ultimate decision-making. That is not to say that the process contained no flaws, but when considering the initiation, negotiation, structure, and approval of the Consensual Foreclosure together, the court concludes that the process was entirely fair. *See*

*Tesla*, 298 A.3d at 710 (affirming this court's finding that although the sale process had some flaws, it had "several redeeming features that emulated arms-length bargaining to the benefit of Tesla stockholders" (internal quotation marks omitted)); *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *29 (Del. Ch. July 21, 2017) (noting that subsequent actions "freshened the atmosphere" and led to a fair process despite acts of unfair dealing occurring early in the process), *aff'd*, 184 A.3d 1291 (Del. 2018) (TABLE); *Technicolor Plenary II*, 663 A.2d at 1144 (concluding the challenged transaction was substantively fair even though "the process followed by the board in authorizing the corporation to enter into the [challenged] transaction was flawed"); *BGC P'rs*, 2022 WL 3581641, at *18 (concluding the deal process, "albeit imperfect," was "ultimately fair").

The Post-Forbearance Directors also proved, by a preponderance of the evidence, that the price received by the Company for its equity interests in its subsidiaries in the Consensual Foreclosure was objectively fair under the circumstances. Specifically, the Post-Forbearance Directors introduced credible evidence that the Company received satisfaction of debts in material excess of the fair value of the collateral the Company surrendered, and GB-SP failed to credibly rebut that valuation of the Company's equity interests in its subsidiaries. The Company may not have gotten any cash, or even satisfaction or release of all its

138

debts, but, based on the circumstances, the price BSW received was fair. *See Trados II*, 73 A.3d at 76; *ODN II*, 2020 WL 2111476, at *37.

Accordingly, the court finds the Post-Forbearance Directors have satisfied their burden of proof to demonstrate that the Consensual Foreclosure was entirely fair to the Company, and the Post-Forbearance Directors are not liable for a breach of fiduciary duty for approving the Consensual Foreclosure.

### E. Count III (Aiding and Abetting Breach of Fiduciary Duty)

GB-SP seeks to hold the Versa Defendants liable for aiding and abetting the Director Defendants' breach of fiduciary duty. To establish a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must prove: "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach." *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015) (citations omitted).

"Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach." *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001). To establish the requisite level of scienter, a plaintiff "must demonstrate that the aider and abettor had 'actual or constructive knowledge that their conduct was legally improper.'" *RBC*, 129 A.3d at 862 (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)).

139

Whether a party acted with scienter is a factual determination. *Id.* A plaintiff can prove knowing participation by showing that the third party "attempt[ed] to create or exploit conflicts of interest in the board." *Malpiede*, 780 A.2d at 1097; *accord RBC*, 129 A.3d at 862. As with the breach of fiduciary duty claim, the court addresses the aiding and abetting claim with respect to each transaction separately.

### 1. Forbearance Agreement

GB-SP argues that the Versa Defendants exploited the Pre-Forbearance Directors' conflicts of interest—and thereby aided and abetted their breaches of fiduciary duty—by offering them "complete insulation from liability and impunity" through the Indemnity Agreement, the release of claims, and the funding of D&O insurance coverage.[431] As explained above, GB-SP proved the existence of a fiduciary relationship and a breach of fiduciary duty. Thus, the first two elements have been satisfied.

The third element has also been satisfied. The Versa Defendants knew that GB-SP had a right to designate a director on the BSW board and that the Pre-Forbearance Directors were deliberately delaying seating Kinsella on the board until the Forbearance Agreement was in place.[432] In addition, the Versa Defendants

---

[431] Pls.' Post-Trial Opening Br. 65.

[432] *See, e.g.*, JX 158 at 98:14–99:5 (Halpern Dep.) (testifying that, as of September 2013, the Versa Defendants "would not have any objection to [Kinsella] being seated on the board, and that fighting about it was a waste of time and money," and that Kinsella was

140

knew the Pre-Forbearance Directors were demanding indemnification for any claims brought by GB-SP.[433] The Versa Defendants exploited the Pre-Forbearance Directors' conflicts of interest and induced the fiduciary breach by agreeing to indemnify them as part of the Forbearance Agreement, which delivered to the Versa Defendants exactly what they wanted—the remaining 35% equity in BSW's foreign subsidiaries and the departure of Davis, Doheny, LaCivita, and Scher from the board.[434]

---

seated on the BSW board following the Forbearance Agreement); *id.* at 102:8–14 ("Q. What was the change that was going to take place in terms of composition following the [F]orbearance [A]greement? A. The -- the -- the number of directors were going to go off of the board. And then the new directors were going to be named to the board, including [Kinsella].").

[433] *See* JX 174; JX 59.

[434] The Versa Defendants argue that they cannot be liable for aiding and abetting because they negotiated the Forbearance Agreement at arm's length. Versa Defs.' Post-Trial Answering Br. 26. The court is not persuaded by this argument. A plaintiff faces a high burden when asserting an aiding and abetting claim against a transactional counterparty, and absent actual collusion and facilitation of fiduciary wrongdoing, arm's length bargaining does not constitute aiding and abetting. *Cambria Equity P'rs L.P. v. Relight Enters. S.A.*, 2021 WL 2336984, at *12 (Del. Ch. Jan. 5. 2021). But the record here demonstrates that the Versa Defendants intentionally facilitated fiduciary wrongdoing. An April 13, 2013 internal Versa document discussing its loan to own strategy with respect to BSW highlighted that two issues for Versa were the "Unpledged 35% equity interests" and that "Current independent board members will not approve the existing transaction." JX 41 at 6. The same document then explained Versa's solution: "Versa can modify the transaction to facilitate approval from current board" by adding "Enhanced D&O coverage or direct indemnification of directors" and "Assumption of all liabilities." *Id.* The Versa Defendants executed this strategy, capitalized on the Pre-Forbearance Board's conflicts as the Versa Defendants discovered them, and intentionally induced a breach of fiduciary duty at the expense of the Company.

Fourth and finally, the Versa Defendants' conduct proximately caused the injury to BSW resulting from the Forbearance Agreement. To prove proximate cause, a plaintiff "'must show that the result would not have occurred 'but for' the defendant's action.'" *RBC*, 129 A.3d at 864 (quoting *Mazda Motor Corp. v. Lindahl*, 706 A.2d 526, 532 (Del. 1998)). There may be more than one proximate cause of an injury. *Id*. Here, the Versa Defendants were in a unique position to exploit the conflicted Pre-Forbearance Board and cause a fiduciary breach and seized that opportunity to extract additional benefits from the Company at its own expense. Specifically, the Versa Defendants diverted potential consideration away from BSW and into the pockets of the Pre-Forbearance Directors by agreeing to provide broad indemnification for claims brought by GB-SP to induce the Pre-Forbearance Directors to grant the Versa Defendants additional collateral. All four elements have been satisfied, and the court finds that the Versa Defendants are liable for aiding and abetting the Pre-Forbearance Directors' breach of the duty of loyalty.

Fashioning a remedy for the Versa Defendants' aiding and abetting the Pre-Forbearance Directors' breach of the duty of loyalty is challenging given the lack of a damages analysis, and the parties' failure to argue this issue. Nevertheless, this court "has broad latitude to exercise its equitable powers to craft a remedy," and its "remedial powers are complete to fashion any form of equitable and monetary relief as may be appropriate and to grant such other relief as the facts of a particular

142

case may dictate." *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 299 A.3d 393, 494 (Del. Ch. 2023) (internal quotation marks omitted).

The appropriate remedy here, albeit a modest one, is equitable subordination. "'Equitable subordination is a doctrine that, based on a creditor's inequitable conduct and its effect on other creditors, allows that creditor's debt to be subordinated to other claims in bankruptcy or allows the creditor's liens to be transferred to the bankruptcy estate.'" *Grassi Fund Admin. Servs., Inc. v. Crederian, LLC*, 2022 WL 1043626, at *4 n.43 (Del. Ch. Apr. 7, 2022) (quoting *Nelson v. Emerson*, 2008 WL 1961150, at *4 n.13 (Del. Ch. May 6, 2008)).

BSW no longer has any operating business and the Company has been dissolved. There are long-pending ABC proceedings before this court, through which the assets of BSW will be paid to its creditors. Based on the record, BSW is still indebted to the Versa Defendants for at least $7 million.[435] As BSW's first position creditor, the Versa Defendants would be first in line to receive any of the amounts collected by BSW from the Pre-Forbearance Directors for their breach of fiduciary duty. But the Versa Defendants induced the Pre-Forbearance Directors' fiduciary breach by payment of the very sums the Pre-Forbearance Directors must now disgorge, and it would be inequitable to permit the Versa Defendants to recover

---

[435] JX 118 at 28; Tr. 473:4–10 (Halpern).

143

from BSW the amounts collected from the Pre-Forbearance Directors as damages. Just as the disloyal fiduciaries must not be permitted to profit from their breach, nor should the parties who aided and abetted in the same receive a windfall from a finding of the fiduciaries' liability. Therefore, as a remedy for their aiding and abetting in the Pre-Forbearance Directors' fiduciary breach, the Versa Defendants' outstanding BSW debt shall be subordinated to that of BSW's other creditors as to any amounts collected or received by or on behalf of BSW from the Pre-Forbearance Directors pursuant to this ruling.

### 2. Consensual Foreclosure

The Versa Defendants cannot be held liable for aiding and abetting a breach of fiduciary duty in relation to the Consensual Foreclosure. To prove a claim for aiding and abetting a breach of fiduciary duty, the plaintiff must establish an underlying breach of fiduciary duty. *RBC*, 129 A.3d at 861; *Malpiede*, 780 A.2d at 1096. Because the Post-Forbearance Directors did not breach their fiduciary duties in connection with the Consensual Foreclosure, the Versa Defendants are not liable for aiding and abetting a breach of fiduciary duty as to the foreclosure. *See In re Wayport, Inc. Litig.*, 76 A.3d 296, 323 (Del. Ch. 2013) (concluding post-trial that plaintiff failed to prove a claim for aiding and abetting where there was no underlying breach of fiduciary duty).

## F.    Count VIII (Indemnification)

Kinsella seeks indemnification under BSW's by-laws for his attorneys' fees and costs in litigating his claims.[436]   Article VIII of BSW's by-laws governs indemnification.  Section 1(a) of Article VIII states, in pertinent part:

> The corporation shall indemnify any director or officer of the corporation . . . who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that he is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director . . . against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the corporation[.][437]

---

[436] In the complaint, Kinsella sought indemnification pursuant to the Shareholders Agreement, the by-laws, and 8 *Del. C.* § 145.  Compl. ¶¶ 108–11.  At the pleadings stage, the court found that "[g]iven the current stage of this litigation, [Kinsella] actually seek[s] advancement rather than indemnification."  Dkt. 92 at 29:21–23.  Because the Shareholders Agreement does not provide for advancement, and because advancement is only permissive under the by-laws and Section 145, the court denied Kinsella's claim "for indemnification and advancement at this stage and grant[ed] defendants' motion to dismiss that count."  *Id.* at 31:6–8.  Kinsella seeks to revive his claim for indemnification pursuant to the Company's by-laws in his post-trial briefing.  The BSW Defendants did not raise any procedural objections in their post-trial briefing and presented substantive arguments.  Any procedural objections are therefore waived.  *Emerald P'rs*, 726 A.2d at 1224.  The court will consider Kinsella's claim for indemnification pursuant to the BSW by-laws at *this* stage of the proceedings.

[437] JX 2 Art. VIII § 1(a).

Article IX of the by-laws further provides that BSW "shall indemnify its officers and directors to the fullest extent permitted by the Delaware General Corporation Law."[438]

"General rules of contract interpretation apply when construing the provisions of a company's charter or bylaws." *Krauss v. 180 Life Scis. Corp.*, 2022 WL 665323, at *3 (Del. Ch. Mar. 7, 2022). "Words and phrases used in [] bylaw[s] are to be given their commonly accepted meaning 'unless the context clearly requires a different one or unless legal phrases having a special meaning are used.'" *Bernstein v. TractManager, Inc.*, 953 A.2d 1003, 1008 (Del. Ch. 2007) (quoting *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 343 (Del. 1983)).

BSW's by-laws mandate indemnification for current and former directors and officers.[439] Kinsella is entitled to indemnification if (1) he is or was a party to a

---

[438] *Id.* Art. IX § 7.

[439] The indemnification provision mirrors the statutory language in 8 *Del. C.* § 145(a) ("A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation[.]"). Pursuant to 8 *Del. C.* § 145(f), a corporation may provide for mandatory indemnification in its corporate charter or by-laws. 8 *Del. C.* § 145(f); *Hibbert*, 457 A.2d

---

146

threatened or pending action, suit, or proceeding by reason of the fact that he is or was a director of BSW; (2) he actually and reasonably incurred expenses in connection with such action, suit, or proceeding; and (3) he "acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the corporation."[440] Because BSW adopted a mandatory indemnification provision, BSW has the burden of proof to demonstrate why it should not be required to indemnify Kinsella. *VonFeldt v. Stifel Fin. Corp.*, 1999 WL 413393, at *3 (Del. Ch. June 11, 1999) ("By using the phrase 'shall indemnify,' the bylaw not only mandates indemnification; it also effectively places the burden on [BSW] to demonstrate that the indemnification mandated is not required."); *see* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.02[f] (2022) ("[T]he Court of Chancery has held that the adoption by a corporation of a mandatory indemnification provision will place the burden of proof in any ensuing litigation concerning its application upon the corporation to demonstrate why it should not be required to indemnify.").

---

at 344 (explaining that a corporation is permitted to "grant indemnification rights beyond those provided by [Section 145]").

[440] JX 2 Art. VIII § 1(a).

The parties dispute whether Kinsella acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of BSW.[441] Kinsella argues that he acted in good faith and in the best interests of the Company to obtain his corporate governance and information rights as a director, to protect the Company's corporate governance procedures, and to compel the BSW Defendants to abide by Delaware law and the Company's by-laws.[442] The BSW Defendants argue that Kinsella failed to act in good faith and in the best interests of BSW because he brought his claims to recover the value of his equity interests in GB-SP and to advance his personal interests.[443] According to the BSW Defendants, Kinsella

---

[441] The parties do not dispute that Kinsella is a "party" to this action "by reason of the fact that he is or was a director" of BSW, or that this action is a covered proceeding under the by-laws. At post-trial argument, the BSW Defendants argued that Kinsella is not entitled to indemnification because this proceeding "was styled as a derivative action" and, therefore, falls within the carveout in the indemnification by-law for "action[s] by or in the right of the corporation." Dkt. 265 at 81:23–82:10; *see* JX 2 Art. VIII § 1(a). The BSW Defendants did not address this argument in their post-trial briefing. "Issues not briefed are deemed waived." *Emerald P'rs*, 726 A.2d at 1224. Notwithstanding, the BSW Defendants' argument misses the mark. GB-SP, as a BSW stockholder, asserted derivative claims on behalf of the Company. Kinsella did not, nor could he, assert derivative claims on behalf of BSW as a director of the Company. *See Schoon v. Smith*, 953 A.2d 196, 210 (Del. 2008) (declining to extend the doctrine of equitable standing to allow corporate director, who was not a stockholder, to bring a derivative action on behalf of a corporation). Kinsella did assert that he was deprived of information as a director, and that the BSW Defendants violated the BSW by-laws. *See* Pls.' Post-Trial Opening Br. 52–53.

[442] Pl.'s Post-Trial Opening Br. 56; Pl.'s Post-Trial Reply Br. 31–32.

[443] BSW Defs.' Post-Trial Answering Br. 53–55.

brought his claims "because he was angry that he had been taken advantage of by the promoters of Sorrento," not because it was in the best interests of BSW.[444]

The court concludes that Kinsella acted in good faith and, at a minimum, in a manner he reasonably believed was not opposed to BSW's best interests. Kinsella sought to vindicate his rights as a director and to promote corporate policy interests of the Company.[445] BSW points to no credible evidence to the contrary. The record does not support BSW's contention that Kinsella's prior dispute with Sorrento has any relationship to the claims asserted by Kinsella in this case.

Kinsella's status as a plaintiff in this case does not change the result. The Supreme Court has held that a plaintiff may be entitled to indemnification in certain circumstances. *See Hibbert*, 457 A.2d at 343–44. In *Hibbert*, the Supreme Court held that a group of directors who initiated litigation against an adverse group of directors in connection with a proxy contest were entitled to indemnification because the language of the by-laws did not preclude indemnification for affirmatively filed actions. *Id.* at 343.[446] In doing so, the Supreme Court stated:

---

[444] *Id.* at 54.

[445] Tr. 21:24–22:5, 28:3–9 (Kinsella) (testifying that he made requests to BSW to be seated on the BSW board and to obtain his information rights as a director).

[446] The plaintiff directors voluntarily dismissed their cases in California prior to seeking indemnification in this court. *Hibbert*, 457 A.2d at 341. In interpreting the plain language of the company's indemnification by-law, the Supreme Court concluded that an "indemnitee's role or position in the litigation is not a prerequisite to indemnification; he must only be involved as 'a party or otherwise,'" and "'[p]arty,' as used [in the by-laws]

149

> Plaintiffs, through the California litigation, sought to compel the defendant directors to attend board meetings and to protect the independence of the board's internal auditing procedures. We can not say that such litigation was entirely initiated without regard to any duty the plaintiffs might have had as directors. In short, those lawsuits served, as we see it, to uphold the plaintiffs' "honesty and integrity as directors."

*Id.* at 344. In *Shearin v. E.F. Hutton Group, Inc.*, 652 A.2d 578 (Del. Ch. 1994), this court interpreted *Hibbert* as "recogniz[ing] that permissible indemnification claims will include those deriving from lawsuits brought by directors, officers, agents, etc., only insofar as the suit was brought as part of the employee's duties to the corporation and its shareholders." 652 A.2d at 594 (emphasis omitted). There, Chancellor Allen concluded that the plaintiff, a former officer of the company, was not entitled to indemnification because the litigation "involve[d] purely the assertion of plaintiff's personal rights (*i.e.*, defamation, breach of contract), and thus advance[d] no interest of, or duty to, [the company]." *Id.*[447]

The BSW Defendants rely on *Hibbert* and *Shearin* to argue that Kinsella did not bring his claims as part of his duties as a director to BSW and its stockholders.[448]

---

refers to either the plaintiff *or* the defendant in a lawsuit." *Id.* at 343 (internal quotation marks omitted).

[447] Because the plaintiff's claims were not "motivated by a fiduciary or other obligation to the corporation," and her "demand that the corporation bear her expenses [was] without merit," Chancellor Allen denied the plaintiff's motion for leave to amend her complaint to add a claim for indemnification. *Shearin*, 652 A.2d at 594–95.

[448] BSW Defs.' Post-Trial Answering Br. 55–57. The BSW Defendants also cite to this court's decisions in *Gentile v. SinglePoint Financial, Inc.*, 787 A.2d 102 (Del. Ch. 2001),

The court disagrees. Based on the record, the court cannot conclude that Kinsella's claims were "initiated without regard to any duty [Kinsella] might have had as [a] director[]" of BSW. *Hibbert*, 457 A.2d at 344. Therefore, the court finds that Kinsella is entitled to indemnification.[449]

## G. Domus's Counterclaim

Domus asserts a counterclaim contending that GB-SP's filing and maintaining of this action is a breach of the Pledge Agreement.[450] The Pledge Agreement is

---

*aff'd*, 786 A.2d 111 (Del. 2001), and *Baker v. Impact Holding, Inc.*, 2010 WL 2979050 (Del. Ch. July 30, 2010). These cases are distinguishable. In *Gentile*, this court concluded that the plaintiff, a former officer and director, was not entitled to advancement for affirmatively filing litigation against the company because the company's by-laws limited indemnification and advancement to proceedings in which the indemnitee is named as a defendant or a respondent. 787 A.2d at 110. Similarly, in *Baker*, this court concluded that the plaintiff, a former director, was not entitled to advancement because the company's certificate of incorporation "expressly limit[ed] the right of advancement to expenses incurred by a covered person 'in defending' a proceeding asserted against that person." 2010 WL 2979050, at *6; *id.* at *9 ("[T]he Advancement Provision requires advancement only for reasonable expenses actually incurred 'in defending' a proceeding and there is no evidence that [the company] intended to or did mandate advancement for affirmative claims."). BSW's indemnification by-law contains no such limitations.

[449] The parties also stipulated that "[u]nder the by-laws of BSW and applicable law, each of the directors of BSW (including Kinsella) is entitled to indemnification in respect of threatened and pending actions." Dkt. 47 ¶ 32. The amount of indemnification and the claims for which Kinsella must be indemnified must await further proceedings.

[450] Dkt. 89. At the pleadings stage, the Versa Defendants argued that GB-SP lacked standing to assert its claims because it had assigned its right to assert such claims to Credit Suisse under the Pledge Agreement. Dkt. 61 at 16–18; Dkt. 92 at 10:13–15. The court rejected that argument. Dkt. 92 at 12:2–10. The Versa Defendants have used their breach of contract counterclaim to reassert many of the same arguments. *Compare* Dkt. 61 at 16 ("GP-SP signed away its right to bring any claim by entering into the Pledge Agreement, pursuant to which GB-SP granted Domus, as successor in interest to Credit Suisse, the power of attorney to commence and prosecute any suit with respect to its shares of BSW

governed by New York law. [451] "To recover for a breach of contract, a party must establish the existence of a contract, the party's own performance under the contract, the other party's breach of its contractual obligations, and damages resulting from the breach." *Adirondack Classic Design, Inc. v. Farrell*, 122 N.Y.S.3d 790, 793 (N.Y. App. Div. 2020).

"Under New York law, as in Delaware, the construction and interpretation of an unambiguous written contract is an issue of law within the province of the court." *San Antonio Fire & Police Pension Fund v. Amylin Pharms., Inc.*, 983 A.2d 304, 313 (Del. Ch. 2009) (internal quotation marks omitted), *aff'd*, 981 A.2d 1173 (Del. 2009) (TABLE); *see Kotler v. Shipman Assocs., LLC*, 2019 WL 4025634, at *16 n.191 (Del. Ch. Aug. 21, 2019), *corrected* (Aug. 27, 2019) ("As to matters of contract formation and interpretation . . . Delaware and New York law are not in conflict," and this court will "look to both Delaware and New York law for basic principles."). The court is "required to adjudicate [the parties'] rights according to the unambiguous terms of the contract and therefore must give the words and phrases employed their plain meaning." *Laba v. Carey*, 277 N.E.2d 641, 644 (N.Y. 1971);

during the pendency of an Event of Default under the Credit Agreement"), *with* Versa Defs.' Post-Trial Answering Br. 51 ("GB-SP [] assigned away its right 'to commence and prosecute any and all suits' arising out of the Collateral—i.e., GB-SP's shares in the Company. GB-SP therefore breached the [Pledge] [A]greement by bringing this lawsuit[.]").

[451] JX 6 § 9.7.

152

*see Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) ("When interpreting a contract, this Court will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." (internal quotation marks omitted)).

Under the Pledge Agreement, GB-SP appointed Credit Suisse as its attorney in-fact, "with full authority . . . to take any action and to execute any instrument that [Credit Suisse] may deem reasonably necessary or advisable to accomplish the purposes of [the Pledge] Agreement."[452] This includes, upon an "Event of Default," for Credit Suisse "to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral" and "to settle, compromise, compound, adjust or defend any claims, actions, suits or proceedings relating to all or any of the Collateral."[453]

The parties do not dispute that the Pledge Agreement is a valid and enforceable contract, or that GB-SP became a party to the Pledge Agreement through execution of the Joinder Agreement.[454] Domus contends that, through the Pledge Agreement, GB-SP assigned away its rights to bring any suit "arising out of the

---

[452] *Id.* § 6.1(a).

[453] *Id.* §§ 6.1(a)(i)(C)–(D).

[454] JX 9.

153

Collateral."[455] "Collateral" is defined to include GB-SP's shares in BSW,[456] which Domus interprets to mean that the Pledge Agreement irrevocably assigns GB-SP's right to "enforce any rights in respect" of those shares, foreclosing GB-SP from bringing its claims in this action.[457]

This argument is unpersuasive because it is contrary to the plain language of the Pledge Agreement. First, the Pledge Agreement does not go so far as to assign claims "arising out of the Collateral." Rather, it only provides Domus, as successor-in-interest to Credit Suisse, the right to "enforce any rights in respect of any Collateral" and "to settle, compromise, compound, adjust or defend" any claims "relating to all or any of the Collateral."[458] Second, reading the plain language of this subsection in the context of the entire provision, Section 6.1 does not extend to derivative or direct suits which are unrelated to the purpose of the Pledge Agreement or to the features of GB-SP's stock as collateral.[459] Finally, although Section 6.1 allows Domus to bring and defend suits on GB-SP's behalf, it contains no language indicating that GB-SP acceded its independent authority to bring suits on its behalf,

[455] Versa Defs.' Post-Trial Answering Br. 51.

[456] *See* JX 6 §§ 1.3, 2.1.

[457] *Id.* § 6.1(a)(i)(C).

[458] *Id.* §§ 6.1(a)(i)(C)–(D).

[459] *Id.* § 6.1(a) (appointing Credit Suisse as "attorney-in-fact" to "*take any action* and to execute any instrument" that Credit Suisse "*may deem reasonably necessary or advisable to accomplish the purposes of this Agreement*" (emphasis added)).

as Domus contends. Rather, the language of Section 6.1 grants Domus the non-exclusive authority to bring suits on behalf of GB-SP in the "Event of Default." Therefore, the court concludes that GB-SP did not breach the Pledge Agreement by bringing its claims in this action.[460]

## III. CONCLUSION

GB-SP proved its direct claims that BSW and the Pre-Forbearance Directors breached the Shareholders Agreement. GB-SP did not, however, establish its entitlement to the full scope of damages it sought to remedy those breaches. For establishing breaches of the Shareholders Agreement, GB-SP is awarded nominal damages of $1, and judgment on Count V is entered in favor of GB-SP. GB-SP is also entitled to its reasonable attorneys' fees and expenses as the prevailing party under Section 7.6 of the Shareholders Agreement.

GB-SP did not overcome the law of the case with respect to its claim for tortious interference and, accordingly, Count VI remains barred. Nor did Plaintiffs

---

[460] In the complaint and the pre-trial order, Plaintiffs sought the appointment of a receiver on behalf of BSW. Compl. ¶¶ 103–07; PTO ¶ 72(M). Plaintiffs did not address the appointment of a receiver at trial or in their post-trial briefing. As such, the court deems this request for relief to have been abandoned. *Oxbow Carbon & Min. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 n.77 (Del. 2019) ("The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial."); *MHS Cap. LLC v. Goggin*, 2018 WL 2149718, at *16 (Del. Ch. May 10, 2018) (treating claims not briefed as abandoned).

155

establish a breach of the Company's bylaws, and judgment is entered in favor of the BSW Defendants on Count IV.

GB-SP proved, on behalf of the Company, that the Pre-Forbearance Directors were conflicted in approving the Forbearance Agreement, subjecting their conduct to entire fairness review. The Pre-Forbearance Directors did not carry their burden to prove the fairness of the Forbearance Agreement, and, therefore, the court finds that they breached their fiduciary duty of loyalty. As a remedy for their fiduciary breach, the Pre-Forbearance Directors must disgorge to BSW all amounts paid to them or their counsel under the Indemnity Agreement, and Curtis and Worker must disgorge to BSW the bonuses they received pursuant to the September 2013 MOU. To this extent, judgment on Count I is entered for GB-SP, on behalf of the Company. GB-SP also proved, on behalf of the Company, that the Versa Defendants aided and abetted that breach and, as a remedy, the Versa Defendants' BSW debt shall be equitably subordinated as to any amounts collected or received by or on behalf of BSW from the Pre-Forbearance Directors pursuant to this ruling, and GB-SP, on behalf of BSW, is entitled to judgment on Count III to the forgoing extent.

GB-SP proved, on behalf of the Company, that the Post-Forbearance Directors were conflicted in approving the Consensual Foreclosure, subjecting their conduct to entire fairness review. The Post-Forbearance Directors, however, carried their burden and proved that the Consensual Foreclosure was entirely fair to the

156

Company, and judgment on Count I is entered for the Post-Forbearance Directors with respect to the Consensual Foreclosure. Accordingly, GB-SP's claim on behalf of the Company that the Versa Defendants aided in such breach also fails, and judgment for Count III is entered in favor of the Versa Defendants as it relates to the Consensual Foreclosure.

Judgment is entered in favor of Kinsella with respect to Count VIII, but the amount of indemnification and the claims for which Kinsella must be indemnified must await further proceedings.

Judgment for Domus's counterclaim alleging breach of the Pledge Agreement is entered in favor of GB-SP. Plaintiffs have abandoned their request to appoint a receiver on behalf of BSW.

The parties shall confer and submit an implementing order to the court within ten days of this opinion.